IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES AVIATION UNDERWRITERS, INC., a New York corporation; and ERA HELICOPTERS, LLC., a Delaware limited liability company[1], <br><br> Plaintiffs, <br><br> vs. <br><br> UNC AIRWORK CORPORATION a/k/a DAI Airwork Corporation, a Delaware corporation; DALLAS AIRMOTIVE, INC. d/b/a UNC Airwork Corporation and DAI Airwork Corporation, a Delaware corporation; PRATT & WHITNEY CANADA, INC., a Canadian corporation; and DOES 1 through 500, Inclusive, <br><br> Defendants. | Case No. A02-0131 CV (JKS) <br><br><br> O R D E R |

**INTRODUCTION**

This is a tort action for strict liability and negligence arising from the crash of a

helicopter owned by Era Aviation, Inc. ("Era"). Initially, United States Aviation Underwriters,

Inc. ("Aviation Underwriters") and Era sought compensation for the loss of Era's helicopter

---

[1]Era Helicopters, LLC, has been substituted for Era Aviation, Inc., as the real party in interest in this case, in accordance with this Court's Order at Docket No. 392. *See also* Docket No. 393.

from Defendants UNC Airwork Corporation/Dallas Airmotive, Inc. (collectively "DAI")[2] and

Pratt & Whitney Canada, Inc. ("PWC") for defective manufacturing, and from DAI for negligent

repair and maintenance.  *See* Docket No. 1.  A separate lawsuit was filed in federal court in

Florida, in which damages for personal injuries were sought.  That case has settled.  Aviation

Underwriters settled its action with the Defendants.  All that remains is Era's claim for damages,

to which Aviation Underwriters was not subrogated, *i.e.*, losses that were not covered by Era's

insurance with Aviation Underwriters.

        Extensive motion practice has established that this case may ultimately turn on the jury's

appraisal of the contending parties' expert witnesses.  Consequently, each party challenged each

of its opponents expert witnesses hoping to exclude their testimony.  Faced with a virtual flood

pleadings, the Court considered its obligations under *Daubert v. Merrell Dow Pharms. Inc*., 509

U.S. 579 (1993), as interpreted in *Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053

(9th Cir. 2002).  These cases require the trial court to screen challenges to expert testimony but

allow the trial court broad discretion to determine how that screening should be accomplished.

The Court evaluated two alternatives.  First, the Court could have held an omnibus mini-trial

where all of the challenged experts could testify subject to cross-examination and rebuttal, and

after hearing all of the relevant evidence the Court could apply *Daubert* and *Mukhtar* and either

disqualify an expert witness or sanitize that witnesses' testimony for subsequent trial.  The Court

rejected this alternative, in part because it would require two trials of the case, and in part

because, given the parties' trial strategy, it was not clear that such a procedure would assure that

---

        [2] DAI acquired UNC in 1998, the two companies have merged and, as a result, UNC no
longer exists.  *See* Docket No. 19, Ex. B (Aff. of Gary Ticker) at 2.  The Court will therefore
make all references to DAI and will not differentiate between the two companies.

the Court would have ruled on all of the expert testimony a party might seek to offer at the subsequent trial. Consequently, the Court chose a second alternative to assure that each party was confined to specific expert testimony evaluated under the *Daubert* standards: Each party would be required to prepare its direct examination for trial in written question and answer format and serve that testimony on its opponents; failure to timely submit written direct examination of a proposed expert witness would be treated as a waiver or forfeiture of the right to call that witness; each opponent would then interpose in writing any objection it had to that testimony, including *Daubert* objections, and the proponent would reply. To the extent that a party relied on its own expert's testimony to disqualify an opponent's testimony, that testimony would be presented in support of the objections by reference to depositions, affidavits, and discovery materials in the file. The Court would then rule. This protocol is set out in this Court's Order at Docket No. 332. The parties have complied with the Order at Docket No. 332 and the Court is now prepared to rule.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 13, 2000, a helicopter owned by Era encountered mechanical difficulties, resulting in a crash that killed the pilot and destroyed the helicopter. Docket No. 53 (Decl. of Mark B. Jones) at 30.[3] The crash occurred in Nevada while the helicopter was performing fire suppression work for the federal government. *Id*. at 32. To aid in its mission, the helicopter was equipped with a water bucket which the parties refer to as a "Bambi bucket." It appears that there is a hook on the underside of the helicopter to which the bucket is attached by long cables. On the day of the accident the helicopters were being operated in teams of two. They would fly

---

[3] As previously indicated, the personal injury case has settled.

to a dip pond, fill their buckets, and then proceed to the site of the fire and empty the buckets and then return to the dip pond to start the process again.

The parties sharply disagree on the cause of the crash.

According to Era, the probable cause of the crash was a "metallurgical failure of an engine component known as a compressor turbine disk" ("CT disk"). *Id*. at 33. Era postulates that this failure caused one of the helicopter's engines to lose power during flight, which resulted in the subsequent crash. *Id*. at 30.

