Jon A. Kodani, Esq. (*pro hac vice*)
Jeffrey J. Williams, Esq. (*pro hac vice*)
**LAW OFFICES OF JON A. KODANI**
2200 Michigan Avenue
Santa Monica, CA 90404
Tel. (310) 453-6762
**Attorneys for Plaintiff**
Era Helicopters, LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **ERA HELICOPTERS, LLC**, a Delaware company,<br><br>Plaintiffs,<br><br>vs.<br><br>**UNC AIRWORK CORPORATION** a/k/a<br>DAI Airwork Corporation, a Delaware corporation;<br>**DALLAS AIRMOTIVE, INC.** d/b/a<br>UNC Airwork Corporation and DAI Airwork Corporation,<br>a Delaware corporation;<br>**PRATT & WHITNEY CANADA, INC.**,<br>a Canadian corporation; and<br>**DOES 1 through 500**, Inclusive,<br><br>Defendants. | Civil Case No.<br>**A02-0131 CV (JKS)** |

### REVISED DIRECT EXAMINATION TESTIMONY OF PLAINTIFF'S EXPERT WITNESS RICHARD ("LASH") LAREW

///

///

Pursuant to the Court's Order dated October 12, 2006 (Docket #404), plaintiff Era Helicopters, LLC, respectfully submits the attached *revised* direct examination testimony of plaintiff's expert witness, **Richard ("Lash") Larew.**

Respectfully Submitted,

Dated: October _____20___, 2006          **LAW OFFICES OF JON A. KODANI**

                                          _____s/ Jeffrey J. Williams_____

                                          By:   Jon A. Kodani, Esq.
                                                Jeffrey J. Williams, Esq.

                                          2200 Michigan Avenue
                                          Santa Monica, CA 90404
                                          Tel. (310) 453-6762

                                          Attorneys for Plaintiff
                                          Era Helicopters, LLC

Direct Examination (*revised*)          Mr. Richard ("Lash") Larew

**WRITTEN TESTIMONY**
*Direct Examination*
*Plaintiff's Expert Witness Richard ("Lash") Larew*

### TABLE OF CONTENTS

**1.0 BACKGROUND, EXPERIENCE AND QUALIFICATIONS** . . . . . . . . . . . . .

**2.0 ASSIGNMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**3.0 FAIR MARKET VALUE OF HELICOPTER** . . . . . . . . . . . . . . . . . . . . . . . . .

**4.0 LOSS OF USE / LOSS OF BUSINESS INCOME/REVENUE** . . . . . . . . .

**5.0 OTHER DAMAGES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**6.0 SUMMARY AND CAUSATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Direct Examination (*revised*)                                                    Mr. Richard ("Lash") Larew

# 1.0 BACKGROUND, EXPERIENCE AND QUALIFICATIONS

| | | |
|---|---|---|
| 101 | Q: Would you please state and spell your name? | A: Yes. My name is Richard L. Larew, and my last name is spelled L-A-R-E-W. |
| 102 | Q: Mr. Larew, have you ever been employed by Era Aviation, Inc.? | A: Yes, I was executive vice president of Era Aviation, Inc. until January of this year. |
| 103 | Q: What were your general responsibilities as executive vice president of Era Aviation, Inc.? | A: Generally, I was responsible for helicopter-related activities for the entire Company covering our Alaska and Gulf of Mexico divisions, and I was responsible for other duties as assigned. I was also a director of the corporation. |
| 104 | Q: Can you describe your educational background for the jury? | A: Yes, I graduated high school, and attended three and one-half years at Central Texas College with a major in business. |
| 105 | Q: Do you have any training as a pilot? | A: Yes. After high school, I spent nine years on active duty in the U.S. Army, where I went to flight school, and became a helicopter pilot. I was a standardization instructor pilot, safety course trained, and before I left the military I was also an instrument examiner. |
| 106 | Q: When did you leave the military? | A: In 1978. |
| 107 | Q: What did you do after that? | A: I applied for and took a job with Era Aviation in Anchorage, Alaska, where I worked until January 15th of this year. |
| 108 | Q: What kind of positions did you hold during your career at Era Aviation, Inc.? | A: I started as a line pilot flying helicopters for Era. Then later I was promoted to check airman, and I also did pilot training. Then I became the Director of Training and Safety. I was next promoted to Director of Operations, Vice President of Operations, Senior Vice President, and finally Executive Vice President. |

| | | |
|---|---|---|
| 109 | Q: Were you ever responsible in any way for calculating Era's business revenues? | A: Yes. Every day for about 15 years I was the person who was primarily responsible for running Era's helicopter business, and that included forecasting business revenues, preparing and analyzing capital budgets, bidding contracts and purchasing equipment and helicopters. |

