David A. Devine, AK Bar No. 7906015
GROH EGGERS, LLC
2600 Cordova Street, Suite 110
Anchorage, AK 99503
Phone: (907) 562-6474
Fax:    (907) 562-6044
devined@groheggers.com

Raymond L. Mariani, NY Bar No. RM2077
NIXON PEABODY LLP
50 Jericho Quadrangle, Suite 300
Jericho, NY 11753
Phone: (516) 832-7520
Fax:    (516) 832-7555
rmariani@nixonpeabody.com

Attorneys for Defendants
Dallas Airmotive, Inc. and
UNC Airwork Corp.

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ERA AVIATION, INC., a Washington corporation )<br>)<br>)<br>                  Plaintiff,     )<br>)<br>vs.                         )<br>)<br>UNC AIRWORK CORPORATION et al.,   )<br>)<br>              Defendants.   )<br>_____)| <br><br><br><br><br><br><br><br><br><br><br>Case No. A02-0131 CV (JKS) |

### <u>REVISED DIRECT EXAMINATION FOR TRIAL OF DR. CHARLES MANNING</u>

Defendants Dallas Airmotive and UNC Airwork hereby submit the *revised* direct

examination of Dr. Charles Manning pursuant to the Court's Order at Docket 404.

Q.    Please state your name for the record.

A:    Dr. Charles Manning.

Q:    Where do you reside?

A:     I maintain my office at 5801 Lease Lane in Raleigh, North Carolina.

Q:     Before I ask you some particulars about your credentials and experience, I would like to ask whether you have prepared opinions in this case concerning the failure of an engine on a Bell helicopter that was being used by ERA Aviation.

A:     Yes I have.

Q:     Please tell the jury the opinions you have reached in short with respect to the failure of that engine and, in particular, as your opinions concern the compressor turbine disc or CT disc as it has been referenced in this case so far.

A:     My general opinion is that the engine failed due to a failure of the compressor turbine disc, which is shown in this photograph (EX _). More importantly, is the reason that the CT disc failed. In that regard, I find that the CT disc failed due to operation of this engine by ERA at elevated temperatures for a long period of time. These elevated temperatures then caused the disc to creep, or expand in size. Once the disc expanded in size to a certain extent, it developed cracks and then parts of the disc broke off during use **causing the engine to fail**.

Q:     Did those events have any relationship to the way in which the disc was manufactured?

A:     No.

Q:     Did those events have any relation to Dallas Airmotive installing the disc in the engine at the most recent service of the engine?

A:     No.

Q:     Now, let me ask you some questions regarding your credentials. What is the nature of your profession?

A:     I am a metallurgical engineer. My education includes first working at the General Electric apprentice school prior to entering the U.S. Air Force. I served in Korea as an aircraft crew chief and a flight chief. I also participated in the Air Force aircraft accident investigation team.

Q:     Did you attend college after you left the Air Force?

A:    Yes.  I attended Florida State University and received my Bachelors of Science.  I went on after that to obtain a Masters Degree from the Virginia Polytechnic Institute in metallurgical engineering.  I also attended Lehigh University and obtained a certificate in fracture mechanics.

Q:    Did you pursue further education after your Masters Degree?

A:    Yes.  I attended North Carolina State University and was awarded a Doctorate Degree in materials engineering with a minor in mechanical engineering.  I also went on to attend the Massachusetts Institute of Technology and obtained a certificate on cardiovascular pathophysiology for engineers.

Q:    Can you tell the jury what that last item means?

A:    Well, I have **participated in analyzing mechanical replacement heart valves for heart patients and the** Massachusetts Institute of Technology course was a basis for my work in that area.

Q:    Now I know you didn't mention with respect to your Air Force service, but, were you in fact awarded a service medal during your service in the Air Force?

A:    Yes, I was **awarded the Soldier's Medal for valor**.

Q:    Once you had completed some of your educational work, did you begin work in accident investigation?

A:    Prior to becoming involved in accident investigation, I worked for NASA and there, I performed testing of various materials that were used for the rockets and other space vehicles that NASA was building.  **I later became the Group Leader of the Failure Analysis and Reconstruction Laboratory at NASA.**  This included investigations into certain accidents.

Q:    After working for NASA, what was your next course of work?

A:    In 1967, **I became an associate professor of Materials Engineering at North Carolina State University.  During the same timeframe,** I formed my own investigation firm concerning failure analysis of various materials and reconstruction of accidents including

aircraft, motor vehicles and other types of machinery.  We also perform stress analysis on various parts such as engines, airframes and other large structures.  We investigate building collapses, pipeline failures and other similar disasters.

Q:    Have you been in that business of investigation until the present time?

A:    Yes I have.

Q:    And approximately how many accidents have you investigated over that time period?

A:    I would estimate that I have personally investigated over **1500** accidents over that time period.

Q:    How many approximately pertained to aircraft such as helicopters and other types of aircraft?

A:    Over **200** of those investigations would concern aircraft.

Q:    Do you indeed hold a pilot's license?

