David A. Devine, AK Bar No. 7906015
GROH EGGERS, LLC
2600 Cordova Street, Suite 110
Anchorage, AK 99503
Phone: (907) 562-6474
Fax:    (907) 562-6044
devined@groheggers.com

Raymond L. Mariani, NY Bar No. RM2077
NIXON PEABODY LLP
50 Jericho Quadrangle, Suite 300
Jericho, NY 11753
Phone: (516) 832-7520
Fax:    (516) 832-7555
rmariani@nixonpeabody.com

Attorneys for Defendants
Dallas Airmotive, Inc. and
UNC Airwork Corp.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| ERA HELICOPTERS, LLC, a Delaware Company | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. A02 - 0131 CV (JKS) |
| | ) | |
| UNC AIRWORK CORPORATION a/k/a | ) | |
| DAI Airwork Corporation, a Delaware corporation; | ) | |
| DALLAS AIRMOTIVE, INC., d/b/a | ) | |
| UNC Airwork Corporation and DAI Airwork | ) | |
| a Delaware corporation; | ) | |
| PRATT & WHITNEY CANADA, INC. | ) | |
| a Canadian corporation; and | ) | |
| DOES 1 THROUGH 500, Inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

**DALLAS AIRMOTIVE, INC. and UNC AIRWORK CORP.'S TRIAL BRIEF**

Defendants DALLAS AIRMOTIVE, INC. and UNC AIRWORK CORP. (hereinafter

collectively "DAI"), by and through undersigned counsel, pursuant to the Court's May 5, 2004

Order, respectfully submit their trial brief.

## I    STATEMENT OF FACTS

The following is a summary of the key facts.  It does not represent all evidence DAI will

present at trial.

1.    The Bell 412 Helicopter

The Bell 412 is operated by one pilot.  It was powered in this instance by an engine with

two power sections, a model PT-6T ("twin-pak") manufactured by Pratt & Whitney.  It contains

the typical helicopter flight controls: pedals for movement of the nose from right to left; a cyclic

stick, that changes the pitch of a single advancing blade to make the nose rise or fall and to roll

left or right; and a collective stick, which changes the pitch of all blades simultaneously and

causes vertical ascent and descent.  Inputs can be made on all three controls in tandem or in

isolation.

The Bell 412 at issue was fitted with a cargo hook on the center of the underside of the

hull.  The hook can be used to attach sling loads, i.e. loads suspended from wire cables that join

at a ring or other coupling that is then attached to the cargo hook.

One type of sling load is a "Bambi bucket", a cloth, plastic reinforced and wire hardware

container designed to carry water to fight forest fires.  A Bell 412 pilot has the ability to

discharge the water contained in the Bambi Bucket, but can also release the Bambi Bucket in its

entirety, including the cable. The circumference and aggregate volume of the Bambi Bucket can

be diminished to a percent of its overall volume by adjusting a belt on the Bambi Bucket

exterior.

2.    The Compressor Turbine ("CT") Disc

This twin pak engine was overhauled by DAI in May 1996 without any remarkable events and was reinstalled by ERA.  ERA reported in November 1997 that it had experienced a "hot start", an event where fuel is ignited in the engine while the engine parts are not rotating.  Notably, the duration of the hot start, and the temperatures of the hot start, are unknown.  After the hot start, the engine was sent to UNC Airwork in Miami for an inspection of any damage.

The Compressor Turbine disk ("CT Disk") is a round metal disk made from a nickel-based alloy called Waspaloy.  It has jagged ridges called "fir trees" running around the circumference at regular intervals.  Metal blades are fitted between every two fir trees and allow the disk to rotate when hot gases pass by it in the engine compartment "hot section".  Subsequent to the hot start, the CT Disc was examined by UNC Airwork's Material Review Board, consisting of lead inspectors and engineers who were qualified to analyze the part, and make a final determination regarding any repair.  The Materials Review Board concluded that the CT Disk did not need to be replaced due to the hot start.  They did see a small abrasion of some type on the body of the disk and decided that the Pratt manual permitted a polishing of that blemish.

The disk diameter was measured at the time and it had "grown" by, at most, 45% of the maximum growth allowed by Pratt & Whitney.  Based, in part, on this factor, the disk was returned to service.  The percentage of growth in comparison to the percentage of time used in the life of the disk before next overhaul is not a consideration of the Pratt manual.

The CT Disk was reinstalled for use in a Bell 412 helicopter ERA used for fighting forest fires on contract to the US Government, Department of the Interior.  This helicopter and engine was ultimately used by on the accident flight.

