Jon A. Kodani, Esq. (*pro hac vice*)
Jeffrey J. Williams, Esq. (*pro hac vice*)
**LAW OFFICES OF JON A. KODANI**
2200 Michigan Avenue
Santa Monica, CA  90404
Tel. (310) 453-6762

**Attorneys for Plaintiff**
Era Helicopters, LLC

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **ERA HELICOPTERS, LLC**, a Delaware company, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Case No. |
| vs. | ) **A02-0131 CV (JKS)** |
| | ) |
| **UNC AIRWORK CORPORATION** a/k/a | ) |
| DAI Airwork Corporation, a Delaware corporation; | ) |
| **DALLAS AIRMOTIVE, INC.** d/b/a | ) |
| UNC Airwork Corporation and DAI Airwork Corporation, | ) |
| a Delaware corporation; | ) |
| **PRATT & WHITNEY CANADA, INC.**, | ) |
| a Canadian corporation; and | ) |
| **DOES 1 through 500**, Inclusive, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFF'S TRIAL BRIEF

## TABLE OF CONTENTS

1.0        **BRIEF OVERVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

2.0        **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

3.0        **SUMMARY OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

4.0        **FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

5.0        **THE CAUSE OF THE CRASH** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

6.0        **THE DEFENDANTS' LIABILITY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

        **6.1 Strict Products Liability – CT Disk** . . . . . . . . . . . . . . . . . . . . . . . .   15

               6.1.1 CT Disk – Consumer Expectations . . . . . . . . . . . . . . . . . . . . . . .   16<br>
               6.1.2 CT Disk – Deviation from the Norm . . . . . . . . . . . . . . . . . . . . . .   16

        **6.2 Strict Products Liability – Sprag Clutch** . . . . . . . . . . . . . . . . . . .   17

               6.2.1 Sprag Clutch – Consumer Expectations . . . . . . . . . . . . . . . . . .   17<br>
               6.2.2 Sprag Clutch – Deviation from the Norm . . . . . . . . . . . . . . . . .   17

        **6.3 Negligence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

7.0        **THE PILOT WAS NOT NEGLIGENT** . . . . . . . . . . . . . . . . . . . . . . . .   19

8.0        **PLAINTIFF'S DAMAGES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

        **8.1 Prejudgment Interest** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

**TABLE OF CONTENTS**
*(continued)*

**9.0    PUNITIVE DAMAGES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

**10.0    SUMMARY OF DISPUTED FACTUAL ISSUES** . . . . . . . . . . . . . . .    24

**11.0    SUMMARY OF DISPUTED EVIDENTIARY ISSUES** . . . . . . . . . . .    24

**12.0    EVIDENTIARY OBJECTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

**13.0    CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

Era Av 4EH/PO/WO Lg24175/20070216

# TABLE OF AUTHORITIES

## Cases

Alaska Children's Services, Inc. v. Smart
677 P.2d 899 (Alaska 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

Beaulieu v. Elliott
434 P.2d 665 (Alaska 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Beaux v. Jacob
30 P.3d 90 (Alaska 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Bell v. Precision Airmotive Corporation
42 P.3d 1071 (Alaska 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

Brinkerhoff v. Swearingen Aviation Corp.
663 P.2d 937 (Alaska 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

Ehredt v. DeHavilland Aircraft Co. of Canada, Ltd.
705 P.2d 446 (Alaska 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

General Motors Corp. v. Farnsworth
965 P.2d 1209 (Alaska 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

State v. Stanley
506 P.2d 1284 (Alaska 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

## Statutes

28 U.S.C. § 1332(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

AK.ST.ANN. 09.17.020(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

AK.ST.ANN. 09.30.070 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

Era Av 4EH/PO/WO Lg24175/20070216

Pursuant to the Court's order (Doc. 413), plaintiff Era Helicopters, LLC, respectfully submits the following Trial Brief:

## 1.0   BRIEF OVERVIEW.

This is a product liability case involving the crash of a helicopter. The crash occurred during a firefighting mission, while the helicopter was carrying water in a bucket attached to the underside of the helicopter.

Subject matter jurisdiction is based on diversity of citizenship, and Alaska state law will be applied. The plaintiff seeks to recover $2.9 million in compensatory damages, more than $1.3 million in prejudgment interest, and punitive damages.