In contrast, Defendants attribute the crash to pilot error. Defendants argue that engine failure resulted from excess temperatures, which were caused by negligent flight maneuvers, weight, and external temperatures on the day of the crash. *See* Docket Nos. 343 (Direct Examination of Dr. Charles Manning); 342 (Direct Examination of Ian Cheyne); 346 (Direct Examination of Vernon Albert).

While Era did not purchase the helicopter from any of the Defendants, Docket No 53 at 30, the engine that lost power ("engine CP-PS62224"), which, according to Era, led to the crash, was manufactured by Pratt & Whitney. *Id*. at 32. The CT disk was purchased from DAI and was not originally a component of engine CP-PS62224 or the helicopter. *Id*. at 34–35. DAI installed the CT disk on engine CP-PS62224 at DAI's Florida facility during an engine overhaul in 1996. *Id*. at 35. Engine CP-PS62224 was then installed, apparently by Era in Louisiana, in a different helicopter from the helicopter that crashed. *Id*.

In 1997, engine CP-PS62224 was again shipped back to DAI in Florida for repairs. *Id*. After DAI finished the repair work in 1998, which included work on the blades within the CT disk, engine CP-PS62224 was shipped back to Era's facility in Louisiana. *Id*. at 36. Engine CP-PS62224 was then installed on the helicopter that would later crash in Nevada. *Id*.

After the crash, Era initiated a suit against Defendants.[4]  Docket No. 1.  This Court has

jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are diverse and the amount in

controversy exceeds $75,000.  *See* Docket No. 1 at 1.

### DISCUSSION

In order to resolve the pending matters the Court must evaluate the challenged testimony

in light of the standards adopted by the United States Supreme Court in the trilogy of cases

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *General Elec. Co. v. Joiner,* 522

U.S. 136 (1997); and, *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999).[5]  Federal Rule of

Evidence 702 provides that an expert may testify "in the form of an opinion or otherwise" if his

or her "specialized knowledge will assist the trier of fact to understand the evidence or determine

a fact in issue."

In *Daubert,* the Supreme Court, in addressing admissibility of "scientific expert

evidence," held that FRE 702 imposes a "gatekeeping" obligation on the trial judge to "ensure

that any and all scientific testimony . . . is not only relevant, but reliable."  509 U.S. at 589.

While holding that the trial court has substantial discretion in discharging its gatekeeping

obligation, the *Daubert* Court suggested a number of factors that lower courts might consider,

for instance: 1) whether a theory or technique can be tested; 2) whether it has been subjected to

peer review and publication; 3) the known or potential error rate of the theory or technique; and

---

[4] Aviation Underwriters has indemnified Era for a portion of the damages to the
helicopter.  Docket No. 1 at 7.  Aviation Underwriters, therefore, became subrogated to Era's
rights up to the amount of the payment  *Id*.  Subsequently, Aviation Underwriters settled with
defendants.  The only remaining claims are Era's claims not reimbursed by Aviation
Underwriters.  In the meantime, Era has transferred its claims to Era Helicopters, LLC.

[5] This well-known trilogy of cases will be referred to as named without full citation.

4) whether the theory or technique enjoys general acceptance within the relevant scientific community. *Id.* At 592-94.

In *Kumho Tire*, the Court clarified that the gatekeeping function is not limited to "scientific" expert testimony, but applies to all expert testimony, ruling that the district court did not abuse its discretion in excluding the testimony of a tire failure analyst on the grounds that the expert's methodology was unreliable. 526 U.S. at 147-50. The Court stated that "it would prove difficult, if not impossible, for judges to administer evidentiary rules under which a gatekeeping obligation depended upon a distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge." *Id.* at 148. "There is no clear line that divides the one from the others," the *Kumho* Court said, observing:

> Disciplines such as engineering rest upon scientific knowledge. Pure scientific theory itself may depend for its development upon observation and properly engineered machinery. And conceptual efforts to distinguish the two are unlikely to produce clear legal lines capable of application in particular cases.

*Id.*

The Ninth Circuit has cautioned, however, that *Daubert-Kumho* do not establish a uniform protocol for evaluating all expert witnesses. *See United States v. Hankey,* 203 F.3d 1160, 1168-69 (9th Cir. 2000). The court emphasized that judges are not to mechanically apply the *Daubert* factors, but rather to exercise a broad discretion when exercising their gatekeeping function. *Id.* at 1168, quoting *Kumho* at 147–48. It stressed that the court's broad discretion extends beyond determining *whether* to admit expert testimony to deciding *how* to test an expert's reliability. *Id.*, quoting *Kumho* at 151–52. Further, the court reasoned that the extent to which the specific *Daubert* factors would apply would depend upon 1) the nature of the issue at hand, 2) the witnesses' particular expertise, and, 3) the subject of the testimony. It is a fact-

specific inquiry. *Id.* at 1168, quoting *Skidmore v. Precision Printing and Packaging, Inc.*, 188

F.3d 606, 618 (5th Cir. 1999). Focusing on the admissibility of expert testimony based upon

some "other specialized knowledge," as opposed to expert testimony based upon pure science,

FRE 702 generally should be applied liberally. *Id.* at 1168.