## 2.0 ASSIGNMENT

| | | |
|---|---|---|
| 201 | Q: While you were an executive vice president for Era Aviation, Inc., were you given an assignment with respect to the crash of an Era helicopter on August 13, 2000? | A: Yes, I was asked to determine whether Era sustained any damages as a result of the crash, and if so, to calculate those damages. |
| 202 | Q: Did you complete your assignment in that regard? | A: Yes, I did. |
| 203 | Q: What kinds of things did you do, if any, to complete your assignment? | A: Basically, I discussed the issue with many other people working for Era, and I asked them to provide me with data relating to the crash and the helicopter itself. I also looked at some materials and information from outside the company, and then I analyzed all of the available data based on my experience in the aviation business. |
| 204 | Q: And were you able to calculate any damages that Era Aviation, Inc. sustained as a result of the crash? | A: Yes, I was. |

| | | |
|---|---|---|
| 205 | Q: Based on your background as an Executive Vice President at Era, and based on your investigation into this matter, what damages, if any, did Era Aviation, Inc. sustain as a result of the crash of its helicopter on August 13 2000? | A: *The damages Era suffered fall into three general categories.*<br><br>*First, there is the loss of the helicopter itself. At the time of the crash on August 13, 2000, a fair market value of that helicopter as equipped on that date was $2,100,000.00.*<br><br>*Second, there are damages associated with the loss of use of the helicopter, because once it was destroyed in the crash, Era could no longer use that helicopter to make money. It took Era about 9 months to replace the helicopter that was destroyed in the crash, and during that 9 month period, Era lost $814,972.37 in business income as a result of not having the helicopter in its fleet.*<br><br>*And finally, there are the expenses that Era incurred in connection with the crash. These include employee expenses, recovery teams, and the costs of shipping the replacement helicopter to our office in Lake Charles, Louisiana. These damages amount to $25,086.62.* |
| 206 | Q: So what is the total amount of damages Era sustained as a result of the crash of its helicopter on August 13, 2000? | A: *The total damages are $2,940,058.99.* |

### 3.0 FAIR MARKET VALUE OF HELICOPTER

| | | |
|---|---|---|
| 301 | Q: I am going to ask you some questions about each of the three categories of damages you mentioned a moment ago, starting with the fair market value of the helicopter, OK? | A: *Alright.* |
| 302 | Q: I think you testified that the fair market value of the helicopter was $2,100,000.00, is that correct? | A: *Yes, that's correct.* |

- 4 -

| | | |
|---|---|---|
| 303 | Q: When you worked for Era, did Era own and operate a fleet of helicopters? | A: Yes. |
| 304 | Q: When you worked for Era, did your job duties require you to be generally familiar with the fair market value of the helicopters that were owned by Era? | A: Yes. |
| 305 | Q: When you worked for Era, did your job duties also require you to be knowledgeable about the value of helicopters that were offered for sale by other helicopter owners? | A: Yes. |
| 306 | Q: What is your understanding of the phrase "fair market value"? | A: The "fair market value" is the amount a fully informed seller would receive from a fully informed buyer in a normal market. |
| 307 | Q: How did you calculate the fair market value of the helicopter that crashed on August 13, 2000? | A: I based the helicopter's fair market value on a variety of data.<br>   First, I took into consideration the helicopter's equipment, its age, its time in service, and its general overall condition.<br>   Second, I checked the helicopter's value in "The Official Helicopter Blue Book."<br>   And third, I considered the prices that were paid for some similar helicopters around the same time. |
| 308 | Q: Alright, why did you take into consideration the helicopter's equipment, its age, its time in service, and its general overall condition? | A: Because the value of any aircraft depends a lot on whether the aircraft will soon need to undergo major repairs, and how long the helicopter has been used. |