A:    I did hold a pilot's license for many years, but at this time I have allowed it to expire.

Q:    **You indicated that you taught at a University?**

A:    Yes, I have worked at North Carolina State as associate professor of materials engineering and was later promoted to be a full professor in materials engineering.

Q:    What courses did that involve teaching?

A:    Well, a wide variety of courses including the mechanical behavior of materials, **corrosion engineering and courses involving the thermal behavior of materials**.

Q:    When you say mechanical behavior of materials, can you be more specific?

A:    Well, that involves **how materials respond to forces or loads such as in an aircraft engine**.

Q:    The corrosion engineering course that you mentioned, please describe that to the jury.

A:    Well, corrosion is **a chemical reaction that occurs between a metal and its surrounding environment that results in deterioration of the metal.**

Q:    The last item you mentioned was thermal behavior of materials.  Please describe that for the jury.

4

A:      Well, thermal behavior basically refers to **how metal behaves at different**

**temperatures**.  When metals are heated, it can change the properties of the metal

depending on the type of metal we are speaking about and the magnitude of the heat that

is applied to the metal and the time in which the metal is heated.  All of those factors go

into determining how the properties might change on a given piece of metal.  The course

I taught involved my advising students who were also studying for doctoral degrees on

this issue.  My students did projects in the development and thermal of high temperature

superalloys such as Waspaloy under my supervision.

Q:      Did you also teach at the University of North Carolina Dental School at one point?

A:      Yes.

Q:      How is it that you came to teach in the dental school as a materials and mechanical

engineer?

A:      **I obtained a grant from the National Institute of Health for research into biomedical**

**materials.  The research involved the development of materials that are used in**

**crowns and bridges for people's dental work.  As a result of the research, I applied**

**to the U.S. government and was awarded a patent by the U.S. Patent Office for my**

**inventions.  I later taught a course at the University of North Carolina on materials**

**issues pertaining to dental materials.**

Q:      Are you registered as a professional engineer?

A:      Yes I am in North Carolina, Virginia and South Carolina.

Q:      Over the course of your career have you had an opportunity to make any speeches at any

events in your industry?

A:      Yes I have.  I have spoken on numerous occasions before a variety of associations.  This

includes the American Society of Metals, the American Ceramic Society, the American

Society of Mechanical Engineers, the North Carolina Bar Association, and particular

seminars concerning failure analysis.

Q:      Have you published any papers in your industry?

A:      **Yes I have.  While at NASA, I published a number of papers that pertained to my materials research that I was performing at NASA on high temperature materials. Over the course of my career, I have published over 30 papers and they cover a whole variety of topics related to metals and their properties as well as accident investigation.   My masters thesis concerned nitrogen diffusion in austenitic stainless steel which in simpler terms basically means looking at how the extent of nitrogen in stainless steel can affect the properties of that metal and that was awarded the top thesis for the year by the American Society of Metals.**

Q:      Have you testified before in court with respect to accidents including aircraft accidents?

A:      Yes I have.  I have testified **in excess of 200** times in both state and federal courts across the United States.

Q:      Have any of those cases involved helicopter accidents?

A:      Yes.  Many have involved helicopter accidents and determining why the engines on a particular helicopter did not operate.

Q:      Now, let me ask you, in this particular case, what type of materials and information did you look at in order to develop opinions about why the engine on this particular Bell helicopter did not operate properly on the day in question?

A:      Well, my approach has always been and continues to be to use the scientific method. That means that our group, we collect and analyze every available fact and piece of information whether that information will be something that develops into an opinion that I might have or it may not, but we look at every possible piece of information that is out there that pertains to an accident so that we have all the available data at our disposal and we are not going to be giving an opinion that is based on only partial information.  Once that is done, then we can make an assessment and try to make determinations about why a particular part failed or why a particular engine did not operate.

Q:      Did you follow that process in this case?

A:      Yes I did, **as I do in every case that I perform an evaluation.**

Q:     Were you retained in this case by Dallas Airmotive to do an investigation regarding why this engine on this Bell helicopter did not operate?

A:     Yes I was.

Q:     Have you been charging for your time on the case?

A:     Yes I have at a rate of $210 per hour for myself and other rates for the other engineers on my staff who have worked for me on this project.

Q:     Can you list for the ladies and gentlemen of the jury the physical items that you have looked at before we get to talking about any documents?

A:     Well, the number one thing I looked at and that is the engine itself.  No engineer of any value is going to give an opinion about an engine failure in a case like this without personally examining the engine parts himself and putting them under the microscope and holding them in his hands and looking at them and coming up with his own determination as to why particular parts failed in the service.  So that the number one item on my list was to have this engine shipped to my laboratory in North Carolina, which I did, and I examined both the number one and number two engine power sections, as well as the combining gear box on October 7 and 8 in the year 2003.  That was a two day examination, all day, both days, where we essentially looked at every key part in this engine to understand exactly why this engine failed in service.

Q:     Did you perform that process by yourself?