After reinstallation, the engine operated without incident for 2000 hours. During that time, the engine was subject to abuse by the operator, including the pilot in this instance, Lester Shadrick. The CT disk was subjected to overstress and over-temperature. This resulted in an admitted growth of the CT Disk by 0.0062 inches between the time of the hot start inspection and the day of the accident. ERA admits that this extreme growth of the disk is not related to the actions of DAI.

     3.    <u>The Accident</u>

Lester Shadrick was an ERA pilot and flight instructor who taught other ERA pilots how to fly the Bell 412 and fight forest fires. Shadrick was also responsible for teaching other ERA pilots about ERA's helicopter operations manual.

Before the accident flight, Lester Shadrick was required to complete a form for calculation of aircraft weight and balance. He wrote his body weight as 225 pounds, while his autopsy notes his weight as almost 300. He noted the weight of the water in the bucket and the bucket itself. The Department of Interior later calculated the weights in its investigation and concluded that the helicopter was 600 to 900 pounds in excess of the allowable gross weight for the conditions of the day.

According to witness statements, pilot Shadrick had been working repeated 8 hour shifts in Nevada from August 1, 2000 until the day of the crash on August 13th. This accident occurred near the end of one of those repeated 8 hour shifts as Shadrick was heading up a canyon with a full bucket of water.

As Shadrick proceeded up a ridge with a load of water, he apparently lost engine power to the No. 1, or left, power section when the CT disk failed. According to the ERA operations manual, the pilot was required to jettison the bucket. Shadrick did not jettison the bucket. The

ERA helicopter operations manual explicitly directs pilots that they must "if any difficulties arise during the flight and emergency landing is necessary, be prepared to release the load immediately.  If autorotation is necessary, release the load immediately".

The button to release the external load was located on the pilot's cyclic, which should have been held by pilot Shadrick throughout the accident sequence.  Chief ERA pilot Terry Cole testified that it would take an average pilot a maximum of only 2 seconds to press the electrical cargo release and jettison the water bucket.

ERA's own manual advised the pilot in advance of the danger of failing to jettison the load: "If for some reason the load will not release, use a flared landing so as to eliminate dragging the load on the ground prior to touchdown as this will cause the rotor craft to nose over with inadequate aft cyclic control to compensate."  Here, the bucket dragged along the ground for approximately 90 feet.  Ultimately, the bucket became wrapped around a pinion tree and pulled the nose of the helicopter directly into the hillside.

4.    Post-Accident Investigations

A post crash-inspection of the engine by Pratt & Whitney concluded that the engine failed when the left power section CT Disk fractured in two places due to cyclic stress.  The parts became ingested downstream and stopped engine rotation.  The right power section also lost power.  Pratt investigators concluded that the CT Disk had experienced "creep" due to abuse of the engine caused by excessive loads and temperatures.  Pratt also noted that both the left and right engine blades showed some evidence of overheating, confirming that the engine had been subjected to sustained operation above flight manual temperature and speed limitations.

10304601.1                                          5

## II    PLAINTIFF'S THEORY OF THE CASE

In its claims against DAI, plaintiff asserts that the CT Disk in the left engine failed due to negligence of DAI. More specifically, plaintiff claims that the use of the CT Disk following the hot start was negligent because it allowed the CT Disk to experience sulfidation/hot corrosion and resulted in a compromising of the disk material. Plaintiff claims that the CT Disk failed over two years after the work done by UNC Airwork because alleged sulfur contamination, related to the abnormal temperature experienced, caused pitting (pockmarks) and then led to cracks. Plaintiff abandoned the claim that the blemish on the disk caused it to crack.

## III    DAI'S THEORY OF THE CASE

The following is a summary of the legal arguments DAI will present at trial. It does not present every legal argument DAI will pursue, but provides key legal arguments central to understanding this case.

1.    Liability Issues

### 1.    Plaintiff Cannot Prove That DAI Maintenance Was Negligent

To establish the tort of negligence under Alaska law, a plaintiff must prove four elements: (1) duty; (2) breach of duty; (3) causation; and (4) harm. Parks Hiway Enters, LLC v. CEM Leasing, Inc., 995 P.2d 657, 667 (Alaska 2000). A failure to prove causation is fatal to a plaintiff's negligence claim. Lyons v. Midnight Sun Transportation Services, Inc., 28 P.2d 1202, 1204 (Alaska 1996) (holding that "[w]ith the element of causation lacking, even the most egregious negligence cannot result in liability.").