The case will be tried to a jury. By statute, the case must be tried in two phases. (AK.ST.ANN. 09.17.020(a).) During the first phase of the trial, the jury will determine liability, and decide if the defendants' conduct warrants punitive damages. If the jury decides that punitive damages are warranted, then the amount of such damages will be decided during the second phase of the trial.

## 2.0   SUBJECT MATTER JURISDICTION.

Federal subject matter jurisdiction is based on 28 U.S.C. § 1332(a), and is uncontested. The original plaintiff (Era Aviation, Inc.) and all defendants were citizens of different states, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

/ / /

- 2 -

### 3.0    SUMMARY OF THE CASE.

On August 13, 2000, a twin-engine helicopter ("the Helicopter") crashed in a remote Nevada desert.[1]  The crash killed 52-year old Lester Shadrick (an Era employee who was the pilot of the Helicopter), and destroyed the Helicopter itself.

The evidence presented at trial will prove that the crash was caused by defects in two (2) products sold by the defendants, and the defendants are strictly liable under applicable Alaska state law.  The first defective product, an engine component part known as a Compressor Turbine Disk (or "CT Disk"), failed at about one-third of its expected useful service life, destroying the Helicopter's #1 (left hand) engine.  A second defective component part – known as a Sprag Clutch Assembly – malfunctioned a split-second after the CT Disk failed, destroying the Helicopter's #2 (right hand) engine.  The end result of these successive failures of defective products was the sudden and complete loss of power from both of the Helicopter's twin engines in less than a few short seconds.  With no remaining power from either of its twin engines, the Helicopter was doomed, and quickly fell from the sky.  Era seeks to recover more than $2.9 million for losses it suffered as a result of the destruction of the Helicopter, plus more than $1.3 million in accrued prejudgment interest.

The evidence will also demonstrate that the defendants' conduct warrants punitive damages. During pre-crash engine repairs, the UNC defendants ignored red warning tags affixed to the CT Disk to designate its status as useless "scrap."  Deliberately violating their own procedures and aviation industry standards, the UNC defendants secretly installed the red-tagged CT Disk in the Helicopter's engine – *without telling Era that it*

---

[1]    When the crash occurred, the Helicopter was owned by the original plaintiff, Era Aviation, Inc.  The underlying claims held by that entity were later assigned to the current plaintiff, Era Helicopters, LLC.

*was doing so* – even though the disk itself had been deemed unfit for use by no fewer than five of the defendants' own employees. On August 13, 2000, that same CT Disk broke into dozens of small pieces while spinning inside the Helicopter's left engine at about 38,000 r.p.m., causing the catastrophic loss of power from both of the Helicopter's engines. If the defendants had obeyed the red-tags that were affixed to the CT Disk, then the disk would have been tossed into the scrap heap instead of being installed in Era's engine, and the crash would not have occurred. When the defendants secretly installed the red-tagged CT Disk inside Era's engine – *without telling Era* – the defendants guaranteed the events that occurred on August 13, 2000, and acted with reckless indifference to the interests of both Era and the pilot.

For their part, the defendants' strategy is to dispute causation, and blame the crash on the actions of the dead pilot. The defendants hope to relitigate nearly all of the Court's prior adverse evidentiary rulings so that the defendants can use evidence that has already been ruled inadmissible to convince the jury that the pilot was a suicidal fool who deliberately abused the Helicopter. The defendants' team of well-paid "experts" will rely on junk science to support their theory that the red-tagging of the CT Disk was just an unrelated coincidence, and the CT Disk actually failed because: (1) the pilot was too heavy, and (2) the water bucket was too large. If allowed to do so, the defendants' experts will also speculate that the pilot was ignorant of correct safety procedures, and failed to take steps which might have saved the Helicopter and the pilot. However, there is no substantial evidence to support the defendants' unfair attacks on the dead pilot. In fact, the engine manufacturers' own investigators have always insisted there is not enough evidence to blame the pilot for this crash.

These facts and claims are discussed in more detail, below.

## 4.0    FACTS.

The evidence presented at trial will prove that Era Aviation, Inc. was the owner and operator of a fleet of airplanes and helicopters. These aircraft operated out of Era's facilities in Alaska, Nevada, and Louisiana.