      Finally, the Ninth Circuit summed up its view as follows:

[A]dmissibility of expert opinion testimony generally turns on the following
preliminary question of law determinations by the trial judge under FRE 104(a).
.      Whether the opinion is based upon scientific, technical, or other specialized
        knowledge;
.      Whether the expert's opinion would assist the trier of fact in understanding the
        evidence or determining a fact in issue;
.      Whether the expert has appropriate qualifications-i.e., some knowledge, skill,
        experience, training or education on that subject matter. FRE 702; (citation
        omitted).
.      Whether the testimony is relevant and reliable. (Citation omitted).
.      Whether the methodology or technique the expert uses "fits" the conclusions
        (the expert's credibility is for the jury). *See Joiner*, 118 S.Ct. at 522**.**
.      Whether its probative value of the testimony is substantially outweighed by the
        risk of unfair prejudice, confusion of issues, or undue consumption of time.
        FRE 403; (citation omitted).

*Id.*

      To summarize the holdings of the relevant cases: A trial judge performing the

gatekeeping function should apply a sliding scale to the challenged testimony**;** where the

testimony rests on pure science the *Daubert* factors should be applied fairly strictly; where the

expert rests his testimony on scientific research the court must consider the research and

determine if it is at least debatable that the research supports the conclusions; where, however, as

in *Hankey* the expert relies upon his personal knowledge and experience derived from years in

the field, other tests must be developed and these tests should be liberally applied; in the long

run, the parties must rely upon their ability to test the factual basis for an expert's opinion

through cross-examination and the opportunity to introduce contradictory and impeaching

evidence.  *Cf.* FRE 705 (within trial court's discretion whether expert must testify to the

underlying facts or data before giving opinion and supporting reasons; opponents will in any

event be free to cross-examine about underlying facts or data).  Further, in appropriate cases the

court can give the jury detailed instructions pointing out problems that the jury should consider.

At all times, the court must be sensitive to the Seventh Amendment right to jury trial in civil

cases.

We may now proceed to an evaluation of the challenged expert testimony.  Ten witnesses

have been submitted as experts.  Only those experts will be permitted to testify.

**Plaintiff's Submitted Expert Witnesses**:

Plaintiff has submitted the witness testimony, in written form, of the proposed experts

Larew, Scanlon, Stimpson, Cox, and Rupert.

Richard "Lash" Larew

Mr. Larew's direct testimony is presented at Docket No. 344.  DAI's objections are

contained at Docket No. 352, and PWC joins in those objections.  Docket No. 361.  PWC makes

its own general and specific objections to the proffered testimony at Docket No. 359.  ERA

submits its replies at Docket Nos. 364 (to PWC) and 367 (to DAI).

Mr. Larew is the former executive vice president of Era Aviation, Inc., a position he held

for almost fifteen years, and he is being offered as an expert regarding Era's damages.  Larew is

a former military helicopter pilot.  He has done pilot training in the past, but in recent years has

been responsible for the company's helicopter related duties nationwide.  His work includes

forecasting business revenues, preparing and analyzing capital budgets, bidding contracts and

purchasing equipment and helicopters.

Plaintiff offers three sets of testimony through Larew.  First, he testified to the value of

the helicopter at the time of its loss, which he states was $2,100,000. He basis this valuation primarily upon what he describes as comparable sales of similar aircraft during the time period in which the subject helicopter was lost. He also referred to the "blue book" for helicopters and took into account the helicopter's equipment, its age, its time in service and its general overall condition. He identifies the test for fair market value at what a fully informed seller would accept and a fully informed buyer would pay in a normal market. Second, he testified to damages for loss of use of the helicopter during the period of time necessary to replace it. He said that it took nine months to replace the helicopter and claims $814,927.37 for that loss. He bases this figure on an average of the earnings of 12 other helicopters owned and operated by Era during this period of time. Finally, he testified to $25,086.62 in expenses that were incurred as a result of the crash.

The Defendants, DAI, have made a *Daubert* objection that Larew's calculations are based on conjecture, based on methodology not accepted in the community of accounting experts, and, as novel and untested theories, are generally impermissible under *Daubert/Kumho Tire*. In addition, Defendants have made a number of other evidentiary objections.[6] It is difficult to understand the objections to methodology. Comparable sales provide circumstantial evidence of the value of both real and personal property. Plaintiff has demonstrated that Larew's calculations regarding lost income were made based on standards set forth under Alaska law.

---

[6] Generally, evidentiary objections fall into two broad categories. The first invokes a rule of evidence allegedly violated, *e.g.*, the hearsay rule. The second invokes the trial court's discretion in evaluating the form that a question may take, *e.g.,* the question is leading or argumentative. *See e.g.,* Edwin A. Heafey, Jr., California Trial Objections (California Practice Handbook No. 38. California Continuing Education of the Bar) *passim* (1967). Both kinds of objections are present in this case and will be dealt with, to the extent possible, in this Order.