<u>Direct Examination (*revised*)</u>　　　　　　　　　　　　　　　　Mr. Richard ("Lash") Larew

| | | |
|---|---|---|
| 309 | Q: Do you recognize exhibit **? | A: *Yes, this is a page from the Official Helicopter Blue Book that was published in early 2001, shortly after this crash.* |
| 310 | Q: Did you rely upon and consider the information in this Blue Book? | A: *Yes, I did.* |
| 311 | Q: Within the aviation industry, is the Blue Book considered to be a reliable source of information regarding the fair market value of used helicopters? | A: *Yes, it is.* |
| 312 | Q: Can you describe for the jury how you used this page from the Blue Book to help determine the fair market value of the helicopter? | A: *Sure. The serial number for the crashed Era helicopter was 33085. So if we start here on the left side of this page, and we find that 33085 fits in between 33051 and 33107, and if we follow this column over to the right side under "Low Time," it shows a value of between $1,800,000.00 and $1,950,000.00. And this helicopter was equipped with an external fuel tank, so in this column we add $100,000.00, for a Blue Book value of somewhere between $1,900,000.00 and $2,050,000.00.* |
| 313 | Q: How do you know this was a "low time" helicopter on August 13, 2000? | A: *Because Era maintained detailed records that show how much time was remaining on the helicopter's major component parts before those had to be replaced, and my review of those documents indicates that this particular helicopter was "low time."* |
| 314 | Q: Do you recognize exhibit **? | A: *Yes, these are the records I just mentioned.* |
| 315 | Q: Did you obtain these records from Era Aviation, Inc.? | A: *Yes, I did.* |

- 6 -

Direct Examination (*revised*)                                        Mr. Richard ("Lash") Larew

| | | |
|---|---|---|
| 316 | Q: Were these records made and kept by Era in the ordinary course of its regularly conducted business activities? | A: Yes. |
| 317 | Q: Was it Era's practice to make these records? | A: Yes. |
| 318 | Q: Were these records made by persons with knowledge of the events described in the records at or near the time of the events described in the records? | A: Yes. |
| 319 | Q: I think you also mentioned that you based the fair market value on the sales of some other comparable helicopters, is that correct? | A: Yes, that's correct. |
| 320 | Q: How many other sales did you consider. | A: A total of five other helicopters that were sold in two separate transactions. |
| 321 | Q: Can you describe the first of these transactions? | A: Sure. The first transaction was in December, 2002, and it involved two Bell 412 helicopters that were sold by Era Aviation, Inc. to a company called Air Logistics in Louisiana. |
| 322 | Q: Were the helicopters that were sold to Air Logistics in 2002 the same model as the helicopter that crashed on August 13, 2000? | A: Yes, they were both the same model, Bell 412. |
| 323 | Q: Were you working for Era Aviation when this sale took place? | A: Yes, I was. |

| | | |
|---|---|---|
| 324 | Q: And how much did Air Logistics pay Era for these helicopters in 2002? | A: The sales price was $3,950,000.00 for both helicopters. |
| 325 | Q: When you were calculating the fair market value of the helicopter that crashed on August 13, 2000, did you consider any documents describing this transaction? | A: Yes, I looked at the sales contract. |
| 326 | Q: Do you recognize exhibit **? | A: Yes, this is the sales contract I just described. |
| 327 | Q: Did you obtain these records from Era Aviation, Inc.? | A: Yes, I did. |
| 328 | Q: Were these records made and kept by Era in the ordinary course of its regularly conducted business activities? | A: Yes. |
| 329 | Q: Was it Era's practice to make these records? | A: Yes. |
| 330 | Q: Were these records made by persons with knowledge of the events described in the records at or near the time of the events described in the records? | A: Yes. |
| 331 | Q: I believe there was one more transaction you considered, is that correct? | A: Yes. The second transaction was in March of 2004, when Era sold three Bell 412 helicopters to a Spanish company called FAASA Aviation. |
| 332 | Q: Were you working for Era Aviation when this sale took place? | A: Yes, I was. |