A:     No I did not.  I have a team of engineers that worked with me on the project that includes Tom Wenzel, who is a degreed engineer, has worked for me for many years, also includes Rocky Manning who is my son, also a degreed engineer who has worked for our company for over 20 years and who has extensive experience in aircraft accident investigation.  I also have various other engineers that work in my laboratory and assist with regard to these investigations.

Q:     Did you make any photographs of that investigation?

A.     Yes we did.  I **made a number photographs using** the microscopes in our lab at various levels of magnification and those are set out here in these books (EX Nos. _____).

Q:     In addition to examining the engine and its various components at your laboratory, can you describe what other information you have reviewed?

A:     Well, it is probably simplest to categorize that.  One item we looked at was all of the records concerning this engine from prior to this accident.  So we obtained the records from Dallas Airmotive with respect to its maintenance on the engine, which in fact was restricted to only the number one power section.  Dallas Airmotive had done maintenance on the number one power section only.  And then, we looked at the Pratt & Whitney records because Pratt & Whitney had done maintenance on the number two power section and Pratt & Whitney had also done maintenance on the combining gear box.  We examined some ERA documents that also concerned the operation of the helicopter and the use of this engine prior to the crash.

Q:     Did you have other documents you reviewed that related to after the crash.

A:     Yes I did.  We had the NTSB report, we reviewed that, we had photographs that were made of the engine and photographs were made of the helicopter itself at investigations after the crash.  There were numerous discovery responses that Dallas Airmotive and Pratt & Whitney and ERA exchanged with each other in the course of this case before this trial and those were all sent to me by your firm and I have reviewed all of those as well.  I also reviewed reports that other persons who examined this engine have published in this case, and that includes a report by **Dave Rupert** and also includes reports from Pratt & Whitney experts, namely Jutta Demers who is a metallurgist up at the Pratt facility in Canada, and I also looked at a statement by the Canadian Transportation Safety Board by their metallurgist Gus Sidla regarding the engine failure.  I have also looked at reports that were published by Dr. Cox, as well as by Chuck Morin.

Q:     Have you reviewed any depositions in the case?

A:      Yes I have.  We received depositions of probably two dozen people that include a number of people from ERA Aviation as to the operation of this helicopter and use of this engine. We also received and have reviewed the depositions of various Pratt & Whitney personnel and that includes Ms. Demers, who I mentioned earlier, Mr. Tom Berthe, who is an investigator for Pratt & Whitney and some other folks at Pratt & Whitney as well.  I also reviewed depositions from some UNC Airwork Dallas Airmotive personnel.  And we also had a deposition from the Bell helicopter chief of mechanical systems, Walter Reilly.  **I reviewed the depositions of Dave Rupert, Don Cox, Chuck Morin and other named experts.**

Q:      Did you speak with any other experts.

A:      I did.  I called Vern Alpert; he is a longtime helicopter pilot who knows these Bells inside and out.  I spoke with him about normal operating temperatures and similar issues.  I also spoke to Charles Morin, another metallurgist.

Q:      Please tell the ladies and gentlemen of the jury generally the information you have on this accident itself.

A:      My understanding is that ERA was hired by the U.S. government to provide fire suppression services at a fire in Nevada.  They were using this helicopter with a water bucket suspended beneath it to drop water on the area nearby or at the fire.

Q:      What was the method for placing water into the bucket that was suspended beneath the helicopter to your knowledge?

A:      The pilot would fly the helicopter to a nearby pond or dip site as they call it and lower the helicopter down as he approached the dip site and allow the bucket to become immersed in the water and effectively then scoop up some water with the bucket and then proceed from the dip site to the location of the fire.

Q:      Did you see any information in the materials you reviewed as to whether the manner in which this pilot performed such maneuvers had any impact on the life of the engine components that we have been discussing?

A:    Yes I did.  There was testimony by a few witnesses who said they had seen the pilot flying in what they call hot dogging style, namely these abrupt and sudden maneuvers like a plane that is coming in for a bombing mission, coming straight down in a fashion at high speed and then abruptly slowing up the helicopter and to the point in some instances where that bucket actually whipped around the front and almost hit the main rotor blades and then, on other occasions there were reports that as he was leaving the dip site that the helicopter bucket would sometimes bang against the bank of the dip pond because he was trying to fly out of there too quickly.  All of these types of maneuvers are ones that place additional stresses on the engine because it is requiring the engine to work harder, particularly when you have a full bucket on there, you have a heavy load, it requires the engine to work harder, increases temperatures in the engine and, as we have discussed previously, those increased temperatures result in a decreased life of these components such as this CT disc.

Q:    How did the helicopter come to rest?

A:    Well it crashed after the engine failed and then the pilot wrapped the bucket cables around a tree.  The NTSB investigator testified that she observed the bucket caught on a tree because it was never jettisoned off the ship.

Q:    Are there any other documents you reviewed concerning the proper methods for maintaining this engine?