In order to prove causation, a plaintiff must prove (1) actual causation and (2) proximate, or legal, causation. Vincent v. Fairbanks Memorial Hospital, 862 P.2d 847, 851 (Alaska 1993). Alaska uses the "but for" test when evaluating actual cause. Id. In order to prove proximate

cause, a plaintiff must satisfy the "substantial factor test" by proving that (1) the defendant's conduct is a substantial factor in bringing about the harm and (2) that there is no rule of law relieving the actor from liability. Id.

### 1    *DAI's Inspection of the Disk was Proper*

There is absolutely no proof that the temperatures to which the CT Disk was exposed during the hot start incident were excessive. ERA experts cannot specify the temperature. To the contrary, the hot start was of such a short duration that the Disk did not reach high temperatures. Indeed, it is uncontested that the microstructure of the Disk did not change as a result of the hot start incident. **This shows that the Disk never reached temperatures in excess of 1900 degrees**, the temperature at which microstructural change would have occurred. Therefore, DAI's inspection of the Disk was appropriate.

### 2.    *The Pratt Manual Allows Sulfidation on a CT Disk*

The Pratt & Whitney manual acknowledges that sulfidation occurs, and sets forth acceptable levels of sulfidation for CT Disks. Even if sulfidation occurred on the subject Disk, this is a normal occurrence.

In fact, ERA pilots are known to have overheated and abused CT Disks. It is undisputed that ERA pilots have operated the accident aircraft improperly, causing overheating and wear on the disks. When pilots overwork engines, it decreases the life expectancy of the parts. Here, the CT Disk sustained extreme measures of growth because ERA pilots had been subjecting it to improper operating conditions.

First, the only possible evidence of sulfidation that the expert Dave Rupert sets forth in his report is at the very tips of the fir trees. However, the fir trees failed at the base. Secondly, the plaintiff's expert Rupert, concurs with Pratt & Whitney in that there is no evidence of a

10304601.1                                      7

change in microstructure of the material of the Disk. This tells us that the Disk did not experience any significant temperature that would allow sulfidation to indicate the disk has a minute build-up (0.00063 inches) at the tip of the fir tree of a substance that plaintiff alleges is sulfidation.

Furthermore, the sulfidation on a CT Disk is an expected event in the course of operating this engine. Pratt & Whitney itself advises operators to check routinely for sulfidation on the CT Disk and CT Disk blades. This is not surprising since the CT Disk experiences the hottest gases within the power section and thus, is susceptible to this phenomenon.

More importantly, there is no hard evidence supporting Plaintiff's sulfidation theory. No one has taken samples of the CT Disk and made findings regarding the presence and depth levels of sulfidation at any given point on the CT Disk. To the extent that there was any observable sulfidation on the CT Disk, it was located at the top of the fir trees, not at the base where the cracks occurred.

### 3. Pilot Error Caused the Accident

Even though DAI has no burden of proving alternate causation, it is apparent that pilot error caused this accident. This is for two major reasons.

### 1. The Accident Aircraft was Overweight

Overtaxing the aircraft by subjecting it to excessive loads causes CT Disks to fail. That is why the disk grew an impermissible amount. Moreover, when the left engine failed, the remaining engine was exposed to excessive weight, thereby exacerbating an already precarious situation.

As discussed above, before flying on August 13, 2000, the pilot failed to calculate properly not only his personal weight, but the Bell 412's load weight, and therefore, the gross

10304601.1                                        8

weight of the accident aircraft.  The Department of the Interior's investigation reveals that the helicopter was 600 to 900 pounds in excess of the allowable gross weight for the conditions of the day.  These inaccurate weight calculations caused the failure of the CT Disk.

### 2.    *The Pilot Never Jettisoned the Load*

The accident aircraft was equipped with a jettison mechanism which enabled the pilot to hit a button on the cycle and instantly release the bucket and supporting cables.  It is uncontested that the jettison mechanism was in proper working order at the time of the accident.  It was standard ERA procedure to test the mechanism prior to a flight or series of flights and there is no evidence that it was not (1) tested, and (2) in working order prior to the accident flight.  It is likewise uncontested that the pilot had adequate time in which to hit the button and jettison the load prior to the crash.  It would have taken a maximum of 2 seconds for the pilot to hit the button and release the load.  Here, the pilot had more than 2 seconds during the accident sequence in which he could and should have jettisoned the load.  Instead, the pilot failed to employ proper emergency procedures, and the bucket and cable, still attached to the helicopter, became entangled in a pinon tree, causing the crash.