The U.S. Government contracts with private companies (like Era) to supply aircraft and flight crews during fire seasons. These aircraft – known as "Call-When-Needed" (or "CWN") aircraft – are used to help fight fires on federal lands. Pursuant to its contract with the U.S. Government, Era agreed to supply CWN aircraft and pilots during the 2000 fire season.

In late July, 2000, one of Era's CWN helicopters (N174EH) was dispatched from its base in Lake Charles, Louisiana. When it arrived in Nevada on July 24, 2000, the Helicopter (N174EH) was assigned to a fire that was raging in the mountainous desert terrain east of Reno, Nevada. This fire would later become known as the "Cold Springs" fire.

To fulfill its firefighting mission, paragraph C.9(10) of Era's contract with the Government stipulated that the Helicopter must be equipped with a water bucket "with maximum capacity commensurate with the maximum lifting capabilities of the aircraft." Accordingly, the Helicopter was equipped to carry a Model 3542 water bucket, known in the aviation industry as a "bambi bucket." The Model 3542 bambi bucket can carry up to 420 gallons of water, and was the proper size bucket that was recommended for the Helicopter by the bucket's manufacturer.

- 5 -



*The subject helicopter (N174EH) flying in the remote*
*Nevada desert before the crash (exact date unknown).*
*The water bucket (or "bambi bucket") can be seen attached*
*to a cargo hook on the underside of the helicopter.*

For several days before the crash, the nine-passenger Helicopter flew sporadically on routine missions transporting firefighting ground crews and other personnel, and making water drops as directed by the Government.

On August 13, 2000, two helicopters (including N174EH) were dispatched to make water drops on the slopes of a mountain. The helicopters would fill their water buckets at "dip sites" located nearby, and then fly in a "daisy chain" formation (one behind the other) to the designated drop sites. Flying in this formation allowed the helicopters to engage in "blacklining," a procedure where the lead helicopter drops its water first, followed shortly thereafter by water being dropped from the trailing

- 6 -

helicopter. The pilot of the trailing helicopter is trained to keep a close watch on the lead helicopter, to make sure that the second drop starts where the first drop ends.



*The steep terrain where the crash occurred.*
*The arrow points to the place where the wreckage came*
*to rest after tumbling down the steep mountain.*

Sometime around 4:30 p.m. on August 13, 2000, the helicopters filled their buckets with water, and were making their way to the designated "blacklining" drop site. Era's helicopter (N174EH) was the lead helicopter in the formation when the crash occurred. Mr. Les Hanberg was the pilot of the trailing helicopter when the crash occurred. During his deposition, Mr. Hanberg (whose eyewitness testimony will be presented to the jury) recalled the events he observed on the day of the crash:

"But he was going downhill.  And as he was going downhill, it put the top of the helicopter more up towards me.  And just prior to the impact, I very vividly remember and I think I said it in my statement here, you could count those rotor blades as they were turning.  They were turning who knows how slow from 300 and some RPM is normal, you would never be able to count them.  And you could actually see the blades just prior to the impact.

"And the impact was more of a--a--all of a sudden, it just stopped coming down the hill and a big pile of dust.  And then it seemed like out of this dust rose a bit of like the helicopter, I guess.  And then it just plopped down there.  It--I don't--does that help you? "

(Hanberg Depo., pp. 38-39.)

When the Helicopter's engines stopped generating power, the aircraft was only about 150 feet above the ground (the approximate altitude used by the helicopters when engaged in "blacklining" activities).  Because the Helicopter was so close to the ground, there was very little time (probably less than a second or two) between the time when the Helicopter's engines stopped generating power and the time when the Helicopter first impacted the ground.

After making initial contact with the ground, the Helicopter tumbled down the side of a mountain, creating a debris field that was later measured at 673-feet long.

- 8 -



*This photograph, taken shortly after the crash, shows the wreckage of the Helicopter resting on the slope of the mountain.*

At some point in time after the initial impact, the pilot (still strapped in his seat) was ejected from the fuselage. Nearby fire crews and emergency personnel rushed to the scene, where they discovered the pilot lying near the main wreckage. Despite heroic efforts, they were unable to resuscitate the pilot, who was declared dead at the scene.



*The main wreckage of the Helicopter can be seen resting precariously on the slope of the mountain in this photograph.*

## 5.0     THE CAUSE OF THE CRASH.

Following the crash, the Helicopter's engines and related components were removed from the Helicopter wreckage, and shipped to PWC's facility near Montreal, Canada, for disassembly and inspection. There, PWC employees carefully disassembled the engines, and concluded that *both* engines stopped generating *all* useful power before the crash.