*See State v. Stanley*, 506 P.2d 1284, 1293 (Alaska 1973).[7]  Docket No. 367, Appendix 3.

Considering the existing record, the Court is satisfied that Larew's proposed testimony complies

with *Daubert, Kuhmo*, and *Stanley*.

The Court is aware that most of the objections to this witness are that his testimony as

proffered goes beyond the scope of his 30(b)(6) deposition.  The parties debate whether Larew's

prior report was a true discovery deposition or was simply provided in aid of mediation.  It does

not matter.  The protocol utilized by the Court assures that all parties will have advance notice of

each expert witnesses' full direct testimony well in advance of trial and can therefore prepare

cross-examination and, if necessary, locate expert testimony to contradict misleading testimony

of an opponent.  The Court will therefore overrule all objections to Larew's testimony including

those based upon violation of the discovery rules.[8]

Finally, Plaintiff cites *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 369

(9th Cir. 1947) for the proposition that the owner of personal property can testify to its market

value without any special training as an appraiser.  In *Universal Pictures*, the corporation parties

could work only through their agents.  It appears that the President of Harold Lloyd Corporation,

Harold Lloyd, as the owner of the party corporation was allowed to testify to the company's

value.  *Id.*  This is the way Plaintiff wishes to use the case—to qualify Larew to testify to value

---

[7]  Alaska law allows tort victims to recover pre-judgment interest for economic losses. The Alaska courts have cautioned that judges must be careful in instructing juries where property is destroyed to adjust pre-judgment interest to begin only upon the completion of any period for which loss of use damages are allowed to avoid a double recovery.  The jury will be properly instructed in this case.

[8]  The purpose of Rule 26 is to avoid surprises at trial.  Here, the very exercise of submitting testimony and objections in writing eliminates the danger of surprise, as contemplated by Rule 26.  The Court will overrule Rule 26 objections to every witness.

as an "owner." Neither party cites any cases regarding the application of this rule to situations arising after the adoption of the Federal Rules of Evidence. Cases from other circuits find no difficulty in applying the rule allowing an owner to testify in cases arising after the adoption of the Federal Rules of Evidence. *See, e.g., LaCombe v. A-T-O, Inc*., 679 F.2d 431 (5th Cir. 1982) (post-Rules adoption case). It is interesting that the cases treat an owner's testimony regarding the value of his property as expert testimony so that the owner can justify his estimate by reference to hearsay that an appraiser would rely upon. *Id.*.at 434 n. 4 (citing advisory committee note to FRE 702), *and United States v. Laughlin*, 804 F.2d 1336, 1341-42 (5th Cir. 1986). In the absence of contrary authority in this circuit, the Court will assume that the rule survives.

The Court agrees with Plaintiff that Larew, as a proxy for the owner, may testify, subject to cross-examination, to the value of the destroyed helicopter.

Lawrence A. Scanlon, Ph.D

ERA offers the direct testimony of Lawrence A. Scanlon, Ph.D. at Docket No. 345, Exhibit A. DAI's objections are at Docket No. 353 and joined by PWC at Docket No. 362. ERA replies at Docket No. 366.

Dr. Scanlon is being offered as an expert in the field of human factors engineering. Human factors engineering appears to be a sub-speciality that combines a knowledge of engineering with a knowledge of psychology in order to consider how men and women use machinery and particularly how people tasked with operating machinery cope with emergencies.

Scanlon taught at UCLA and operated his own private company. He also worked for Raytheon, formerly Hughes Aircraft, for 35 years as head of Human Factors Research. He has the requisite background in both engineering and psychology to assist the jury in evaluating how

a helicopter pilot would react in an emergency.  His testimony in this case, based upon the information he has reviewed, is that the pilot appears to have properly balanced safety concerns and the firefighting mission of the helicopter, that the pilot appears to have exercised good decision making and piloting skills when faced with the sequential loss of the two engines and finally, that the initial cause of the crash was the failure of first engine followed by the failure of the second engine.

Defendants make strenuous *Daubert* objections.  They argue that if an expert does not conduct his or her own research independent of the litigation regarding his or her testimony, the trial court must determine whether there exists any "objective verifiable evidence that the testimony is based on scientifically valid principles."  *Domingo v. T.K.,M.D.*, 289 F.3d 600, 605 (9th Cir. 2002), citing *Daubert*, 43 F.3d 1311, 1317–18 (9th Cir. 1995).  Defendants argue that Dr. Scanlon has done no research independent of this litigation with respect to human factors relating to external loads on helicopters, that he has relied too much on the findings of others, and that he points to no specific support for his piloting theories in this case.  See Docket No. 353 at 3.  *Domingo* and *Daubert* advise that experts may validate their theories by explaining "precisely how [the experts] went about reaching their conclusions and point[ing] to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 605-606, citing *Daubert,* 43 F.3d 1311, 1319 (9th Cir. 1995).