- 8 -

Direct Examination (*revised*)                                    Mr. Richard ("Lash") Larew

| | | |
|---|---|---|
| 333 | Q: And how much did FAASA Aviation pay Era for these three helicopters in 2004? | A: $2,522,000.00 for one helicopter, and $2,182,500.00 for each of the other two helicopters. |
| 334 | Q: When you were calculating the fair market value of the helicopter that crashed on August 13, 2000, did you consider any documents describing this transaction? | A: Yes, I looked at the sales contract. |
| 335 | Q: Do you recognize exhibit \*\*? | A: Yes, this is the sales contract I just described. |
| 336 | Q: Did you obtain these records from Era Aviation, Inc.? | A: Yes, I did. |
| 337 | Q: Were these records made and kept by Era in the ordinary course of its regularly conducted business activities? | A: Yes. |
| 338 | Q: Was it Era's practice to make these records? | A: Yes. |
| 339 | Q: Were these records made by persons with knowledge of the events described in the records at or near the time of the events described in the records? | A: Yes. |
| 340 | Q: Were the three helicopters that were sold in 2004 in the same condition as the helicopter that crashed on August 13, 2000? | A: No, the helicopter that crashed had been in service for less time, and its major component parts were newer than the three helicopters that were sold in 2004. |

- 9 -

| | | |
|---|---|---|
| 341 | Q: So based on all of the information you just discussed, what do you believe the fair market value of Era's helicopter was on August 13, 2000? | A: $2,100,000.00. |

### 4.0 LOSS OF USE / LOSS OF BUSINESS INCOME/REVENUE

| | | |
|---|---|---|
| 401 | Q: How difficult was it to replace a helicopter back in August of 2000? | A: At that time, the market for used helicopters was pretty good if you were a seller. These kinds of helicopters were not readily available, and they were hard to acquire. It would take quite a bit of time to find a suitable helicopter, get it equipped the right way, have it properly serviced and checked out before it could fly. There are a whole series of events that have to occur to get an aircraft ready to work like this helicopter worked, and to generate the kind of revenue for Era that this helicopter was generating before it was destroyed. |
| 402 | Q: Did Era eventually replace the helicopter that was destroyed on August 13, 2000? | A: Yes. |
| 403 | Q: When was Era able to buy a replacement helicopter? | A: It took about eleven months after the crash, until June of 2001. |
| 404 | Q: Now in addition to the loss of the helicopter itself, I think you also mentioned a second category of damages that were sustained by Era, is that correct? | A: Yes, the loss of use of the helicopter, or the loss of business revenue. |

| | | |
|---|---|---|
| 405 | Q: What do you mean by "loss of use" and "loss of business revenue"? | A: I mean that before this helicopter was destroyed, it was constantly generating income for Era Aviation, Inc., except for those times when the helicopter was out of service for periodic repairs or maintenance. And after the helicopter was destroyed, Era lost the income that helicopter generated for the company, because it no longer had the helicopter in its fleet until it was replaced. |
| 406 | Q: How much income or revenue did Era lose because this helicopter was destroyed? | A: A net total of $814,974.18 during the nine months after the crash. |
| 407 | Q: How did you calculate the amount of these damages? | A: When this helicopter crashed, Era operated 12 other Bell 412 helicopters. I examined how many hours each of those helicopters actually flew each month during the nine months after the crash, and how much money each of those helicopters generated for the company each month for the same period. |
| 408 | Q: Do you recognize this two-page document that has been marked as exhibit **? | A: Yes, this is a chart that shows the information I mentioned a moment ago. |
| 409 | Q: Did you make this chart based on records you obtained from Era Aviation, Inc.? | A: Yes, the chart was prepared under my direction and information was derived from Era's maintenance and accounting records. |
| 410 | Q: Were those records made and kept by Era in the ordinary course of its regularly conducted business activities? | A: Yes. |
| 411 | Q: Was it Era's practice to make those records? | A: Yes. |

| | | |
|---|---|---|
| 412 | Q: Were those records made by persons with knowledge of the events described in the records at or near the time of the events described in the records? | A: Yes. |
| 413 | Q: Have you confirmed that the information in this chart is reliable and accurate? | A: Yes, I have. |
| 414 | Q: What are these two columns that are in each box? | A: The column on the left side of each box is the number of hours actually flown by each aircraft during that month. And the column on the right side in each box is the amount of revenue each helicopter actually generated during that same month.<br><br>For example, look at this first helicopter listed here (pointing--- N164EH. In August, 2000, that helicopter flew 78.4 hours, and generated $221,993.96 in revenue. If we follow the line over to the other boxes, we can see how many hours it flew and how much money it generated in each month after August, 2000. |
| 415 | Q: What are these numbers listed under "TOTAL" at the bottom of each box? | A: Those numbers represent the total number of hours actually flown by all of Era's Bell 412 helicopters for that month, and the total amount of money generated by those same helicopters for that month. |
| 416 | Q: Does the information contained in exhibit ** all relate only to Bell 412 helicopters, or does it include other models too? | A: No, the information in this chart is just the hours flown and money generated by Bell 412 model helicopters that were in Era's fleet when this crash occurred in August, 2000. |