A:    Well, yes certainly.  We have the various portions of the Pratt & Whitney maintenance manual that we looked at and that includes how to perform maintenance on the engine when it comes in for various events such as routine maintenance or in this instance, we are going to talk about something called the hot start and we looked at those particular sections of the Pratt & Whitney manual that they publish and provide to companies like Dallas Airmotive about how to perform proper maintenance on the engine.  (EX Nos__) [We also looked at the Pratt & Whitney manual on critical and rotating components blend repair specifications.  That's a section that tells you how to **inspect and** perform repairs

when a part has some kind of a mark or other problem with it and what's allowed and how to do it according to Pratt & Whitney, who actually manufactures these parts. We also had a Dallas Airmotive document called "Compressor and Power Turbine Disc Polishing" which pretty much addresses the same issue, how to repair parts that might have some limited damage to them][1] We looked at the Pratt & Whitney customer training manual which is a manual they put out for this line of engines, namely the PT6T engines and it provides various information to companies like Dallas Airmotive about engine maintenance. It also has information about corrosion on engine parts and what should be done with respect to corrosion on engine parts. (EX No.____).

Q:    Well, let me just ask you at this point, when you say corrosion, what does that reference with respect to this type of engine, the PT6T?

A:    Well, corrosion can be caused by a number of environmental conditions earlier that will affect the properties of a part and, in this instance, there has been some discussion, which in my opinion, is completely erroneous, but there has been some discussion about sulphidation. Sulphidation has somehow caused a problem and caused a failure of this CT disc and I absolutely reject that opinion based on my first hand examination of the CT disc itself, as well as the very well known literature regarding potential sulphidation on this type of a metal that is involved in the CT disc.

Q:    Where can cause sulphidation with respect to the operation of an engine of this type?

A:    Well, the fuel itself that is being injected into the engine and it's being used to run the engine. That fuel can contain fair amounts of sulphur and so the Pratt & Whitney manual that we discussed previously actually has pictures in it to help tell service companies like Dallas Airmotive, what are acceptable levels of sulphidation that you would find on parts

---

[1] This section will be relevant only if the Court were to reconsider its ruling on the red tag, etc. DAI reserves the right to further amend this testimony in the event of a new ruling.

in the engine, including a CT disc and a company like Dallas Airmotive then examines the parts and compares it to the Pratt & Whitney manual and Pratt & Whitney tells them that certainly some levels of sulphidation are completely acceptable and indeed, that can be expected to happen in a component of this type in this type of an engine.

**Additionally, another potential agent which can cause sulphidation is airborne salts from a coastal seawater environment.**

Q:    Now, before I get into some particulars regarding the CT disc in this engine, I want to ask you some more general questions regarding the tolerance for certain metals to withstand heat over a course of time when being used in a piece of machinery such as an engine. Why is that a metal component in an engine, such as a disc like this, might fail after its being used over a certain period of time?

A:    All rotating components in an engine, or for that matter, in any other machine can be subject to three variables that will affect the life of that component. Those variables are time, temperature and load and let me discuss each of those in turn. The load on a part refers to the strain or amount of stress that is being placed on the part while it is in use, so for example, with a rotating part like this CT disc, which I am going to show you here on a cutaway view of this engine in the diagram (EX No.___), a rotating part like this CT disc has a generally continuous and consistent load placed on it. Here is a photograph of a CT disk removed from an engine. (EX NO.___) It's rotating at approximately 38,000 revolutions per minute, or turning around 38,000 times every minute. And the stress that's placed on the part is because of that rotation. The rotation itself places certain stresses on certain parts of the wheel more than others. In this situation, because the wheel is rotating once the engine spools up, and is running, the wheel is rotating at a fairly constant speed of approximately 38,000 rpm, then the stress is a very consistent one and is not a variable process that changes over the course of operation of the engine. The engine is running at this 38,000 rpm speed for virtually all of its time when it's operating. The spooling up and spooling down period is quite brief in comparison.

Q:     The next factor you mentioned was time.  What do you mean by that?

A:     Well, the time is the time that the engine is operating and this CT disc wheel is in motion, so that we know because the aircraft has logs where the pilots keep track of how many hours they have flown, and there is a separate log for the engine itself and that separate engine log, which we have reviewed, tells us exactly how many hours this engine has been operated.

Q:     The third factor you mentioned is temperature.  Tell us how that can affect the life of a part such as the CT disc?

A:     Well, the temperature is the third and in this case the critical factor.  The reason is that temperature can vary depending on certain factors in operation of the engine and of the helicopter.  The temperature could be higher or lower depending upon the load that is placed in or outside the helicopter.  In this case, the pilots were carrying big buckets filled with hundreds of gallons of water underneath the helicopter. There were also people in the helicopter, the pilot, perhaps someone else, and cargo or items inside the helicopter. All of that adds up to a weight that the engines must bear in terms of keeping the helicopter in flight.  The greater that weight is, the greater the work, so to speak, the engine must perform in order to keep the helicopter in flight and that heavier load is going to result in increased temperatures in the engine.

Q:     What other factors would affect the internal temperature of the engine and particularly the temperature that this disc itself would experience?