### 3.    *Plaintiff Cannot Recover on a Strict Product Liability Theory*

Under Alaska law, a manufacturer is strictly liable in tort when (1) an article he places on the market; (2) knowing that it is to be used without inspection for defects, (3) proves to have a defect; (4) that causes injury; (5) to a human being.  Pratt & Whitney Canada, Inc. v. Sheehan, 852 P.2d 1173, 1176 (Alaska 1993), citing Clary v. Fifth Avenue Chrysler Center, 452 P.2d 244 (Alaska 1969).

Plaintiff will argue that DAI reintroduced the CT Disk into the stream of commerce after the CT Disk allegedly suffered sulfidation/hot corrosion that "compromised" the disk's material.

10304601.1

9

DAI is not a manufacturer.  Moreover, the disk was property of ERA and was not "placed on the market" by DAI.

Alaska recognizes strict liability damages for purely economic losses if the plaintiff proves (1) causation and (2) that the loss occurred under "dangerous circumstances."  Sheehan, 852 P.2d at 1177.  However, like plaintiff's negligence claim, plaintiff cannot prove causation in this matter.

### 4.    *Damages Issues*

In Alaska, the party seeking damages has the burden of proof of such damages.  Onam Alaska v. Bell Lavalin, 842 P.2d 148, 154 (Alaska 1992).  Damages must be proven with specificity and cannot be speculative.  Cent. Bering Sea Fishermen's Ass'n v. Anderson, 54 P.3d 271, (Alaska 2002) (noting that "an award cannot stand . . . if the amount is the result of the speculation."); Chenega Corp. v. Exxon Corp., 991 P.2d 769, 799 (Alaska 1999) (stating that "the law does not permit a recovery of damages which is merely speculative or conjectural.") (internal citations and quotations omitted).  Alaska strictly construes awards of future damages. Chenega Corp., 991 P.2d at 799 (Alaska 1999) (noting that "[a]s a general rule, [Alaska law] refuses to allow a plaintiff damages relating to the tortious injury unless the proofs establish with reasonable probability the nature and extent of those consequences.").

Plaintiff also has a strict duty to mitigate damages in Alaska.  Irving v. Bullock, 549 P.2d 1184, 1187 (Alaska 1976) (stating that "[i]t is the duty of any person who has been injured to use reasonable diligence and reasonable means under the circumstances in order to prevent the aggravation of such injuries to mitigate his damages and to effect a recovery.").  Consequently, a plaintiff's failure to mitigate damages results in a dollar-to-dollar deduction to his recovery for

the amount of damages he failed to mitigate. <u>Johnson v. Alaska State Dep't of Fish&Game</u>, 836

P.2d 896, 910 (Alaska 1991)**.**

Finally, there is no basis for an award of punitive damages, which are a harsh remedy not

favored by the law. <u>Chizmar v. Mackie</u>, 896 P.2d 196, 210 (Alaska 1995).  Courts allow punitive

damages only with caution and within narrow limits.  <u>Id</u>.  In evaluating such claims, the court

should make a threshold determination as to whether a plaintiff can support a prima facie case

for punitive damages.  <u>See</u> <u>Mitchell v. Heinrichs</u>, 27 P.3d 309, 311 (Alaska 2001) (affirming

summary judgment dismissal of punitive damages claims); <u>Chizmar</u>, 896 P.2d at 210 (affirming

directed verdict dismissing punitive damages claims).  Punitive damages may not be awarded in

any action unless supported by clear and convincing evidence demonstrating that the defendant's

conduct was outrageous, such as acts done with malice, bad motive, or reckless indifference to

the interests of another.  <u>Chizmar</u>, 896 P.2d at 210.

### 1.        Plaintiff Cannot Prove Any Consequential Damages.

Plaintiff cannot prove, with reasonable specificity, that it suffered consequential

damages. Plaintiff's 30(b)(6) witness, Richard LaRew, was absolutely incapable of quantifying

any lost profits of the corporation.  His testimony was steeped in generalities about the general

revenues of the corporation as a whole.  He was unable to provide any specifics on the amount of

lost profits attributable to this particular helicopter being out of service until it was replaced.

That type of speculation and conjecture does not afford a sufficient basis for a jury to award

consequential damages at trial.

Plaintiff's counsel subsequently provided a spreadsheet that counsel created to justify the

lost revenues claim of ERA.  However, that data comes too late to sustain the plaintiff's claim

following the production of its Rule 30(b)(6) witness for a deposition.  Moreover, that analysis is

not a record of ERA, but attorney argument. It is also filled with generalities and speculations. ERA's counsel simply divided the general revenues of the company among various helicopters that ERA operates to attributed the cost of operation equally among the various equipment. This type of speculation is not sufficient to sustain an award for damages at trial.