PWC's Chief Accident Investigator (Mr. Thomas Berthe) also quickly concluded that the initiating event that caused *both* engines to lose power was the failure of the CT

Disk in the Helicopter's #1 (left-hand) engine. (Berthe Depo., 139:5-9.)  This conclusion was expressed in Mr. Berthe's final report on this matter:

> "The engine left hand power section lost useful power prior to impact due to the fracture and release of two compressor turbine firtree segments and their adjacent blades into the engine gas path, and their subsequent impact with their adjacent turbine blades and downstream components."  (Berthe Final Report, § 3.0, page 2 of 18.)



In this photograph, the arrow points to one of the fifty-eight "firtrees" on each CT Disk.  The firtrees create an interlocking mating surface, which allows the removeable blades to be attached to the disk itself. Two of these firtrees (and their adjacent blades) separated from the CT Disk while the disk was spinning inside the engine at about 38,000 r.p.m.

Era Av 4EH/PO/WO Lg24175/20070220



*In this post-crash photograph of the CT Disk from the Helicopter's left engine, the arrow points to the area where two firtrees and their adjacent blades separated from the CT Disk.*

Rotating at about 38,000 r.p.m. inside the left-engine, the separated CT blades and fir tree segments collided with other components inside the left engine, quickly causing the #1 (left hand) engine to stop generating useful power needed to drive the Helicopter's main rotors and keep the aircraft aloft.



*A side-by-side comparison of the post-crash condition of the CT Disk from the #1 left-hand engine (shown in the photo on the left) and the post-crash condition of the CT Disk from the #2 right-hand engine (shown in the photo on the right.) Note the missing blades and firtree segments that separated from the left-hand CT Disk while the disk was spinning inside the engine at about 38,000 r.p.m.*

Of course, this particular Helicopter was equipped with two engines, so the loss of power from a single engine should not have been a major problem – the second engine was capable of producing enough power to drive the main rotor blades and keep the Helicopter in the air.  In fact, the Helicopter's gearbox is designed with a component (known as a "Sprag Clutch" assembly) that is supposed to keep the main rotor blades turning in the event one of the twin engines loses power during flight.

Unfortunately, the #2 (right hand) engine was never given an opportunity to do its job after the #1 (left hand) engine stopped generating useful power.  The severe imbalance vibrations created by the separation of the CT Disk blades and firtrees in the left hand engine caused the Sprag Clutch assembly to malfunction.  This malfunction fractured an intermediate drive shaft that is part of the drive train connecting the #2 (right

Era Av 4EH/PO/WO Lg24175/20070220

hand) engine to the main rotors. When the intermediate drive shaft fractured, the #2 (right hand) engine went into an "overspeed" condition, literally racing out of control and destroying its internal components in a fraction of a second.



*This photograph shows the post-crash condition of the intermediate drive shaft from the Helicopter's gearbox. This shaft was one of several components that created a drive train connecting the #2 (right hand) engine to the main rotor, allowing the #2 (right hand) engine to drive the rotor blades in the event the #1 (left hand) engine stopped generating power during flight. The arrow points to the area where the drive shaft fractured, essentially disconnecting the #2 (right hand) engine from the main rotor, and sending the #2 engine into an overspeed condition that resulted in the rapid destruction of engine components inside the #2 engine.*

With both of its engines no longer generating power to drive the main rotor blades, the Helicopter was doomed. Quickly falling to the ground from its altitude of only about 150 feet, the Helicopter tumbled down the side of a steep mountain. **The entire sequence of events occurred without warning to the pilot, and in less than a few seconds**. (Berthe Depo., 116:19 - 117:5.)



| *The Helicopter was destroyed during the crash.* |

## 6.0    THE DEFENDANTS' LIABILITY.

A preponderance of the evidence presented at trial will prove that the defendants are liable one or more of the following alternative theories:

**6.1 Strict Products Liability – CT Disk:** The defendants are strictly liable under Alaska law for selling a defective product (the CT Disk).  The CT Disk was defective under the "consumer expectations" test, *and* the "deviation from the norm" test.