Dr. Scanlon presents a closer question under *Daubert*.  He relies upon helicopter manuals, his background as a teacher and researcher in Human Factors, and information he gleaned from eye witnesses.  While Scanlon's justifications could have been more clearly

elaborated, it appears that he passes muster under *Daubert*. *See Using the Human Factors Expert in Civil Litigation*, 40 Am. Jur. *Trials* § 629 (2006) (human factors considered a fully developed scientific discipline). Defendants' objections go more to the weight to be assigned Scanlon's testimony than to the methodology he utilizes. While much of his testimony is dependent on the jury accepting the testimony of Plaintiff's other experts regarding the emergency faced by the pilot when, as Plaintiff hopes to prove, the engines failed, jury instructions can focus the jury's attention on the relationship between each witnesses testimony and the effect of a juror's failure to believe one expert witness on the juror's evaluation of other expert witnesses whose testimony depends upon the disbelieved witness. Essentially, Defendants must rely upon their own evidence and their cross examination of Plaintiff's witnesses to bring out these connections and dependencies.

Dr. Scanlon is permitted to offer expert testimony in the area of human factors.

Douglas Stimpson

The direct testimony of Douglas Stimpson is presented at Docket No. 345, Appendix B. DIA makes its objections at Docket No. 351, in which PWC joins at Docket No. 363. Plaintiff's reply at Docket No. 365.

Stimpson is offered as an expert in the fields of piloting, aircraft maintenance, and aviation accident investigation. Stimpson has been involved in aviation for 35 years, initially in the Air Force and later in industry. He is an airplane and helicopter pilot and mechanic, and has worked as an aircraft accident investigator. Stimpson's conclusions are outlined below.

Both engines on the twin engine helicopter stopped providing power to the main rotor blades before the crash. As a result, there was nothing this pilot could have reasonably done to avoid this crash. The actions he did take, like turning the helicopter to the left to fly over

descending terrain, were proper, but the pilot could not avoid the crash.

Second, referring a chart made by Stimpson, the left engine failed because of the catastrophic failure of a component part known as the CT disk. Two years before the crash, the same disk had been rejected and "red tagged" by UNC Airwork because of damage. The Court has previously granted a motion in limine brought by DAI to exclude evidence that the CT disk had a blemish and was "red tagged." *See* Docket Nos. 242 (Motion); *and* 333 (Order). The Court stated that "Era's positional risk theory is not sufficient to permit an inference of proximate cause." Docket No. 333 at 3. However, that Order was overturned, in part, on reconsideration. Docket No. 376. Evidence of the red tag goes to weight, not admissibility. *Id*. at 4. Thus, all objections to direct testimony based on the red tag issue will be overruled.

Third, the right engine stopped providing power to the main rotor blades when the right intermediate drive shaft fractured. And fourth, an in-flight loss of useable power from both engines on a twin-engine helicopter is an extremely rare event, and such a failure would not be expected by the pilot.

The Court has carefully considered the reasons Stimpson gives for his conclusions. The Court is satisfied that Stimpson's expertise lies primarily in experience, not in "science," and the Court is convinced that Stimpson's experience would be helpful to the jury. The Court has considered each of the Defendants specific objections to Stimpson's testimony and concludes that these objections go to the weight and not the admissibility of the testimony. Whether the deposition testimony of the other witnesses upon which Stimpson relies bear him out should be explored on cross-examination.

 Defendants object that Stimpson's analysis is unreliable and, therefore, inadmissible under *Daubert*. They refer to Stimpson's analysis as "junk science." Docket No. 351, page 6.

Plaintiff responds at Docket 365, Appendix 2.  Defendants take issue with Mr. Stimpson's use of simulated flights that did not accurately replicate the accident flight.  Plaintiff responds that the fact that the flight simulator did not exactly "re-create" the crash sequence goes to the weight, not the admissibility, of Mr. Stimpson's opinions.  If Defendants' primary objection is trustworthiness, that can be dealt with on cross-examination.  Otherwise, use of a flight simulator in litigation involving an aircraft accident is a reasonable source of information for experts who may be called to testify.  Particularly where, as here, Plaintiffs do not appear to be asking to admit a video or computer-generated graphic of the simulated flight as demonstrative evidence, the Court sees no reason to prevent Stipmson from referring to his use of the exercise to gather information.  *E.g., Walker v. Fairchild Indus., Inc.*, 554 F.Supp. 650 (D. Nevada, 1982) (finding simulators widely used to recreate flight conditions, information gleaned is relevant, and defendants may avoid undue prejudice by stressing differences between simulator and real conditions).

Mr. Stimpson shall be permitted to testify as an expert in the fields of piloting, aircraft maintenance, and aviation accident investigation.

Douglas O. Cox, Ph.D.