Direct Examination (*revised*)                                                                    Mr. Richard ("Lash") Larew

| | | |
|---|---|---|
| 417 | Q: How can you be sure that the information regarding flight hours and revenue in this chart, exhibit **, is accurate and reliable? | A: Two reasons.<br>First, FAA regulations require that Era must maintain detailed accurate records of the hours flown by all of its helicopters, and that information is recorded in log books that are updated on a daily basis.<br>Second, Era's billing records are also audited by many of the companies and government agencies that it does business with, so there is a system that double checks the accuracy of that kind of information. |
| 418 | Q: So how did you use the information in this chart to calculate Era's loss of use damages? | A: This chart shows that the other 12 Bell 412 model helicopters in Era's fleet actually flew 7,423.6 hours between August, 2000 and April, 2001, and those same 12 helicopters generated a total of $15,052,035.20 in gross revenues for Era Aviation, Inc.<br>By dividing the gross revenues by the total number of hours flown, I determined that the Bell 412 helicopters in Era's fleet generated an average of $2,027.59 in gross revenues for every hour flown. |
| 419 | Q: What did you do next? | A: I subtracted the hourly costs of operating each helicopter, since Era did not have to pay these costs for the helicopter after it was destroyed.<br>In the aviation business, these expenses are known as Direct Operating Costs, and they include things like maintenance at $400.00 per hour, fuel and oil at $115.00 per hour, the extra flight pay cost for pilots beyond salary at $15.00 per hour, and other administrative costs for a total of $689.00 per hour.<br>When I subtract the Direct Operating Costs of $689.00 per hour from the gross hourly revenue of $2,207.59, I determined that the average net revenue generated by each Bell 412 helicopter in Era's fleet was $1,338.59 per flight hour. |

| | | |
|---|---|---|
| 420 | Q: How did you use this net hourly revenue to calculate Era's loss of use damages? | A: This chart shows that during the nine months after August 2000, Era had an average of 10 Bell 412 helicopters in service in each month, and those ten helicopters flew an average of 742.36 hours each month during that same period.<br><br>By multiplying the average number of hours flown each month, 742.36, by the net revenue generated per flight hour, $1,338.59, I arrived at a total loss of revenue of $993,715.67. |
| 421 | Q: What did you do next, if anything? | A: The last thing I did was to apply a credit for $178,743.30. This credit was for the revenue this particular helicopter actually generated in August of 2000, before the crash on August 13, 2000, and a credit for some other expenses that Era did not have to incur because the helicopter was destroyed. |
| 422 | Q: So after you applied this credit, what was the total amount of revenue or earnings that Era Aviation, Inc. lost? | A: $814,972.37. |
| 423 | Q: Does that number refer to *net* earnings after expenses? | A: Yes. |
| 424 | Q: Does that number also refer to earnings that were reasonably anticipated by Era Aviation, Inc., but were lost because the helicopter was not available after August 13, 2000? | A: Yes. |

## 5.0 OTHER DAMAGES

| | | |
|---|---|---|
| 501 | Q: Was there a third category of damages that Era sustained as a result of the crash on August 13, 2000? | A: Yes, in addition to the fair market value of the helicopter and the loss of use, or loss of revenue, damages, Era also had to pay some extra expenses because of the crash. |