A:     **Well, the exterior temperature will affect the engine temperature and the altitude at which the helicopter is operating will also affect the engine temperature.  First, let me talk about exterior temperature.  The outside temperature, if it is higher, means the engine must work harder to produce the same amount of power.  Secondly, if the helicopter is operated at higher and higher altitudes, then the engine must work harder and harder as the altitude increases because the air is thinner and the thinner air and again causes the engine to work harder to produce the same amount**

**of power.     Additionally, the helicopter blades on the main rotor create less lift at higher altitude because of the thinner air and therefore the engine must work harder create lift.  So, what you have is a combination of these factors of the exterior temperature, the altitude that you are operating at and the amount of weight that is inside or suspended from the bottom of the helicopter, all three of those can significantly increase the temperature that is experienced by the engine and, in particular, by this disc.**

Q:    Why does increased temperature then given a constant rate of stress and given a certain amount of time that the engine is operating, why does an increase in temperature then result in the part not working and lasting as long as it would had the temperature been less?

A:    **The hot section of a turbine engine is a very demanding environment from a metal standpoint.  A turbine engine efficiency is based partly on the temperature – the higher the temperature, the better the engine efficiency.  Therefore, the designers of turbine engines have pushed for higher temperature metals and have pushed for higher temperatures in the engine.   Much research was performed over the years to develop new superalloys which could withstand the higher temperatures without failure.   The metals which are used at operated near their temperature limits to maximize engine efficiency.  Increases in operating temperatures above manufacturers maximum recommended temperatures can accelerate a phenomenon called creep on a rotating part like this CT disc.  Creep is a process** where the metal will tend to expand and the size of the part can therefore change.  The disc will actually have a larger diameter measurement than it did when it was first put into use when it was brand new.  The creep occurs because the material that the disc is made out of, in this instance, it's a metal called Waspaloy.  That material can only be heated so much before it starts to stretch and the increase in the size can be very small as far as we are normally concerned in terms of how we typically measure things in our everyday life.  Here we are

talking about a measurement of 0.0073 inches which is 73 ten thousandths.  So, we are talking about a very small increment of measurement, however, in a rotating part such as this, that type of a measurement is an important one, even at that small amount, that's still important.  And the reason is the manufacturer of the disc, Pratt & Whitney, states that the disc can only expand a certain amount, .003", so each time it comes into the shop for maintenance, the maintenance company will measure it and determine what the growth is and there is only a certain amount of growth that is permitted before the disc can then no longer be used.  The increase in temperature can cause the disc to grow in size more rapidly than one would desire and that then is going to result in a faster failure of the part because the increase in size will eventually tend to create cracks in the disc and those cracks then eventually will cause the disc to break and fail, **known as stress rupture failure.**

Q:    Let's go back now to when this engine came to Dallas Airmotive for its maintenance events and can you describe to me what those events were as you understand it from the materials and testimony that you have reviewed.

A:    Well, the engine came to Dallas Airmotive two times, namely the number one power section came two times for work.  In the first instance, the engine came for a routine overhaul, which Dallas Airmotive performed, and then in the second instance, in November 1997 the engine **came for a hot start and static fire.  Dallas Airmotive inspected the engine after that hot start and static** fire.

Q:    Can you tell the jury please what **hot start and static fire mean?**

A:    **Well, a hot start is when the engine experiences excessive temperatures for a few seconds during the starting procedures that is normally related to an abnormal condition during the starting process.   In this case, it was reported in this case that excessive fuel had been introduced into the engine, which, upon an attempted start of the engine, caused excessively high temperature conditions in the engine.  The engine was immediately shut down but a static fire remained in the engine for 15**

**seconds until it was extinguished. After such an incident occurs, the Pratt & Whitney manual requires that a maintenance company do a particular type of inspection that is specific to hot starts to determine whether there has been any damage of any type to the engine and to particular parts.**

Q:    Were you able to make a determination whether that temperature was of such a level in the hot start that it damaged the CT disc in any way?

A:    I did reach an opinion in that regard and my opinion is it absolutely did not affect the properties of the metal in the CT disc. **The reason for that is we examined the disc under a metallurgical microscope under high magnification, which we can look at the microstructure of the disc, namely all the way down to the level of the individual grains in the disc and looking at the disc at that level under that extremely high magnification, we were able to see that the microstructure in the disc had not changed after this accident. Therefore, it's quite easy to then work backwards and know that the microstructure had not changed after** the hot start. So, a change in microstructure would have meant that the disc had reached some extremely high levels of temperature, namely in excess of **2000EF**. That did not occur in this instance.

Q:    Have any other persons retained in the case to do an investigation made any similar or different findings?

A:    Well, the expert that ERA retained, he reached the same conclusion as me, that there was no change in the microstructure to the CT disc. **Additionally, the Pratt and Whitney metallurgist came to the same conclusion.**

Q:    Was there any other change to the disc due to the hot start event that, in your opinion, may have led to ultimately to the failure of the disc?