### 2.    Plaintiff has Failed to Mitigate Damages

Even if plaintiff can prove damages with sufficient specificity, plaintiff has failed to mitigate its damages. Indeed, if plaintiff was serious about mitigating damages, ERA would have obtained another helicopter immediately, which it plainly failed to do.

### 3.    Plaintiff is not entitled to Punitive Damages

Plaintiff's claim for punitive damages is based on its unsupported allegation that defendants installed an unairworthy component part in Era's engine. UNC Airwork's records indicate that the accident aircraft's CT Disk was subjected to an over-temperature event (commonly referred to as a "hot start") at ERA Aviation's facilities in November 1997. Subsequent to the hot start, the CT Disk was examined by UNC Airwork's Materials Review Board consisting of lead inspectors and engineers who were qualified to analyze the part and make a final determination regarding any repair. During this inspection, a blemish (or "grooved condition") was found in the rivet head area on the disk. Although a temporary "red tag" was placed by a lower level inspector, indicating the disk had not yet been polished, the disk was polished by the Miami facility, inspected, and returned to service.

When the disk failed, the fir trees of the disk were broken off at the base of the fir tree where it meets the body of the disk, not near the rivet head area. Plaintiff's experts all claim that excess sulfur caused the disk to fracture, not the blemish. ERA's experts admit that the blemish in the rivet head area bears no connection to any corrosion on the fir trees or the fracture at the

base of the fir trees. Plaintiff's own experts long ago conceded that the blemish did not cause the disk fracture and is not related to the failure mode theory plaintiff advocates in this matter. Consequently, the court has excluded the red tag and all documents associated with it that concern the disk blemish.

Further, a second red tag is not legible and bears some notation regarding carbon buildup. However, for the reasons stated above, that cannot be a basis for punitive damages. It has no mention of sulfur, which is the ERA theory of liability. The only possible evidence of sulfidation that the expert David Rupert sets forth in his report is at the very tips of the fir trees, although the fir trees failed at the base. Moreover, plaintiff's expert Rupert concurs with Pratt & Whitney in that there is no evidence of a change in microstructure of the material of the Disk. The Disk did not experience any significant temperature that would allow sulfidation to indicate the disk has a minute build-up (0.00063 inches) at the tip of the fir tree of a substance that plaintiff alleges in sulfidation.

Further, the sulfidation on a CT Disk is an expected event in the course of operating this engine. Pratt & Whitney itself advises operators to check routinely for sulfidation on the CT Disk and CT Disk blades. Thus, the presence of sulfur cannot be a basis to claim that a maintenance firm was negligent to the point of almost intentional conduct, where the manufacturer of the part states that this substance is to be expected on the part. No samples of the CT Disk show levels of sulfidation at any given point on the CT Disk. Thus, plaintiff has no proof that sulfur exists on the disk, even post-accident.

In short, there will be no evidence demonstrating that the defendants' conduct was outrageous, or done with malice, bad motive, or reckless indifference to the interests of another.

10304601.1

13

IV.     **OBJECTIONS TO PLAINTIFF'S EXHIBITS**

DAI submits herewith its objections to Plaintiff's Exhibits.

Respectfully submitted this 20th day of February, 2007.

Defendants Dallas Airmotive, Inc. and
UNC Airwork Corporation

By:    s/ David A. Devine
David A. Devine (AK Bar No. 7906015)
GROH EGGERS, LLC
2600 Cordova Street, Suite 110
Anchorage, AK 99503
Phone: (907) 562-6474
Fax: (907) 562-6044
E-Mail: devined@groheggers.com

Raymond L. Mariani, NY Bar No. RM2077
NIXON PEABODY LLP
50 Jericho Quadrangle, Suite 300
Jericho, N.Y. 11753
Phone:  (516) 832-7520
Fax:       (516) 832-7555
E-Mail:  rmariani@nixonpeabody.com

I HEREBY CERTIFY that on February 20, 2007,
a copy of the foregoing was served **electronically** on:

Jon A. Kodani, Esq.
Jeffrey J. Williams, Esq.
LAW OFFICE OF JON A. KODANI

Attorney for Plaintiff Era Helicopters, LLC

William F. Brattain II, Esq.
BAKER BRATTAIN, LLC

Attorney for Defendant Pratt & Whitney

 s/ David A. Devine