**6.1.1  CT Disk – Consumer Expectations:**  The evidence will prove that the CT Disk was purchased from the defendants in a new condition, with a written useful service life of 10,000 cycles established by the defendants.[2]  The CT Disk fractured on August 13, 2000, after accumulating only 3,067 cycles of use (i.e., less than one-third of its expected useful service life.)  The failure of the CT Disk was the initiating event which eventually caused both of the Helicopter's engines to lose power before the Helicopter crashed to the ground.  Under these circumstances, the CT Disk "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner."  (Alaska Civil Pattern Jury Instruction 07.03; General Motors Corp. v. Farnsworth, 965 P.2d 1209, 1220 (Alaska 1998); Bell v. Precision Airmotive Corporation, 42 P.3d 1071, 1072 (Alaska 2002); Berthe Depo., 111:21-25.)

**6.1.2  CT Disk – Deviation from the Norm:**  In addition, the evidence will show that the CT Disk was also defective because it "differed from the manufacturer's intended result." (Alaska Civil Pattern Jury Instruction 07.03.)  Specifically, the engine manufacturer (defendant PWC) intended the CT Disk to have a useful service life of 10,000 cycles. This particular CT Disk failed after accumulating only about 3,067 cycles, causing the Helicopter to crash on August 13, 2000.  Thus, plaintiff submits the evidence will show that the defendants are liable for selling a CT Disk that was defective because it "differed from the manufacturer's intended result."  (Alaska Civil Pattern Jury Instruction 07.03.)

---

[2]     That is, PWC represented that the CT Disk did not have to be replaced until the disk had accumulated 10,000 cycles of use.  Once the CT Disk accumulates 10,000 cycles, it must be replaced regardless of its overall condition.

**6.2  Strict Products Liability – Sprag Clutch:**  Defendant PWC is also strictly liable under Alaska law for selling another defective product (the Sprag Clutch Assembly).[3] The Sprag Clutch Assembly was defective under the "consumer expectations" test *and* the "deviation from the norm" test.

**6.2.1  Sprag Clutch – Consumer Expectations:**  The evidence will prove that defendant PWC designed, manufactured and/or sold the Sprag Clutch Assembly that failed on August 13, 2000, and caused the Helicopter to crash.  In the event of a single engine failure, an "ordinary" pilot of a twin-engine helicopter (like N174EH) would reasonably expect the Sprag Clutch Assembly to perform its intended function by allowing the remaining engine to drive the main rotor blades and keep the helicopter aloft.  Here, the Sprag Clutch Assembly on N174EH was defective because it malfunctioned and prevented the #2 (right hand) engine  from driving the main rotor blades after the #1 (left hand) engine stopped generating useful power.  Under these circumstances, the Sprag Clutch "failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner."  (Alaska Civil Pattern Jury Instruction 07.03; General Motors v. Farnsworth, supra, 965 P.2d at p. 1220.)

**6.2.2  Sprag Clutch – Deviation from the Norm:**  In addition, the evidence will show that the Sprag Clutch Assembly was also defective because it "differed from the manufacturer's intended result."  (Alaska Civil Pattern Jury Instruction 07.03.) Specifically, the engine manufacturer (defendant PWC) intended the Sprag Clutch

---

[3]    The CT Disk was sold by *all* of the defendants, so *all* defendants are strictly liable for damages caused by that defective product.  In contrast, the Sprag Clutch Assembly was sold only

Assembly to function properly in the event the #1 (left hand) engine stopped generating power.  But this particular Sprag Clutch Assembly failed to function properly under those circumstances.  Thus, plaintiff submits the evidence will show that PWC is liable for designing, manufacturing, and/or selling a Sprag Clutch Assembly that was defective because it "differed from the manufacturer's intended result."  (Alaska Civil Pattern Jury Instruction 07.03.)

**6.3  Negligence:**  In addition to the claims based on strict liability for the sale of defective products, the evidence will also show that the UNC defendants were negligent, and that negligent conduct was a cause of the crash on August 13, 2000.

Before the crash, the UNC defendants removed the CT Disk from the engine during routine maintenance.  After examining the *pre-crash* condition of the CT Disk, four different UNC employees in Miami, and at least one UNC employee in New Jersey, all separately concluded in writing that the CT Disk was badly damaged, could not be repaired, and needed to be replaced.  Accordingly, the CT Disk was designated as "*scrap*," and *red warning tags* were affixed to the CT Disk to prevent the disk from being inadvertently re-used.  The red-tagged scrap CT Disk was supposed to be mutilated and replaced by a new CT Disk.  However, a low-level UNC employee in Miami removed the red tags from the CT Disk, and tried to repair the damaged CT Disk pursuant to instructions provided by PWC.  The "repaired" CT Disk was then reinstalled in the engine before the crash.