The direct testimony of Donald O. Cox, Ph.D., is presented at Docket No. 345, Appendix C.  Objections by DAI are contained at Docket No. 350, in which PWC join at Docket No. 360. Plaintiff replies at Docket No. 368.

Dr. Cox is a mechanical engineer specializing in metals.  He holds three college degrees from UCLA, including a Ph.D. in metallurgy.  He states that he has used his education to analyze how and why machines fail for more than 30 years.  Dr. Cox is offered as an expert in the field of metallurgical and mechanical engineering.  His testimony will present his opinions that the

CT disk in the helicopter's left engine fractured due to sulphidation (corrosion) in the fir trees, and that the sprag clutch on the right side malfunctioned when the left engine failed. His testimony regarding the CT disk mentions the red tag it was given in 1998. *See* Docket No. 376, and discussed above.

Defendants primarily argue that Cox's direct testimony expands on prior testimony and a report he furnished pursuant to FRCP 26. The Court has considered this objection and concludes that the protocol chosen by the Court, which assures each party substantial advance notice of any direct testimony the experts will give, cures any discovery problems. *See* note 8, *supra*. Defendants are now in a position to prepare cross-examination and marshal conflicting evidence.

Dr. Cox shall be permitted to testify as an expert in his field.

<u>David Rupert</u>

Finally, Plaintiff has offered the direct testimony, in written form, of David Rupert at Docket No. 345, Appendix C. DAI's objections are noted at Docket No. 350. PWC joins in the objections at Docket No. 360. Plaintiff replies at Docket No. 368.

Rupert is a mechanical engineering technologist and is being offered as an expert in the fields of mechanical engineering, metallurgy, and aircraft engines and drive trains. Rupert received a diploma in Mechanical Engineering Technology from Algonquin College in Ottawa, Ontario, Canada. He spent 13 years working for the Canadian government investigating aircraft accidents. After leaving government employment in 1984, he joined a private company, R.J. Waldron & Company, essentially doing the same things: accident investigations and failure analysis. His education is ongoing, in the form of courses, seminars, and on-the-job training.

Rupert's testimony is that sulphur contamination from 1996 and hot corrosion caused by a static fire in 1997 created a defective CT disk, which led to engine failure and, ultimately, the

crash of the helicopter.

The Defendants object that Rupert's testimony is speculative and conjectural and not admissible by *Daubert* standards. Docket No. 349 at 7–8; 39. Also, numerous Rule 26 objections are made. *Id.* at 14, 16, 18, 19, 20, 40, 41, 42, 43, 44, 48. Three hearsay objections are made, *id.* at 26, 36, 41, one foundational objection, *id.* at 32, and one leading objection, *id.* at 40. Finally, Defendants object to any mention of the red tagged CT disk. *Id.* at 44–49.

The Court has considered the above objections to Rupert's testimony. As a matter of gatekeeping, the Court finds Rupert's conclusions relevant and his methodology sound and, thus, his testimony admissible under the *Daubert* trilogy. In addition, the objections based on Rule 26 are overruled, as above. The hearsay objections are to a report and two charts prepared by Rupert. Plaintiff maintains that the report was created pre-litigation and is not being offered for its truth, but rather, to show that Rupert's opinions were formed independently and objectively, thereby bolstering it against any attacks that may be made on his trustworthiness. Plaintiff suggests that a limiting instruction telling the jury not to consider the report for its content could be made. The Court will grant an order in limine precluding reference to the report since it would be cumulative of the witness's oral testimony. Should Defendants argue in the presence of the jury that Rupert's testimony is a recent fabrication, the Court will reconsider the ruling. As to the charts, Plaintiff contends that it is not seeking to admit them into evidence, but to merely use them as demonstrative aids, and they may be used as such without violating the rule against hearsay. The foundation objection is frivolous and will be overruled. It can be cured simply by rephrasing the question, "Mr. Rupert, what kind of engine was on Era's helicopter when it crashed?" The same goes for the leading objection, which can be rephrased as Plaintiffs suggest. *See* Docket No. 369 at 15. It, too, is overruled. As far as the series of Red Tag

objections, they too, are overruled.  *See* Docket No. 376 (red tag evidence goes to weight, not admissibility; however, evidence of "grooving" is inadmissible).

The proffered expert testimony of David Rupert is admissible.

**Pratt & Whitney Canada's Submitted Expert Witnesses**:

Defendant PWC has submitted the witness testimony, in written form, of the proposed experts Morin and Albert.

<u>Charles R. Morin</u>

The direct written testimony presented by Defendant Pratt & Whitney of Charles Morin is contained at Docket No. 347.  Plaintiff's objections are at Docket No. 358.  PWC replies at Docket No. 375.

Mr. Morin is being offered as an expert in metallurgical engineering and aviation failure analysis.  Mr. Morin holds a two-year degree in metallurgical engineering technology, as well as both a Bachelor's and Master's degree in metallurgical engineering from Ohio State University. He has taught courses and seminars on failure analysis.  He wrote a course book on the subject this is used by the FAA and NTSB.  He is widely recognized in the field.  Morin testifies regarding the accident sequence.  He also offers his opinion that the second engine was still working at the time of the crash.  He offers extensive technical testimony about the helicopter's mechanics, particularly the sprag clutch, intermediate drive shaft, and chip detectors.