- 14 -

Direct Examination (*revised*)                                    Mr. Richard ("Lash") Larew

| | | |
|---|---|---|
| 502 | Q: How much were these extra expenses? | A: $25,086.62. |
| 503 | Q: What kinds of extra expenses are included in that amount? | A: The costs of shipping the replacement helicopter to Era's shop in Lake Charles, where this helicopter was stationed before the crash, was $8,622.31, and the costs of insuring that shipment was $7,150.00.<br><br>Plus, Era had to pay its employees to retrieve the helicopter wreckage in Nevada, and attend various inspections of the wreckage and the engines that were conducted by the NTSB, Pratt & Whitney and others after the crash. These employee expenses amounted to $9,314.31. |
| 504 | Q: Do you rely on any documents that describe those expenses? | A: Yes. |
| 505 | Q: Do you recognize these documents marked as exhibit **? | A: Yes, these are the documents regarding the shipment of the replacement of helicopter, and the extra employee expenses I mentioned a moment ago. |
| 506 | Q: Did you obtain these records from Era Aviation, Inc.? | A: Yes, I did. |
| 507 | Q: Were these records made and kept by Era in the ordinary course of its regularly conducted business activities? | A: Yes. |
| 508 | Q: Was it Era's practice to make these records? | A: Yes. |
| 509 | Q: Were these records made by persons with knowledge of the events described in the records at or near the time of the events described in the records? | A: Yes. |

- 15 -

Direct Examination (*revised*)                      Mr. Richard ("Lash") Larew

## 6.0 SUMMARY AND CAUSATION

**601** Q: With the court's permission, I'd like you to step down from the stand, and come over to this easel.

A: OK

**602** Q: Using this marker and this paper that we'll identify as exhibit **, can you please itemize all of the damages that Era sustained as a result of the loss of the helicopter on August 13, 2000?

A: Sure. *(writing on paper with marker)*
    *First, there is the fair market value of the helicopter, and that was $2,100,000.00.*
    *Second, there is the loss of use or loss of revenue damages, and those damages amount to $814,972.37.*
    *And finally, there are the expenses and costs that Era had to pay, and those amount to $25,086.62.*

**603** Q: Would Era Aviation, Inc. have suffered these damages if the helicopter had *not* crashed on August 13, 2000?

A: No.

**604** Q: Were these damages all sustained by Era because its helicopter was destroyed on August 13, 2000?

A: Yes.

- 16 -

## CERTIFICATE OF SERVICE
*Era Helicopters, LLC v. UNC Airwork Corp. et al.*
D.Alaska Case No. A02-0131 CV (JKS)

[XXXX]  I hereby certify that on _____**October 20, 2006**_____,
I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

**For Defendants UNC Airwork Corp. and Dallas Airmotive, Inc.**
David A. Devine, Esq.
Ken Eggers, Esq.
GROH EGGERS, LLC
3201 C Street, Suite 400
Anchorage, AK 99503
Tel. (907) 562-6474
Fax (907) 562-6044
EMail *devined@groheggers.com*

**For Defendant Pratt & Whitney Canada Corp.**
William F. Brattain II
BAKER BRATTAIN, L.L.C.
N Street Plaza
821 N Street Suite 101
Anchorage, AK 99501
Tel. (907) 277-3232
Fax (907) 272-4850
EMail *brattain@bakerbrattain.com*

_____s/ Jeffrey J. Williams_____

Jeffrey J. Williams, Esq.
LAW OFFICES OF JON A. KODANI

**Attorneys for Plaintiff
Era Helicopters, LLC**

2200 Michigan Avenue
Santa Monica, CA 90404-3906
Tel: (310) 453-6762
Fax: (310) 829-3340
**Email:** *lojak@kodanilaw.com*

## CERTIFICATE OF SERVICE
*Era Helicopters, LLC v. UNC Airwork Corp. et al.*
D.Alaska Case No. A02-0131 CV (JKS)

[XXXX]   I hereby certify that on _____**October 20, 2006**,
I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand delivery, etc.) indicated by the non-participant's name:

*-Via E-Mail –*

**For Defendants UNC Airwork Corp.**
**and Dallas Airmotive, Inc.**
Raymond L. Mariani, Esq.
NIXON PEABODY, LLP
50 Jericho Quadrangle, Suite 300
Jericho, NY  11753
Tel. (516) 832-7520
Fax (516) 832-7555
EMail *rmariani@nixonpeabody.com*


_____s/ Jeffrey J. Williams_____

Jeffrey J. Williams, Esq.
LAW OFFICES OF JON A. KODANI

**Attorneys for Plaintiff**
**Era Helicopters, LLC**

2200 Michigan Avenue
Santa Monica, CA 90404-3906
Tel: (310) 453-6762
Fax: (310) 829-3340
**Email:** *lojak@kodanilaw.com*