A:    No there was not. We reviewed the disc after this accident and found that the disc failure was not related in any way to corrosion or sulfidation of any kind. That theory has been thrown out by some people in the case. However, **since it was opined by the ERA group,** we certainly reviewed it, but we have concluded it is totally wrong. It is not

supported by the evidence.  There are some minute levels of oxidation or corrosion, it appears, which is the chemical reaction affecting the surface material of the disc, but that occurs **primarily** at the tips of these fir trees.  This photograph shows an overall view of the fir trees (EX ___).  The individual turbine blades slide into each of these fir trees. The location where the failure has occurred, which can be seen in this photograph (EX __) is at the bottom of this fir trees in this area.  The tips of the fir trees are in this area. The oxidation seen at the tips is shown in this high magnification photograph (EX__). The oxidation at the base of the fir trees is significantly less to nonexistent down in the area where the disc cracked and broke as shown in this high magnification photograph (EX___) .  You can see the crack but clearly no corrosion as shown in this other photograph.  Since the oxidation/corrosion was not present in the locations where the cracks were occurring at the base of the fir trees, the oxidation/corrosion would not affect the location where the cracks are occurring.  Additionally, the extent of depth of the oxidation/corrosion was on the range of 10-20 microns and clearly not visible without high magnification.   Even if the corrosion seen at the tips was occurring where the cracks occurred, I would still not expect that to cause failure of the disk.

Q:    At the time Dallas Airmotive looked at this disc for the hot start inspection, what was the level of inspection that it needed to conduct according to the Pratt & Whitney manual?

A:    **Pratt only required looking for sulfidation on a visual basis, meaning just using the naked eye.  The Pratt manual did not require Dallas Airmotive to look at the disc under a microscope, nor would that be something that would be expected since it is not in the manual.  As I just mentioned, the oxidation/corrosion that was observed with the microscope was not visible to the naked eye, and therefore it would not have been something that Dallas Airmotive would have been able to detect in following the guidelines of the Pratt and Whitney maintenance manual.   According the Pratt and Whitney overhaul manual, a disk it to be rejected if there is scaling due to oxidation or sulfidation – we clearly do not have any scaling on the disk even**

**after the accident.  (Do we need to show 72-50-04from Pratt & Whitney Overhaul Manual)  Pratt & Whitney metallurgist Jutta Demers sectioned the disk and examined the microstructure and made no mention of corrosion in her report and when asked in her deposition she said she saw no corrosion.  ERA expert Dave Rupert makes no mention of any corrosion except for viewing the surface at high magnification using a microscope.  Sulfidation on the turbine blades, which are attached to the disk, is allowed to the point that heavy surface roughness is allowable as shown in the following diagram (EX _____).  The inspection of turbine blades for sulphidation is also done with the naked eye.**

Q:    Did you conduct any research regarding the properties for the material Waspaloy that was used on the compressor turbine disc that we have been speaking about?

A:    Yes.  I reviewed the reference materials for Waspaloy which are published by the manufacturer of the material and other industry sources, and in particular looked at the affect of temperature on the ability of the Waspaloy material to resist creep.  And again, as I stated earlier, creep being the tendency of the **material to stretch and the disc to grow** larger in size over the course of time because of stress and temperature increases. If we look at the chart that I am holding here (EX __), we will see that the stress rupture strength, namely that means the ability of the material to withstand stress, that strength decreases 29.4% when the temperature of the metal, in this instance this disc, is between 1300℉ and 1400℉.  However, when you elevate the temperature to 1700℉ to 1800℉, the strength decreases 53.6%, so in other words, a fairly small increase in temperature here on the order of 300℉ to 400℉ out of a total of 1800℉, so we are talking about an increase in temperature of only 20% or 25%, but that decreases the rupture strength of the material by 53%, so you have a reduction in strength that is non-linear, in other words not a one-for-one correlation with the increase in temperature.  In other words, fairly small increases in temperature can lead to very significant alterations in the service life of this Waspaloy material.

Q:    Can you explain in what manner this disc could experience a creep, if there had not been a change in microstructure at the time of the hot start, where the creep according to ERA is supposedly coming from some type of corrosion related to sulphidation.  Is that what you understand to be the theory by the ERA expert in this case?

A:    Well, I do understand that to be their theory, but there is no scientific explanation for how that could occur.  The quick elevation in temperature that occurred in the hot start was estimated at approximately 15 seconds, which is quite short, and creep is not something that occurs in a short time, but it is a time dependent event that occurs over hundreds of hours of operation, so there would also be, in this instance, in the hot start, there would be a very, very low level of stress on the disc because the disc would be barely rotating in the start up phase.  So, as we had discussed earlier, the various factors that are going to affect creep, namely time, temperature and stress, well you certainly don't have stress here because the disc is not moving at full speed and you don't have time because the time is quite short, namely on the order of 15 seconds, so what do you have to have? You have to have some extreme condition of temperature to the point where it's going to change the microstructure and we know that absolutely did not happen in this instance. Since the microstructure did not change after the hot start, there is no explanation for creep other than high temperature operation.  **Since the microstructure did not change during the hot start, there is no explanation for creep other than high temperature operation of the engine after the hot start.  Sulphidation does not cause creep or make the metal more susceptible to creep.**

Q:    Can you show me how the creep was measured?