UNC never told Era that the CT Disk had been deemed 'scrapped," and never told Era that the CT Disk had been "repaired" before being reinstalled in Era's engine.  The

by defendant PWC, but not by the UNC defendants), so only PWC can be held strictly liable for

existence of the red tags and the repairs to the CT Disk were only discovered by Era during the course of this litigation.  If the red-tagged CT Disk had been mutilated and replaced (as required by aviation industry customs and standards), then the CT Disk would not have been in the Helicopter's #1 (left  hand) engine on August 13, 2000, and the crash would not have occurred.  Based on the foregoing, plaintiff submits that a reasonable jury will conclude that the UNC defendants were grossly negligent (if not reckless), and that negligent misconduct caused the Helicopter to crash on August 13, 2000.

## 7.0    THE PILOT WAS NOT NEGLIGENT.

The defendants are expected to rely heavily on the contention that the pilot (Mr. Shadrick) was at fault for the crash.  Specifically, the defendants' expert witnesses are expected to tell the jury that the pilot flew the helicopter with too much weight, causing the CT Disk to fail.  This contention is based on unreliable hearsay statements that have already been ruled inadmissible by the Court.  (Doc. 196 and 333.)

There is no admissible evidence of pilot error or negligence, and there is no reliable scientific basis for the conclusion that flying a helicopter with too much weight will cause a CT Disk to fail prematurely.  PWC's own accident investigator (Mr. Berthe) testified during his deposition that the pilot did *not* cause the CT Disk or the Sprag Cultch Assembly to fail.  (Berthe Depo., 110:14 - 111:12.)

Lastly, even if Mr. Shadrick was negligent (*he was not*), there is *absolutely no evidence* of any kind to support the conclusion that his negligence was a contributing cause of damage to the helicopter.  According to the defendants' own accident

---

damages caused by the defective Sprag Clutch Assembly.

reconstruction expert (Dr. Kenneth Orloff), even if Mr. Shadrick was negligent (he was not), the Helicopter still would have been severely damaged (or destroyed) as it attempted to land on a steep hillside without power from either of the Helicopter's twin-engines.

## 8.0    PLAINTIFF'S DAMAGES.

Plaintiff Era (the owner of the Helicopter) suffered the following damages as a result of the crash on August 13, 2000:

| | |
|---|---:|
| Loss of Helicopter | $2,100,000.00 |
| Non-reimbursed Expenses | $25,086.62 |
| Loss of Business Revenue | $814,972.37 |
| | |
| Total Compensatory Damages | $2,940,058.99 |

"The general principle underlying the assessment of damages in tort cases is that an injured person is entitled to be replaced as nearly as possible in the position he would have occupied had it not been for the defendant's tort."  (Beaulieu v. Elliott, 434 P.2d 665, 670-671 (Alaska 1967); Beaux v. Jacob, 30 P.3d 90, 97 (Alaska 2001).)

"The plaintiff is entitled to be compensated for the fair value of the use of the [personal property] during the period [reasonably necessary to replace it]."  (Alaska Pattern Jury Instruction 20.16.)  Under Alaska law, Era's damages for loss of business revenue are measured by "[t]he [net earnings after expenses] that were reasonably anticipated for the period of loss of use, but were lost because the [helicopter] was not available."  (Alaska Civil Pattern Jury Inst. No. 20.17B(B).)

The "appropriate measure of damages" for the loss of use of the destroyed helicopter (N174EH) would be that helicopter's "share of gross earnings reasonably anticipated for [the] period involved [i.e., the time required to obtain a replacement

helicopter] … less expenditures which would have been chargeable to the owner." (State v. Stanley, 506 P.2d 1284, 1293 (Alaska 1973).)  "Generally, once the existence of lost profits is established, the actual amount need not be proven exactly." (Alaska Children's Services, Inc. v. Smart, 677 P.2d 899, 902 (Alaska 1984).)  Here, Era will present evidence and testimony from Era employees establishing the following facts:

1.  The Helicopter that crashed on August 13, 2000 (N174EH) was a Bell Model 412. Era operates a fleet of Bell Model 412 helicopters, and frequently sells and buys such helicopters.  When this crash occurred in August, 2000, the reasonable fair market value of a model Bell 412 helicopter was **$2,100,000.00**.