Era makes several categorical objections to Morin's testimony.  First, that Morin is not qualified to give testimony regarding accident reconstruction testimony or weight of the helicopter because those are not his areas of expertise.  Next, that Morin's accident sequence testimony is duplicative of that of another defense expert, Dr. Orloff.  Also, Rule 26 objections are made.  Finally, that Morin's purported knowledge about the helicopter being overloaded at

the time of the accident comes from information obtained in an Office of Aircraft Services PowerPoint presentation, which this Court deemed inadmissable at Docket No. 196; thus, the objection is that the testimony violates FRE 703.

First, as a threshold matter, Morin is qualified to be admitted as an expert under *Daubert*: his testimony is relevant and his methodology sound. Next, Plaintiff's Rule 26 objections are overruled for the reasons stated above to Defendants' Rule 26 objections. Regarding Morin's lack of qualifications regarding helicopter weight and use of Orloff's sequence testimony, it appears that he has engaged in permissible fact gathering under Rule 703. *See, e.g., Daubert* at 592 ("Unlike an ordinary witness . . . an expert witness is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observations"); *and In re Air Disaster at Lockerbie, Scotland*, 37 F.3d 804, 826 (2d. Cir. 1994) (trial court did not err in permitting expert witnesses to base their opinion testimony on facts obtained from summaries of trial testimony of other witnesses).

The question of whether his use of the OAS presentation violates Rule 703 is a closer question. The Court has already granted a motion in limine to exclude the OAS presentation. Docket No. 196. FRE 703 permits reliance on inadmissible evidence, though, if it is the type of evidence reasonably relied upon by experts in the field. Trial courts are charged with making such determinations on a case-by-case basis. *See, e.g., Soden v. Freightliner Corp.*, 714 F.2d 498, 502–505 (5th Cir. 1983) (trial courts should examine reasonableness of proposed expert witness's reliance on sources of inadmissible evidence on case-by-case basis). Morin is being presented as an expert in failure analysis. The Court finds that his reliance on a report prepared by the OAS is reasonable. Particularly given the circumstances presented here, that the challenge is being made to Morin's use of the inadmissible OAS presentation to provide

information regarding the weight of the helicopter.  Weight of the helicopter is empirical

information of the sort that can be independently verified.  If Morin has based his testimony on

an erroneous base calculation of the helicopter's weight, the erroneous calculation would

certainly be subject to cross-examination.

Mr. Morin is permitted to testify as an expert in metallurgical engineering and aviation

failure analysis.

Vernon Albert

The testimony of Vernon Albert is contained in Docket No. 346.  No objections have

been presented, although Plaintiff reserves the right to bring them if Mr. Albert testimony

changes.  Docket No. 354.

Mr. Albert describes himself as a professional aviation consultant.  He is a military-

trained pilot and flight instructor, and had nearly 30 years experience flying helicopters with

Petroleum Helicopters in Lafayette, Louisiana, before starting his own consulting company.  Mr.

Albert has had experience piloting helicopters with vertically suspended loads.  His opinions as a

pilot and a flight instructor are:  the helicopter in question was overloaded; the pilot should have

jettisoned the load (Bambi bucket full of water) to improve maneuverability; the second engine

did not fail in flight; and, the chip detection system was inoperative due to the circuit having

been pulled on the master warning system panel.

Mr. Albert is permitted to testify as an expert in helicopter piloting.

**Dallas Airmotive's Submitted Expert Witnesses**:

Defendant DAI has submitted the witness testimony, in written form, of the proposed

experts Manning, Orloff, and Cheyne.

Dr. Charles Manning

DAI presents Dr. Charles Manning's written testimony at Docket No. 343. Objections are at Docket No. 356, and the reply at Docket No. 374.

Dr. Manning served in the Air Force as an aircraft crew chief and flight chief. He has a Bachelor of Science degree from Florida State University, a Masters from Virginia Polytechnic Institute in metallurgical engineering; a certificate in fracture mechanics from Lehigh University; a Doctorate in materials engineering with a minor in mechanical engineering from North Carolina State University; and, a certificate on cardiovascular pathophysiology for engineers from Massachusetts Institute of Technology. He has investigated over 200 aircraft accidents. The thrust of Dr. Manning's testimony is that the engine on the helicopter at issue was operated outside the permissible scope, as intended by its manufacturer Pratt & Whitney. Manning believes the engine was operated at excessive temperatures due to the high altitudes, excess loads, and high temperatures in the area of operation.