A:    There are a total of 58 fir trees on a disk (EX____).  Since 2 fir trees had fractured a total of 56 measurements were made from the center of the disk to the outer edge of each of the 56 fir trees.  This chart (EX__) shows the individual results of each measurement. This chart (EX__) is a handwritten diagram showing each individual measurement around the wheel.   This bar graph (EX___) illustrates how much growth actually

occurred in the wheel. ALL 56 radial growth measurement exceeded the maximum

growth allowed by Pratt and Whitney. The maximum radial growth on the chart is listed

as 0.0015 inches which corresponds to the 0.003 diameter growth since the radius is

twice the diameter. ERA experts had suggested that the creep was caused by cracks in

the fir trees. But there were cracks in only 11-13 fir trees, yet, as has just been show in

these charts and diagrams, every fir tree showed creep beyond the allowable. The only

explanation for this creep all the way around the wheel is high temperature operation of

the engine.

Q:    Dr. Manning, please tell the jury what was the increase in growth of the disc between

Dallas Airmotive's general maintenance work they did and the hot start work they did in

1997.

A:    Well, the disc over that time had grown by 0.0014 inches, namely 14 thousandths and

that is an amount that is clearly permissible under the Pratt & Whitney guidelines. The

Pratt & Whitney guidelines state that the disc must be removed at the time of the

overhaul if the disc has grown more than .003 inches during the life of the disc. There

was no way for Dallas Airmotive or anyone to possibly tell whether the disc would reach

that extent of growth to .003 inches in the remaining time before it would next be

overhauled and inspected again, and the reason for that is the rate of creep is not a linear

rate, so it does not grow at a consistent rate. Creep can occur and then slow down or

virtually stop and then occur again, so there was no way to predict that and pursuant to

the Pratt & Whitney manual, is perfectly acceptable for Dallas Airmotive to put this disc

back in the engine.

Q:    Can you explain to the jury why it is that the disc grew at a greater than acceptable rate?

A:    Yes. My opinion and conclusion is that the disc had creep at an unacceptable rate due to

abnormal usage of this engine. The engine was operated in abnormal conditions, namely

at increased temperatures and those increased temperatures are what caused the disc to

have creep, namely to grow in size at an unacceptable rate to the point that the disc failed. **There is no other explanation for how the creep occurs**.

Q:     Is there a relationship, Dr. Manning, between the actions of the pilot and the magnitude or amount of creep that we would see in these parts of the engine such as the CT disc?

A:     No question in my mind that is true and it is not just my opinion, but I have relied on the book written by Pratt & Whitney, the people who manufacture this disc.  They have written a book called "The Aircraft Gas Turbine Engine and It's Operation", and in that book Pratt & Whitney tells us, and I wholeheartedly concur with this, that, as I am showing you in a page copied from the manual "the pilot controls the magnitude of creep by the way that he or she operates the engine"  (EX __) and we know that because the pilot has the ability to keep the engine working at a lower temperature and for these metals in the engine such as the CT disc to experience lower temperatures. Conversely, the pilot if he wants to fly the helicopter differently can expose the engine to much higher temperatures and, therefore, he is going to cause creep and have shorter life of these parts and the parts will fail before they are expected to fail.

Q:     What is it that you have reviewed, Dr. Manning, that has provided you with a basis to state that this helicopter was operated outside of normal operations and, therefore, caused an increased temperature and, therefore, this creep?

A:     Well, I reviewed a number of things, particularly the sheet concerning the pilot's load on the day in question.  He was clearly overweight on that day.  That's a conclusion that was reached in other reports, including the U.S. Department of the Interior report which I relied upon the calculations there.  Other testimony I relied on concerning the maneuvers that the pilot executed in operating the helicopter, namely steep banking turns, dropping the nose of the helicopter as one is coming in to try to do a water pickup and these types of extreme maneuvers place greater stresses on the engine, because the engine has to work harder to move the helicopter through these extreme maneuvers, so you have a combination of those factors.  Additionally, if we look at the temperature and altitude that

he was operating at, there are charts that are published by the manufacturer of this helicopter, namely Bell Helicopter, and if we look at the chart which I am holding up here (EX No.____), you will see by looking down the side of the chart, there is an area where you will see the altitude and then coming across you will see an area for the temperature, which is the outside temperature, and when you make a combination of these two factors, we can come up with an internal temperature of ITT as it is sometimes called, inner turbine temperature, for this engine and so then we get a indication here of what kind of temperatures are being experienced by this CT disc due to the combination of higher altitude and the higher temperature *and* the weight that is on the helicopter.  So, we put all these factors together and what do we get?  We get an elevated temperature that is in the range of what I was talking about earlier, namely **1400° to 1500°F**.