2.  Based on the market conditions that existed when this crash occurred, it would reasonably take about nine months to replace a Bell Model 412 helicopter, and during the nine months after the crash of N174EH (from August 2000 until April 2001), the other Bell Model 412 helicopters in Era's fleet earned an average of $993,715.67 in net revenue per helicopter.  After subtracting the revenue actually earned by N174EH during August of 2000 before it crashed ($178,743.30), Era's total loss of business revenue stemming from the crash of this helicopter is **$814,972.37**.

3.  As a result of the crash, Era also suffered other costs and expenses losses in the total sum of **$25,086.62**.  This sum includes expenses relating to the recovery of the helicopter from the Nevada desert, and shipping costs for the replacement helicopter.

- 21 -

Based on the foregoing, plaintiff respectfully submits that a reasonable jury will conclude that Era suffered damages in the total amount of $2,940,058.99 in compensatory damages as a result of the loss of N174EH, plus prejudgment interest.  (Ehredt v. DeHavilland Aircraft Co. of Canada, Ltd., 705 P.2d 446, 452 (Alaska 1985); Brinkerhoff v. Swearingen Aviation Corp., 663 P.2d 937, 942-943 (Alaska 1983).)

8.1    Prejudgment Interest:  If the jury finds in favor of plaintiff, then in addition to compensatory damages described above ($2,940,058.99), the defendants will also be obligated to pay prejudgment interest.

The rate of prejudgment interest will be "three percentage points above the 12th Federal Reserve District discount rate in effect on January 2" of 2007.  (ALASKA ST. ANN.  § 09.30.070(a).)  The rate as of January 2, 2007 was 6.25 percent, thus the prejudgment interest rate in this case will be 9.25 percent.  Prejudgment interest will be calculated from no later than the date the defendants  were served with the summons and complaint (July 1, 2002).  (ALASKA ST. ANN.  § 09.30.070(b).)  Based on the foregoing, the defendants may be required to pay prejudgment  interest of more than $1.3 million, calculated as follows:

| Time Period | Accrued Interest (9.25%) |
|---|---|
| 7/1/2002 - 6/31/2003 | $271,955.46 |
| 7/1/2003 - 6/31/2004 | $271,955.46 |
| 7/1/2004 - 6/31/2005 | $271,955.46 |
| 7/1/2005 - 6/31/2006 | $271,955.46 |
| 7/1/2006 - 6/1/2007 | $249,292.51 |
| **Total Accrued Interest:** | **$1,337,114.35** |

- 22 -

## 9.0     PUNITIVE DAMAGES.

A preponderance of clear and convincing evidence will prove that the defendants' conduct warrants punitive damages.  For example, the evidence will prove that:

1.   Before the crash, the UNC defendants knew that the CT Disk was unfit for use, and their own procedures called for the CT Disk to be destroyed.  At least five of the UNC defendants' own employees separately concluded that the CT Disk was not safe for use due to damage the disk suffered during pre-crash operations, and refused to repair the disk for fear that the disk would someday fail if it was ever installed in an engine.

2.   Before the crash, the UNC defendants also knew that the engine manufacturer (Pratt & Whitney) designated the CT Disk as a "critical" rotating component of the engine, the failure of which was likely to cause massive engine failure with a consequent probability of death, serious injury and/or property damage.

3.   Before the crash, the UNC defendants also knew that the CT Disk would never be inspected or examined by Era once the disk was installed inside Era's engine. Despite this knowledge, the UNC defendants fraudulently hid from Era the fact that the CT Disk had been "red-tagged" as useless scrap metal before the disk was installed inside Era's engine.

In short, by deliberately installing the "red-tagged" CT Disk inside Era's engine, without telling Era that the disk had been repeatedly rejected and deemed unsafe for use, the UNC

defendants engaged in outrageous conduct, and acted with reckless indifference to the interests of both Era and the pilot who was killed when the CT Disk broke apart during flight, leading to the ensuing loss of power from both of the Helicopter's engines.