The Court has already deemed Dr. Manning's testimony inadmissible under *Daubert*. Docket No. 196. The Court's ruling on June 14, 2004 was that Manning's testimony "as currently supported" was inadmissible, but stated that the ruling was "without prejudice to a future showing from the Defendants that his methodology and opinions are generally accepted under the standards established by *Daubert*." *Id*. at 12. Since that time, DAI attests that it has submitted much data to support a direct connection between excess temperature and creep. Docket No. 374, page 3 (referring to Docket No. 252). In addition, ERA has had an opportunity to depose Dr. Manning on his opinions in a second deposition. Docket No. 374. DAI has sufficiently corrected any deficiencies preventing admissibility of Dr. Manning's testimony, under *Daubert.*

Era makes copious other objections to Manning's proffered testimony.  *See* Docket No.
356, Appendices 1–16.  The objections based on FRE 402 and 403 for lack of relevance are
overruled.  So too, the objections based on non-responsiveness, using facts not in evidence in a
hypothetical, and lack of qualifications are overruled, and the Court accepts the representations
of DAI that it will modify some of its questions.  *See* Docket No. 374 at 12.  The bulk of the
remaining objections relate to Manning's use of the OAS presentation and NTSB factual report.
The Court has already addressed this issue in some detail.  *See* Docket No. 196.  The Ninth
Circuit has literally interpreted 49 U.S.C. § 1154(b), and excludes from evidence the entire
report of the NTSB.  *See Benna v. Reeder Flying Service, Inc.*, 578 F.2d 269 (9th Cir. 1978),
*accord Chiron Corp. v. NTSB*, 198 F.3d 935 (D.C. Cir. 1999).  Other courts distinguish between
conclusions and opinions in the reports and mere factual matter and allow into evidence the
factual matter.  *See* Christopher R. Christensen, *Changing Tides in the Law Regarding
Admissibility of NTSB Final Accident Reports*, 19-SPG Air & Space Law 4 (Spring 2005)
(discussing the circuit split and developing rules).  This Court must follow the Ninth Circuit.
Current regulations do allow the investigators to testify and allow use of their reports if other
tests are met.  *See, e.g.,* 49 CFR § 836.2 and 853.3 (discussing admissibility of the investigators'
factual reports and possible testimony).  Thus, although the NTSB final report is not admissible,
the investigators' reports might be admissible if they pass muster under the regulations and
*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) (stressing significance of
"trustworthiness"), and subject to the terms of FRE 703, which will require specification of the
specific facts or data upon which the expert wishes to rely, a determination of whether those
facts or that data is independently admissible, and if not, whether probative value as explaining
the conclusions outweighs possible prejudice.  The Court again reminds the parties that motions

in limine are subject to revision or reconsideration until the end of the case. *See Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000) (in limine rulings not binding on the trial court and may be revised at any time during trial); *and Luce v. United States*, 469 U.S. 38, 41–42 (1984) (same).

Subject to the limitations above, Dr. Manning will be permitted to testify as an expert at trial.

Dr. Kenneth L. Orloff

Dr. Orloff's testimony is represented in Docket No. 341.  No objections were submitted.

Dr. Orloff is a physicist and mechanical engineer.  He has worked for NASA, taught classes at the university level, and maintained a consulting practice in the field of aviation and accident reconstruction.  He is also a flight instructor with accumulated flight time of approximately 6,500 hours, 500 of which have been in a helicopter.  It is his opinion that although the helicopter lost power, that if the pilot had released the external load, the helicopter would have been more controllable, possibly resulting in a less violent crash.

Dr. Orloff's testimony has already been deemed permissible under *Daubert*.  Docket No. 196.

Ian Cheyne

Ian Cheyne's proffered testimony is at Docket No. 342.  Plaintiff's objections are at Docket No. 355.  DAI's reply is at Docket No. 373.

Mr. Cheyne is being offered as an expert in the area of engineering and quality as they relate to the aviation industry, based upon his education and 30+ years of experience repairing and overhauling turbine engines.  Since 1998, he has been the Vice President of Engineering and Quality at Dallas Airmotive (DAI).

Era makes numerous objections. *See* Docket No. 355, Appendices 1–18.  The Court

finds that Cheyne's testimony will assist the factfinders; therefore, the objections are overruled and Cheyne will be permitted to present expert testimony.

**IT IS THEREFORE ORDERED:**

The following witnesses are admitted to testify as experts: Larew; Scanlon; Cox; Rupert; Morin; Albert; Manning, Orloff; and, Cheyne, subject to the parameters outlined in this Order. Corrected proposed direct testimonies (eliminating leading questions, etc.) in conformity with this Order shall be submitted no later than **Wednesday, October 25, 2006.** The parties are instructed to certify the case ready for trial and submit proposed trial dates no later than **Wednesday, November 1, 2006**, in a status report prepared, filed, and served by counsel for Plaintiff after consultation with counsel for defendants. If the parties are unable to agree on any aspect of the status report, Defendants may separately present their position(s) in a report filed and served on or before the due date for the joint status report.

Dated at Anchorage, Alaska, this 11th day of October, 2006.


/s/ James K. Singleton, Jr.
**JAMES K. SINGLETON, JR.**
**United States District Judge**