Q:     Dr. Manning, can you quantify in any way, assuming that the helicopter regularly reached temperatures of 1350 - 1400˚F and occasionally up to 1500˚F, how would that decrease the life of this CT disc made out of Waspaloy?

A:     Well, I've obtained the creep data for Waspaloy.    If you look at the chart that I am holding here (EX No.___), we can see a graph that shows how the life of the part over time, how that metal will have a lower resistance to creep due to the elevated temperatures.  **The chart indicates that as the temperature increases, the rate at which the metal will creep increases.**

Q:     Did you reach any conclusions regarding what happened in the engine sequence of failure once the number one power section ceased to provide power during the flight?

A:     I did not make any specific findings in that regard.  I do know that the number two power section at some point stopped providing power, but I have not made any effort to find out specifically when.

Q:     Did you reach any conclusion as to the propriety of DAI's work?

A:    Yes.  Its work was entirely appropriate and in good order.  The failure of that disc was

from the abnormal and abusive operations by ERA and its pilots in terms of creating

elevated temperatures for the parts in the engine.

Q:    Similarly, with respect to the combining gear box, did you make any findings in that

regard Dr. Manning?

A:    No I did not.

Q:    Let me ask you to consolidate your various opinions you have told us about today.

A.    Sure.  My opinions are as follows:

First, When Dallas inspected this disk for the hot start, they did absolutely nothing wrong

by re-installing this CT disk.  They followed the Pratt manual.  The disk could not have

shown any visual signs of sulfidation or corrosion, because it still shows no signs of it

over 1000 hours later, after this accident.  With my laboratory equipment, which is quite

sophisticated for testing for surface corrosion, we can find barely a trace, and remember,

Pratt allows a fairly high level of sulphidation before you have to even consider rejecting

this disk.

Also, the growth of the disk was clearly within what Pratt allows.  According to the

manual, Dallas was allowed to put the disk back in service.  This disk is an expensive

part, costing tens of thousands of dollars, and ERA would have been the one to pay for

that cost if Dallas pulled it off the engine prematurely.  There was no reason to send ERA

a bill for the disk when Pratt says it was okay to keep using it.

Second, the PT6T engine on this Bell Helicopter was operated outside the permissible

scope as intended by Pratt & Whitney.  It was operated at excessive temperatures due to

the high altitudes, excess loads and high temperatures in the area of operation and at these

fires.

Third, the ERA pilots had the ability to avoid those excess engine temperatures.  Pratt

tells us that in its own book.  They have the same charts I showed you earlier, with the

graph showing the altitude, weight and outside temperature.  They should know better than to operate so that you run the engine abnormally as they did.

Four, the extreme temperatures that this disk experienced can be directly traced to it failing.  The Waspaloy chart from the metal manufacturer tells us that heating the disk up to 1600 or 1700 degrees F, versus 1300 or 1400, means you double the rate of creep.

Five, the disk grew in size, just as the Waspaloy chart says it will.  The growth of the disk was from creep, namely the excess temperatures causing it to expand.  The growth had nothing to do with the hot start.  No metallurgist has ever said that in this case, not me, not Gus Sidla from the Canadian TSB, not Jutta Demers at Pratt.

Six, the creep alone caused the failure.  Sulphidation did nothing to create the stress rupture cracks in the disk.  There is simply no scientific evidence of that.  *A hired expert can say it, but it is not true*.  There is no basis to say it.  There is no evidence.

Seven, had the pilots operated the engine properly, the disk should have lasted until the next overhaul.  There is nothing to indicate the disk would not have worked properly had the temperatures of the disk been kept at a maximum of 1350 generally during engine operation.

Therefore, the root cause, the ultimate cause when you cut away all the layers of investigation, is that the engine failed due to excess temperatures placed on this disk by ERA.

Q.    Thank you for your time Dr Manning.

Respectfully submitted this 27th day of November, 2006.

Defendants Dallas Airmotive, Inc. and
UNC Airwork Corporation

By:    s/ David A. Devine                        .
        David A. Devine (AK Bar No. 7906015)
        GROH EGGERS, LLC
        2600 Cordova Street, Suite 110
        Anchorage, AK 99503
        Phone: (907) 562-6474
        Fax: (907) 562-6044
        E-Mail: devined@groheggers.com

        Raymond L. Mariani, NY Bar No. RM2077
        NIXON PEABODY LLP
        50 Jericho Quadrangle, Suite 300
        Jericho, N.Y. 11753
        Phone:  (516) 832-7520
        Fax:      (516) 832-7555
        E-Mail:  rmariani@nixonpeabody.com

I HEREBY CERTIFY that on November 27, 2006,
a copy of the foregoing was served **electronically** on:

Jon A. Kodani, Esq.
Jeffrey J. Williams, Esq.
LAW OFFICE OF JON A. KODANI

Attorney for Plaintiff Era Helicopters, LLC

William F. Brattain II, Esq.
BAKER BRATTAIN, LLC

Attorney for Defendant Pratt & Whitney

  s/ David A. Devine