## 10.0    SUMMARY OF DISPUTED FACTUAL ISSUES

Pursuant to Local Rule 39.2(b)(6), the plaintiff submits that the following factual issues will probably dominate the trial:

1.    Whether the CT Disk failed because it was defective (as plaintiffs contend) or because the disk had been subjected to various forms of misuse (as defendants contend).

2.    Whether the helicopter was destroyed because the pilot had *no* time to take action to prevent the crash after both engines failed sequentially (as plaintiffs contend), or because the pilot failed to jettison the water bucket attached to the underside of the helicopter (as defendants contend).

## 11.0    SUMMARY OF DISPUTED EVIDENTIARY ISSUES

Pursuant to Local Rule 39.2(b)(7), the plaintiff submits that the following evidentiary issues will probably arise during the trial:

1.    All significant evidentiary issues have already been ruled upon in a series of orders issued by the Court.  (See, Doc. 196, 202, 333, 376, 386, 388, and 404.)

- 24 -

2.    To the extent these orders are enforced, plaintiff expects few other significant evidentiary issues to arise during the trial.

3.    However, the defendants have expressed their intent to relitigate nearly all of the Court's previous orders, hoping to reverse some of those orders and allow the introduction of evidence which has already been ruled inadmissible.

4.    If the defendants' strategy is successful, then the plaintiff expects that many of the same evidentiary issues that have already been fully litigated will consume much of the Court's time during the trial.

## 12.0    EVIDENTIARY OBJECTIONS.

Pursuant to the Court's order (Doc. 413), counsel met and conferred on February 6, 2007, for the purpose of reviewing trial exhibits.  Based on that meeting, the plaintiff respectfully offers the following objections to the defendants' evidence:

1.    Plaintiff's objections to defendants' exhibits are set forth in **Appendix "A"**

2.    Plaintiff's objections to the excerpts of deposition transcripts identified by defendants are set forth in **Appendix "B"**

/ / /

/ / /

- 25 -

**13.0    CONCLUSION.**

Based on the foregoing, plaintiff Era Helicopters, LLC, respectfully submits that a preponderance of admissible evidence will prove that the defendants are liable for compensatory damages in the sum of $2,940,058.99, plus prejudgment interest of more than $1.3 million.  Finally, plaintiff Era submits that clear and convincing evidence will also warrant an appropriate award of punitive damages.

Respectfully Submitted,

Dated:  February __20__, 2007                **LAW OFFICES OF JON A. KODANI**

                                             s/  Jeffrey J. Williams

                                             By:    Jon A. Kodani, Esq.
                                                    Jeffrey J. Williams, Esq.

                                             2200 Michigan Avenue
                                             Santa Monica, CA  90404
                                             Tel. (310) 453-6762
                                             EMail *lojak@kodanilaw.com*

                                             Attorneys for Plaintiff
                                             Era Helicopters, LLC

## CERTIFICATE OF SERVICE

*Era Helicopters, LLC v. UNC Airwork Corp. et al.*
D.Alaska Case No. A02-0131 CV (JKS)

[XXXX] I hereby certify that on     **February 20, 2007**   ,
I electronically filed the foregoing with the Clerk of Court using the
CM/ECF system which will send notification of such filing to the
following e-mail addresses:

**For Defendants UNC Airwork Corp.**  **For Defendant Pratt & Whitney**
**and Dallas Airmotive, Inc.**    **Canada Corp.**
David A. Devine, Esq.      William F. Brattain II
Ken Eggers, Esq.       BAKER BRATTAIN, L.L.C.
GROH EGGERS, LLC     N Street Plaza
3201 C Street, Suite 400    821 N Street Suite 101
Anchorage, AK  99503    Anchorage, AK  99501
Tel. (907) 562-6474     Tel. (907) 277-3232
Fax (907) 562-6044     Fax (907) 272-4850
EMail *devined@groheggers.com*  EMail *brattain@bakerbrattain.com*
   *wardm@groheggers.com*     *williamfbrattain@hotmail.com*


       *s/ Jeffrey J. Williams*

    Jeffrey J. Williams, Esq.
    LAW OFFICES OF JON A. KODANI

    **Attorneys for Plaintiff**
    **Era Aviation, Inc.**

    2200 Michigan Avenue
    Santa Monica, CA 90404-3906
    Tel: (310) 453-6762
    Fax: (310) 829-3340
    **Email: *lojak@kodanilaw.com***