Jon A. Kodani, Esq. (*pro hac vice*)
Jeffrey J. Williams, Esq. (*pro hac vice*)
**LAW OFFICES OF JON A. KODANI**
2200 Michigan Avenue
Santa Monica, CA  90404
Tel. (310) 453-6762

**Attorneys for Plaintiff**
Era Helicopters, LLC

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **ERA HELICOPTERS, LLC**, a Delaware company, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>**UNC AIRWORK CORPORATION** a/k/a )<br>DAI Airwork Corporation, a Delaware corporation; )<br>**DALLAS AIRMOTIVE, INC.** d/b/a )<br>UNC Airwork Corporation and DAI Airwork Corporation, )<br>a Delaware corporation; )<br>**PRATT & WHITNEY CANADA, INC.**, )<br>a Canadian corporation; and )<br>**DOES 1 through 500**, Inclusive, )<br>)<br>Defendants. )<br>) | Civil Case No.<br>**A02-0131 CV (JKS)** |

---

## [PROPOSED]
## PRETRIAL ORDER

---

Pursuant to the Scheduling Order entered on November 8, 2006 (Doc. 413), the following is the joint Proposed Pretrial Order to be discussed and considered at the Final Pretrial Conference set for May 16, 2007.

---

## I.   Parties

### A.      Plaintiff.

Plaintiff Era Helicopters, LLC, is represented by attorneys Jon A. Kodani and Jeffrey J. Williams of the Law Offices of Jon A. Kodani, 2200 Michigan Avenue, Santa Monica, California.

### B.      Defendants.

1.      Defendant Pratt & Whitney Canada, Inc. (PWC) is represented by attorney William F. Brattain, of Baker Brattain LLC, N Street Plaza, 821 N Street, Suite 101, Anchorage, Alaska.

2.      Defendants UNC Airwork Corp. and Dallas Airmotive, Inc. ("the UNC defendants") are represented by attorneys Raymond L. Mariani, of Nixon Peabody LLP, 50 Jericho Quadrangle, Suite 300, Jericho, New York, and David A. Devine, Groh Eggers LLC, 2600 Cordova Street, Suite 110, Anchorage, Alaska.

## II.   Jurisdiction

Subject matter jurisdiction is based on 28 U.S.C. § 1332(a), and is uncontested.  The original plaintiffs (United States Aviation Underwriters, Inc. and Era Aviation, Inc.) and all defendants were citizens of different states, and the amount in controversy originally exceeded $75,000.00, exclusive of interest and costs.

### III.    Schedule of Trial

Trial by jury is scheduled for Tuesday, May 22, 2007, at 9:00 a.m., in Courtroom No. 4, United States Courthouse, Anchorage, Alaska. The trial is estimated to require 5 to 10 days, including jury selection.

### IV.    Nature of Action

This is a case involving the crash of a helicopter.

The plaintiff contends that the crash was caused by defects in two products sold by the defendants: (1) a compressor turbine disk (CT Disk) sold by all defendants, and (2) a sprag clutch assembly that was sold by defendant Pratt & Whitney Canada, Inc. The plaintiff also contends that the UNC defendants were negligent. The defendants deny these contentions, and assert other causes of the accident. The crash destroyed the helicopter. The plaintiff seeks to recover $2.9 million in compensatory damages and more than $1.3 million in prejudgment interest against all defendants, plus punitive damages against the Dallas Airmotive / UNC defendants.

Defendants assert that plaintiff has no standing because it was never assigned the claim of Era Aviation, Inc. Defendants assert that plaintiff is not entitled to recover $2,047,480 in damages for the destruction of the helicopter since Era Aviation, Inc. already recovered those damages from its insurance company, which then brought, settled, and dismissed with prejudice its own subrogated claim against defendants. Defendants contend that plaintiff's property damage claim is limited to its insurance deductible of $52,520. Defendants also contend that Alaska law precludes plaintiff from recovering both loss of use

damages and prejudgment interest.  Defendants assert that there is no basis for an award of punitive damages.

Alaska state law will be applied.  By statute, the case must be tried in two phases. (AK.ST.ANN. 09.17.020(a).)  During the first phase of the trial, the jury will determine liability and compensatory damages, if any, and decide if the defendants' conduct warrants punitive damages.  If the jury decides that punitive damages are warranted, then the amount of such damages will be decided during the second phase of the trial.

## V.    Legal Issues Already Decided by this Court

The Court has made the following pretrial rulings:

## A.    Agreed:

1.  Plaintiff's claims are *not* barred by the economic loss rule.  (Doc. 78)

2.  The NTSB preliminary and final reports are inadmissible.  (Doc. 196, 202, 386, 388)

3.  The OAS PowerPoint presentation is inadmissible.  (Doc. 196)

4.  Plaintiff did not spoliate the bambi bucket.  (Doc. 210)

5.  Plaintiff's claims are *not* barred by the statue of repose in the General Aviation Revitalization Act of 1994 (GARA).  (Doc. 332)

6.  Subject to approved protocol, witnesses may be impeached with prior inconsistent statements made during the pilot's widow's wrongful death lawsuit in Florida.  (Doc. 333)

7.  Parties may not refer to defendants' insurance coverage.  (Doc. 333)

8.   Parties may not refer to defendants' agreement to settle Florida lawsuit.  (Doc. 333)

9.   Parties may not refer to locations of attorneys' offices.  (Doc. 333)

10.  Parties may not refer to defendants' settlement with USAU.  (Doc. 333)

11.  Parties may not refer to impact of Shadrick's death on his family, friends, or co workers.  (Doc. 333)

12.  Parties may not refer to personal information about Lester Shadrick (except body weight, etc.)  (Doc. 333)

13.  Parties may not refer to settlement discussions.  (Doc. 333)

14.  Parties may not refer to parties' relative wealth (except on issue of punitive damages in the second phase of the trial, if any).  (Doc. 333)

15.  Parties may not refer to fragment of unrelated CT disk discovered by Mr. Rupert.  (Doc. 333)

16.  Evidence regarding Battle Mountain incident is inadmissible.  (Doc. 333)

17.  Deposition testimony of Scott Ellis is inadmissible.  (Doc. 333)

18.  Deposition testimony of Brett Juchtzer is inadmissible.  (Doc. 333)

19.  Transcripts of audiotape interviews (Byrd, Christianson, Davis, Ellis, Juchtzer, Meredith, Sayles, Thompson) and summaries of witness statements (Christianson, Hanberg, Morrow) are inadmissible.  (Doc. 333)

20.  Rauch e-mail to Mitchell is inadmissible.  (Doc. 333)

21.  Revised direct examination testimony of plaintiff's expert witnesses (Larew, Scanlan, Stimpson, Cox and Rupert) is admissible.  (Doc. 404)

- 5 -

22.    Stimpson weight calculations are admissible.  (Doc. 333)

23.    Pre-litigation report prepared by Rupert is inadmissible.  (Doc. 404)

24.    Revised direct examination testimony of defendants' expert witnesses (Morin, Albert, Manning, Orloff and Cheyne) is admissible.  (Doc. 404)

25.    Parties may not refer to the stipulation in the Florida lawsuit, in which Pratt & Whitney's Florida attorney stipulated that DAI was responsible for the loss of the helicopters.

## B.    Disputed:

1.    Plaintiff contends that the Court has ruled that plaintiff Era Helicopters, LLC was properly substituted under FED.R.CIV.P. 25(c) in place of one of the original plaintiffs, Era Aviation, Inc.  (Doc. 402).

Defendants repeatedly demanded years ago, but were only provided three days ago, a purported assignment of claims from Era Aviation, Inc. to Era Helicopters, LLC. The purported assignment is inconsistent with the sworn testimony of an ERA Helicopters, LLC officer as to who became the assignee and as to the date of the assignment.  The purported assignment was not listed on the plaintiff's exhibit list and therefore cannot be considered at trial. Therefore defendants do not concede at this time that Era Helicopters, LLC owns the claims asserted here.  Further, with respect to the claim for destruction of the helicopter, Era Aviation, Inc. was paid $2,047,480 from its insurer, USAU, which then pursued, settled and dismissed with prejudice its own subrogation claim for that amount.  This means the most that Era Aviation, Inc. was entitled to claim for the destruction of the helicopter was the insurance deductible of $52,520.00, which in turn

was the only claim that Era Aviation, Inc. had a right to assign to Era Helicopters, LLC, if a timely assignment occurred. Finally, defendants contend that any purported assignment of a punitive damages claim is void or unenforceable since such an assignment is against public policy against champerty and maintenance.

2.    Plaintiff contends that the Court has ruled that Dr. Charles Manning's opinions are unreliable and inadmissible. (Doc. 196, 202).

Defendants contend that the Court subsequently ruled that Dr. Manning's expert testimony is admissible. (Doc. 404).

3.    Plaintiff contends that the Court has ruled that evidence of insurance payments Era received from USAU is inadmissible. (Doc. 196 and 333).

Defendants contend that the Court is likely to revisit that issue in view of the comments expressed at the status conference on March 7, 2007. In any event, defendants contend that the Court has ruled that even if it allows plaintiff to present evidence of its total property damages, if plaintiff is awarded damages, the full amount of the insurance proceeds paid to Era from USAU will be subtracted from the award. (Doc. 333, 404 and 439)

4.    Defendants contend that the Court has ruled that plaintiff may not recover damages covered by insurance. "If Era is awarded damages, the full amount of the insurance proceeds paid to Era will be subtracted from the award (not simply the amount for which the insurer settled the subrogated claim)." (Doc. 333 at 1). "All that remains is Era's

claim for damages, to which Aviation Underwriters was not subrogated, i.e., losses that were not covered by Era's insurance with Aviation Underwriters." (Docket 404 at 2). "Only Era's claims for uninsured losses remain." (Docket 439 at 1). See also, DAI's Motion for Rulings of Law re Recoverable Damages at Docket 475.

Plaintiff contends that as of March 23, 2007, the Court has not yet ruled whether plaintiff may (or may not) recover damages covered by insurance.

5.    Plaintiff contends that the Court has ruled that evidence of CT Disk plucking and red tag is admissible. (Doc. 376).

Defendants contend that the Court ruled that the red tag associated with the "grooving" is excluded from evidence. (Docket 376 at p. 5).

## VI.    Joint Statement of Issues

### A.    Plaintiff.

The legal elements required to be established by plaintiff in order to establish each claim asserted by plaintiff are:

### 1.        Plaintiff's Right to Assert the Claim

a.    plaintiff is the lawful assignee of the claims for damage to the property.

**2.**    **Strict Product Liability** (CT Disk and/or Sprag Clutch)

    a.    for each defendant, that it designed, manufactured, and/or sold one or more of the products;

    b.    the products were defective;

           i.    the products differed from the manufacturer's intended result; or the products differed from other units of the same product line; or

           ii.    the products failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; and

           iii.    the use of the products in a manner that is reasonably foreseeable by the defendant involves a substantial danger that would not be readily recognized by the ordinary user of the product and the defendants failed to give adequate warning of such danger.

    c.    the products were defective when it left the possession of the defendant; and

    d.    a defect in the product was a legal cause of the damage.

**3.**    **Negligence**

    a.    the defendant(s) was (were) negligent;

Era Av 4EH/PO/WO Lg24175/20070323c

b.      the negligence was a legal cause of the plaintiff's harm; and

c.      the plaintiff was actually harmed.

**4.     Punitive Damages**

a.      ***Plaintiff***: by clear and convincing evidence, the conduct of the Dallas Airmotive and/or UNC defendants demonstrated actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice such as acts done with bad motive or with reckless indifference to the interests of others.

b.      ***Defendants***: by clear and convincing evidence, the conduct of the Dallas Airmotive and/or UNC defendants demonstrated actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice such as acts done with bad motive or with reckless indifference to the interests of Era Aviation, Inc.

**B.     Defendants.**

The legal elements required to be established by defendants in order to establish each affirmative defense asserted by defendants are:

**1.     Negligence of Era Aviation or its Pilot**

a.      Era Aviation or its pilot was (were) negligent; and

b.      the negligence was a legal cause of the harm.

**2.      Avoidable Consequences**

    a.    Plaintiff is not entitled to be paid for any loss or for part of any loss Era Aviation, Inc. could have avoided with reasonable efforts and without undue risk, hardship or embarrassment, even if the loss originally resulted from an act or omission for which a defendant is legally responsible.

**3.      Negligence of Other Person/Entity**

    a.    a person or entity other than DAI, Pratt & Whitney Canada, Era Aviation or its pilot was negligent; and

    b.    the negligence was a legal cause of the harm.

## VII.    Stipulated Statement of Facts

1.    As of August 13, 2000, Era Aviation, Inc. owned several helicopters, including the Helicopter N174EH and the engine in the Helicopter.

2.    The Helicopter was a model 412 manufactured by Bell Helicopters, Inc.

3.    Era Aviation, Inc. was in the business of, among other things, providing helicopter services for a fee to customers.

4.   Era Aviation, Inc. entered into a contract with US Department of the Interior (DOI) to provide a helicopter and pilot for fire suppression operations in the western U.S., including Nevada.

5.   Defendants UNC Airwork Corp. and Dallas Airmotive, Inc. (DAI) are in the business of, among other things, performing maintenance and repairs to helicopter engines, including sales of parts incidental to maintenance and repairs.

6.   The engine in the Helicopter was a PT-6T model manufactured by PWC.

7.   PWC is in the business of, among other things, manufacturing and selling PT-6T engines.

8.   The PT-6T engine is a turbine engine with two power sections.

9.   The PT-6T engine power sections drive a common gearbox.

10.  The PT-6T engine gearbox drives the main rotor via a transmission.

11.  PWC was not the manufacturer or seller of the helicopter's transmission, which was manufactured by Bell Helicopters

12.  Era Aviation, Inc. hired DAI in 1996 to perform certain maintenance on the No. 1/left power section serial no. 62224.

13.  DAI performed certain maintenance on the No.1/left power section and returned that component to Era Aviation, Inc.

14.  When DAI performed certain maintenance on the No.1/left power section in 1996, that power section had been in service for about 10,043 total hours.

15.  In 1996, PWC sold to DAI a new CT disk, part no. 3024211, serial no. 23B827.

- 12 -

16.     As part of the maintenance, in 1996 DAI installed the new CT disk, serial no. 23B827, in the No.1/left power section.

17.     In 1997, the engine experienced an overtemperature event during maintainence by Era Aviation, Inc. personnel.  Following the overtemperature event, Era Aviation, Inc. hired DAI to inspect the No.1/left power section in 1997 and the engine was sent to DAI.

18.     DAI performed certain maintenance on the No 1/left power section and returned it to Era Aviation, Inc. in 1998.  At that time, the disk had been used for 648 cycles.

19.     When DAI performed certain maintenance on the No.1/left power section in 1998, that power section had been in service for about 10,807 total hours.

20.     The Helicopter N174EH was sent by Era Aviation, Inc. to Nevada in 2000 to be used in the fire suppression operation for the DOI.

21.     The Helicopter was equipped with a cargo hook that could be used to carry objects suspended underneath the Helicopter.

22.     The fire suppression work in Nevada involved suspending a bucket with water under the Helicopter and releasing the water at a designated location.

23.     The Helicopter was equipped with a control that, if manipulated, releases only the water in the bucket by opening the bottom and sides of the bucket.

24.     The Helicopter was equipped with two separate controls that, if manipulated, released the entire bucket itself and its wire ropes from the cargo hook.

25.     One of the controls to release the entire bucket and ropes was located on a cyclic control.

Era Av 4EH/PO/WO Lg24175/20070323c

26.    One of the controls to release the entire bucket and ropes was located on the floor of the cockpit.

27.    Era Aviation, Inc. created a manual for its pilots.

28.    Era Aviation, Inc. employed pilot Lester Shadrick and sent him to operate the Helicopter in Nevada.

29.    Mr. Shadrick had worked for Era Aviation, Inc. since November 1985.

30.    Mr. Shadrick was director of pilot training at Era Aviation, Inc. from November 1995 to the date of the accident.

31.    As of the time of the accident, Mr. Shadrick had been issued an FAA certificate that entitled him to fly helicopters.

32.    As of the time of the accident, DOI had issued a certificate that allowed Mr. Shadrick to fly fire suppression flights.

33.    In July 2000, fires broke out in Nevada.

34.    Mr. Shadrick began flights in Nevada in July 2000 and was then transferred to the Twin Peaks fire.

35.    The bucket suspended from the Helicopter at the time of the accident was a Bambi Bucket model 3542 capable of holding a maximum of up to 420 gallons of water.

Era Av 4EH/PO/WO Lg24175/20070323c

36.    The bucket was not carrying its maximum possible amount of water at the time of the crash.

37.    A gallon of water weighs approximately 8.0 pounds.

38.    Mr. Shadrick was required before every flight to perform a check of the control that allowed the release of water and checks of the two controls that allowed release of the entire bucket and wire ropes.

39.    Mr. Shadrick was required before each mission to complete a weight and balance report form.

40.    Mr. Shadrick performed the accident flight to carry water to a location designated by DOI.

41.    Mr. Shadrick picked up water at a pond in the bucket suspended from the Helicopter on the accident flight.

42.    The Helicopter crashed before it reached the designated location for the water drop.

43.    The Helicopter was destroyed by the crash.

44.    The pilot (Mr. Shadrick) died as a result of the crash.

45.    After the crash, a part in the No.1/left power section, the compressor turbine disk, was found to have fractured.

46.     At the time of the crash, the CT disk had been in use for 3,067 cycles.

47.     At the time of the crash, the CT disk (part number 3024211, serial number 23B827) was inside power section serial number 62224, and that power section was the #1 (left hand) engine on the helicopter that crashed.

48.     At the time of the crash, the helicopter's #1 (left hand) power section had been in service for about 12,784 total hours.

49.     At the time of the crash, the helicopter's #1 (left hand) power section had been in service for about 2,470 hours since its last overhaul.

50.     At the time of the crash, the helicopter's #2 (right hand) power section had been in service for about 11,060 total hours.

51.     At the time of the crash, the helicopter's #2 (right hand) power section had been in service for about 2,556 hours since its last overhaul.

52.     After the crash, the intermediate drive shaft was found fractured.

53.     N174EH was equipped with a combining gearbox, serial number 1936.

54.     In 1997, defendant PWC sold a new sprag clutch assembly to Era Aviation, Inc.

55.     In 1997, defendant PWC installed a new sprag clutch assembly inside combining gearbox serial number 1936, when the combining gearbox had been in service for about 9,980 hours.

56.     At the time of the crash, the same sprag clutch assembly was still installed inside the helicopter's combining gearbox serial number 1936.

57.     At the time of the crash, the combining gearbox had been in service for about 11,957 total hours.

58.     At the time of the crash, the combining gearbox had been in service for about 1,977 hours since its last overhaul.

59.     The parties have agreed that defendant was *not* motivated by financial gain and that therefore the statutory cap on punitive damages in AS 09.17.020(f) is the greater of $500,000 or three times compensatory damages, if any.

## VIII.    Contested Issues of Fact and Law

**A.     The Following Are the Issues of Fact to Be Tried and Decided:**

**1.     Issue 1:**        *What claims, if any were assigned to plaintiff Era Helicopters, LLC?*

        a.     Defendants contend:

               i.     Defendants repeatedly demanded years ago, but were only provided three days ago, a purported assignment of claims from Era Aviation, Inc. to Era Helicopters, LLC. The purported assignment is inconsistent with the sworn testimony of an ERA Helicopters, LLC officer as to who became the assignee and as to the date of the assignment.  The purported assignment was not listed on the plaintiff's exhibit list and

- 17 -

therefore cannot be considered at trial. Therefore defendants do not concede at this time that Era Helicopters, LLC owns the claims asserted here. Further, with respect to the claim for destruction of the helicopter, Era Aviation, Inc. was paid $2,047,480 from its insurer, USAU, which then pursued, settled and dismissed with prejudice its own subrogation claim for that amount. This means the most that Era Aviation, Inc. was entitled to claim for the destruction of the helicopter was the insurance deductible of $52,520.00, which in turn was the only claim that Era Aviation, Inc. had a right to assign to Era Helicopters, LLC, if such an assignment occurred before Era Aviation, Inc. abandoned all its claims in bankruptcy. Finally, defendants contend that any purported assignment of a punitive damages claim is void or unenforceable since such an assignment is against public policy against champerty and maintenance.

b.     Plaintiff contends:

i.     A copy of the assignment was provided to the defendants on March 20, 2007. The assignment evidences an intent by Era Aviation, Inc. to  assign to Era Helicopters, LLC all rights, claims and remedies relating to the subject helicopter crash and this lawsuit.

ii.     On April 1, 2005, Era Aviation, Inc. assigned to Era Helicopters, LLC, all of its claims relating to this lawsuit and the crash of the subject helicopter.

- 18 -

iii.   The interpretation and legal effect of the assignment is not an issue of fact for the jury to decide, but an issue of law for the court to decide.

iv.   The scope of damages recoverable by plaintiff is not an issue of fact for the jury to decide, but an issue of law for the court to decide.

**2.     Issue 2:**     *Did UNC / DAI manufacture or sell the CT disk?*

a.     Plaintiff contends:

i.   The UNC / DAI defendants are strictly liable if they placed a defective product in the stream of commerce.

ii.   The UNC / DAI defendants purchased the CT disk from PWC, installed that same disk in Era's engine, charged Era for the CT disk; and Era paid the UNC/DAI defendants for the CT disk.  By doing so, the UNC/DAI defendants placed the defective CT disk in the stream of commerce.

b.     Defendant UNC / DAI contends:

i.   UNC did not manufacture the disk.  UNC did not sell the CT disk to Era Aviation.  UNC only installed the CT disk in the left hand (No. 1) power section, which is not a "sale" as intended by Alaska law.

c.     Defendant PWC contends:

That when the CT disk left its possession:

       i.     the product did not differ from the manufacturer's intended result; nor did the product differ from other units of the same product line; or

      ii.    the product performed as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; and

    iii.    the product was not used in a manner that was reasonably foreseeable by PWC and therefore PWC was under no duty to warn an ordinary user of the danger of using the product in such a manner.

     iv.    the product was not defective when it left the possession of the defendant PWC.

**3.     Issue 3:**     *Was the CT disk defective?*

a.   <u>Plaintiff contends:</u>

      i.    The CT disk was supposed to last for 10,000 cycles of use, but the disk broke apart after just 3,067 cycles of use. Therefore, the CT disk was defective, because:

     •    The CT disk differed from the manufacturer's intended result, and

     •    The CT disk failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

ii. The CT disk fir trees fractured as a result of hot corrosion initiated by the presence of sulfur contaminants on the surface of the CT disk fir trees.  Therefore, the CT disk was defective, because:

- The CT disk differed from the manufacturer's intended result, or the CT disk differed from other units of the same product line.

iii. The UNC defendants knew that the CT disk was a "critical rotating component" of the engine, and they also knew that a failure of the CT disk would likely cause catastrophic engine failure.  The UNC defendants also knew that the CT disk had been involved in an overtemp event, and that the disk had been "red-tagged" to prohibit the installation of the disk in the engine.  Despite this knowledge, the UNC defendants installed the disk in the engine, and gave no warnings of any kind to Era.  Therefore, the CT disk was defective, because:

- The use of the CT disk in a manner that was reasonably foreseeable to the UNC defendants involved a substantial danger that would not be readily recognized by the ordinary user of the product and the UNC defendants failed to give adequate warning of such danger.

b.  Defendants contend:

i. The disk met the manufacturer's specification for size and condition when installed by UNC and when inspected by UNC after the ERA hot start.

- 21 -

ii.  The disk grew at a rate not intended by the manufacturer before and after the ERA hot start.

iii. The disk growth was caused by Era Aviation's use of the disk and engine with loads that exceeded the permissible range for weight, in conjunction with temperature and altitude, according to the helicopter manufacturer's manual.

iv.  The disk could not have fractured from hot corrosion initiated by sulfur contaminants as alleged because no sulfur contaminants were found by any person after the accident on the disk.  Moreover, the manufacturer permits certain degrees of sulfur on a disk when in use. Any traces of sulfur that might have existed on the disk were within the range permitted by the manufacturer.

v.   The red tag that has not been excluded from evidence is not entirely legible and did not relate to sulfur present on the disk.  The word "sulfur" never appears on the UNC documentation associated with the engine inspection after the hot start.  The word "carbon" appears and carbon is not a known cause of disk failure or alleged by ERA to have been a cause of disk failure.

vi.  Era and the pilot Shadrick repeatedly operated the helicopter outside permissible engine and airframe parameters, all contributing to and causing the premature failure of the CT disk.

vii. The disk was subjected to misuse and abuse by ERA.  The misuse and abuse of the disk and engine resulted in a change to the part at issue, the CT disk, in a manner never expected by or intended by the manufacturer.

- 22 -

**4.    Issue 4:**    *Was the CT disk defective when it left the defendants'*
*possession?*

a.   Plaintiff contends:

    i.   The defendants sold the CT disk in a "new" condition.

    ii.   The CT disk was never touched by plaintiff prior to the crash.

    iii.   The CT disk was never changed or modified prior to the crash.

    iv.   The metallurgical structure of the CT disk was unchanged.

b.   Defendants contend:

    i.   UNC never sold the CT disk to anyone.  The disk was damaged by
Era due to its abuse and misuse of the disk and engine.  These actions
by ERA caused the disk to change by growing at a rate never
expected or intended by the manufacturer from intended use of the
product.  The metallurgical structure  changed through the creation of
cracks and from creep, all caused by the ERA misuse and abuse of the
product, namely the disk, which caused disk failure.

    ii.   PWC contends  that when the CT disk was originally sold and left its
possession, the CT disk was new and manufactured in accordance
with all specifications and not defective in any respect..

**5.    Issue 5:**    *Were defects in the CT disk a legal cause of damage?*

a.   Plaintiff contends:

    i.   The failure of the CT disk was a cause of the loss of power in both
engines.

ii.  If the CT disk had lasted 10,000 cycles instead of failing after just 3067 cycles of use, then the engines would not have lost power during flight, and the crash would not have occurred.

iii.  If the CT disk firtrees were not contaminated with sulfur, then the CT disk firtrees would not have fractured, the engines would not have lost power during flight, and the crash would not have occurred.

iv.  If Era was told that the CT disk had been "red-tagged," then the disk would not have been installed in the engine, the engines would not have lost power during flight, and the crash would not have occurred.

v.  If the CT disk had been mutilated as required by aviation industry standards and the "red tags," then the CT disk would not have been installed in the engine, the engines would not have lost power during flight, and the crash would not have occurred.

vi.  It is more likely true than not true that:

  •  The defects in the CT disk were so important in bringing about the harm that a reasonable person would regard those defects as a cause and attach responsibility to those defects, and

  •  The harm would not have occurred but for the defects in the CT disk.

- 24 -

vii.    The defects in the CT disk were a substantial factor in bringing about the following harm suffered by plaintiff:

| | |
|---|---:|
| Loss of Helicopter | $2,100,000.00 |
| Non-reimbursed Expenses | $25,086.62 |
| Loss of Business Revenue | <u>$814,972.37</u> |
| | |
| Total Compensatory Damages | <u>$2,940,058.99</u> |

b.   Defendants contend:

i.    The disk failure did not cause Power Section 2 to fail.

ii.    No defect existed in the disk at the time of installation and time of inspection by UNC.  The legal cause of disk damage was the abuse and misuse of the disk and engine by Era.  The disk had no detectable sulfur content, and certainly no amount of sulfur that was outside the amount allowed by the manufacturer.

iii.    No Federal Aviation Regulation or other regulation requires destruction of a CT disk because it had a red tag affixed by a worker, which was later reviewed by engineers who decided that the part could be used pursuant to manufacturer's specifications.

iv.    Defendants further contend that of the $2,100,000 in damages for loss of the helicopter, Era Aviation, Inc. already received $2,047,480 from its insurer, USAU, which then pursued, settled and dismissed with prejudice its own subrogation claim for that amount.  This means the most that Era Aviation was entitled to claim in this action for the loss of the helicopter was $52,520.00, which in turn was the only claim that Era Aviation, Inc. had a right to assign to Era Helicopters, LLC,

- 25 -

if such an assignment occurred before Era Aviation abandoned all its claims in bankruptcy.  Defendants also contend that Alaska law precludes plaintiff from recovering both loss of use damages and prejudgment interest, and that if loss of use damages are recovered, such damages are limited to the period of time reasonably necessary to obtain a replacement helicopter or the date Era Aviation received the insurance payments from USAU whichever occurred first.

6.    **Issue 6:**      *Was the sprag clutch defective?*

a.   Plaintiff contends:

i.   Following the loss of power in the #1 (left hand) engine, the sprag clutch was supposed to (but did not) allow the #2 (right hand) engine to continue generating sufficient power to keep the helicopter from crashing.  Therefore, the sprag clutch was defective, because:

• The sprag clutch differed from the manufacturer's intended result, and

• The sprag clutch failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

ii.  Defendant PWC knew that other sprag clutches had failed to function properly in substantially similar circumstances, but failed to warn Era and the pilot of the likelihood of such failures.  Therefore, the sprag clutch was defective, because:

- The use of the sprag clutch in a manner that was reasonably foreseeable to defendant PWC involved a substantial danger that would not be readily recognized by the ordinary user of the product and defendant PWC failed to give adequate warning of such danger.

### b.   Defendant PWC contends:

That when the sprag clutch left its possession;

i.     the product did not differ from the manufacturer's intended result; nor did the product differ from other units of the same product line; or

ii.    the product performed as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; and

iii.   the product was not used in a manner that was reasonably foreseeable by PWC and therefore PWC was under no duty to warn an ordinary user of the danger of using the product in such a manner..

iv.    the product was not defective when it left the possession of the defendant PWC.

v.     The sprag clutch performed within its approved design parameters.

vi.   The intermediate drive shaft failed in torsional overload as a result  ground/main rotor contact.

vii.  The  loss of useful power being developed by the number two power section was not occasioned by the sudden misengagement of the sprag clutch due to any failure in its design or manufacture but rather  the intermediate drive shaft's failure  in torsional overload due to the main rotor/ ground strike.

viii. The main rotor/ground strike occurred because the helicopter was tethered to a pinion tree by the helicopter's  sling and water bucket which the pilot failed to jettison as required by the plaintiff's own manuals, procedures, and instructions under these circumstances.

**7.    Issue 7:**        *Was the sprag clutch defective when it left the defendant's possession?*

a.  Plaintiff contends:

i.  The defendant sold the sprag clutch in a "new" condition.

ii. The sprag clutch was never touched by plaintiff prior to the crash.

iii. The sprag clutch was never changed or modified prior to the crash.

b.  Defendant PWC contends:

That when the sprag clutch left its possession;

- 28 -

i.    the product did not differ from the manufacturer's intended result; nor did the product differ from other units of the same product line; or

ii.    the product performed as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; and

iii.    the product was not used in a manner that was reasonably foreseeable by PWC and therefore PWC was under no duty to warn an ordinary user of the danger of using the product in such a manner..

iv.    the product was not defective when it left the possession of the defendant PWC.

v.    The sprag clutch performed within its approved design parameters.

vi.    The intermediate drive shaft failed in torsional overload as a result ground/main rotor contact.

vii.    The loss of useful power being developed by the number two power section was not occasioned by the sudden misengagement of the sprag clutch due to any failure in its design or manufacture but rather the intermediate drive shaft's failure in torsional overload due to the main rotor/ ground strike.

viii. The main rotor/ground strike occurred because the helicopter was tethered to a pinion tree by the helicopter's sling and water bucket which the pilot failed to jettison as required by the plaintiff's own manuals, procedures, and instructions under these circumstances.

**8.     Issue 8:**          *Were defects in the sprag clutch a legal cause of damage?*

a.   Plaintiff contends:

i.   The failure of the sprag clutch was a cause of the loss of power in the #2 (right hand) engine.

ii.  If the sprag clutch had not been defective, then the #2 (right hand) engine would have continued generating sufficient power to keep the helicopter flying, and the crash would not have occurred.

iii. If Era or the pilot had been told of the likelihood of failure of the sprag clutch, then the crash would not have occurred.

iv.  It is more likely true than not true that:

• The defects in the sprag clutch were so important in bringing about the harm that a reasonable person would regard those defects as a cause and attach responsibility to those defects, and

• The harm would not have occurred but for the defects in the sprag clutch.

v.  The defects in the sprag clutch were a substantial factor in bringing about the following harm suffered by plaintiff:

| | |
|---|---:|
| Loss of Helicopter | $2,100,000.00 |
| Non-reimbursed Expenses | $25,086.62 |
| Loss of Business Revenue | <u>$814,972.37</u> |
| | |
| Total Compensatory Damages | <u>$2,940,058.99</u> |

b.  <u>Defendants contend:</u>

i.  The sprag clutch performed within its approved design parameters.

ii.  The intermediate drive shaft failed in torsional overload  as a result  ground/main rotor contact.

iii.  The  loss of useful power being developed by the number two power section was not occasioned by the sudden misengagement of the sprag clutch due to any failure in its design or manufacture but rather  the intermediate drive shaft's failure  in torsional overload due to the main rotor/ ground strike.

iv.  The main rotor/ground strike occurred because  the helicopter was tethered to a pinion tree by the helicopter's  sling and water bucket which the pilot failed to jettison as required by the plaintiff's own manuals, procedures, and instructions under these circumstances.

    v.    Contributory to any misengagment of the sprag clutch, if such misengagment occurred, was contamination of the helicopter's lubrication fluids and the deactivation of the chip warning device which would have, if activated, forewarned of potential contaminants in the helicopter's lubrication system.

    vi.   Defendants further contend that of the $2,100,000 in damages for loss of the helicopter, Era Aviation, Inc. already received $2,047,480 from its insurer, USAU, which then pursued, settled and dismissed with prejudice its own subrogation claim for that amount.  This means the most that Era Aviation was entitled to claim in this action for the loss of the helicopter was $52,520.00, which in turn was the only claim that Era Aviation, Inc. had a right to assign to Era Helicopters, LLC, if such an assignment occurred before Era Aviation abandoned all its claims in bankruptcy.  Defendants also contend that Alaska law precludes plaintiff from recovering both loss of use damages and prejudgment interest, and that if loss of use damages are recovered, such damages are limited to the period of time reasonably necessary to obtain a replacement helicopter or the date Era Aviation received the insurance payments from USAU whichever occurred first.

**9.**    <u>**Issue 9:**</u>    *Were the UNC defendants negligent?*

a.  <u>Plaintiff contends:</u>

    i.   The UNC defendants owed a legal duty to use reasonable care.

- The UNC defendants held themselves out as experienced and competent helicopter engine repair facilities.

- Era reasonably relied on the UNC defendants to do their job correctly.

- Era reasonably relied on the UNC defendants' representations as to the quality of the work performed by the UNC defendants.

- The UNC defendants knew that the CT disk would not be inspected or tested by Era.

- The UNC defendants knew that the CT Disk was a "critical rotating component" part of the engine, the failure of which would likely cause a catastrophic engine failure and substantial damage.

ii.  The UNC defendants negligently failed to replace the CT disk in 1998.

- The CT disk had been involved in an overtemp event.

- The CT disk was damaged.

- At least five of the UNC defendants' own employees separately determined that the disk could not be safely reinstalled in the engine.

- The UNC facility in Millville, New Jersey, refused to attempt any repairs on the damaged CT disk.

- The CT disk had been "red-tagged" as useless scrap.

iii. The UNC defendants negligently violated Part 145 of the U.S. Federal Aviation Regulations by installing an unsafe and unairworthy CT disk in the engine in 1998.

- The UNC defendants were required to comply with Part 145 of the U.S. Federal Aviation Regulations.

- Part 145.57(a) of the U.S. Federal Aviation Regulations provides:

> (a) Except as provided in Sec. 145.2, each certificated domestic repair station *shall perform its maintenance and alteration operations in accordance with the standards in part 43 of this chapter*. It shall maintain, in current condition, all manufacturers' service manuals, instructions, and service bulletins that relate to the articles that it maintains or alters.

- Part 43.13(a) of the U.S. Federal Aviation Regulations provides:

> *"Each person performing maintenance ... shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual ...."*

- The UNC defendants attempted repairs to the CT disk in a manner that was prohibited by the manual written by the engine manufacturer (PWC).

- Part 145.39(a) of the U.S. Federal Aviation Regulations provides that the UNC defendants are *"primarily responsible for the satisfactory work of [their] employees."*

- 34 -

iv.  The UNC defendants negligently failed to follow their own proce-
dures and aviation industry standards and customs.

• The UNC defendants' procedures and aviation industry standards
and customs required that the CT disk be inspected and approved
by the MRB after the attempted repairs.

• The CT Disk was never examined or approved by the MRB after
the repairs were attempted.

• Aviation industry standards and customs required that the CT disk
blades be removed in a manner that prohibits the introduction of
sulfur contaminants on the surface of the CT disk fir trees.

• The CT Disk blades were removed in a manner that allowed the
introduction of sulfur contaminants on the surface of the CT disk
fir trees.

• The UNC defendants' procedures and aviation industry standards
and customs called for the existence of safeguards to segregate
and prevent the use of critical rotating component parts that have
been "red-tagged."

• The CT disk was not segregated from other parts, and it was
installed in the engine even though it had been "red tagged" as an
unsafe and unairworthy critical rotating component part.

v.  The UNC defendants negligently provided false information regarding the CT disk.

- The UNC defendants falsely certified that the CT disk was safe and airworthy, and the engine repairs had been performed in accordance with the engine manufacturer's requirements.

vi.  The UNC defendants negligently failed to provide information regarding the CT disk.

- The UNC defendants failed to tell Era that the CT disk had been "red-tagged."

- The UNC defendants failed to tell Era that the CT disk had been designated as "scrap."

- The UNC defendants failed to tell Era that repairs had been attempted on the CT disk in violation of the engine manufacturer's manual.

- The UNC defendants failed to tell Era that the CT disk was damaged.

- The UNC defendants failed to tell Era that at least five of the UNC defendants' own employees separately determined that the disk could not be safely reinstalled in the engine.

- The UNC defendants failed to tell Era that the UNC facility in Millville, New Jersey, refused to attempt any repairs on the damaged CT disk.

b.  Defendants contend:

    i.   UNC exercised reasonable care in all aspects of its work on the disk and engine at issue.

    ii.   UNC hired competent mechanics whom were trained in accordance with industry and FAA standards to perform engine maintenance and repair, including parts inspections in accordance with manufacturer's specifications.

    iii.   UNC hired competent managers to oversee the work of its personnel, whom were trained in accordance with industry and FAA standards to perform engine maintenance and repair, including parts inspections in accordance with manufacturer's specifications.

    iv.   The hot start event in 1998 by Era did not require CT disk replacement according to the manufacturer's specifications.

    v.   UNC personnel met as a Material Review Board in accordance with industry standards and decided using reasonable procedures and the manufacturer's specifications that the disk could be reinstalled.

    vi.   UNC had no incentive to avoid replacement of the CT disk because Era would have paid for a new CT disk, not UNC.

    vii.   The Era theory of negligence is premised exclusively on the presence of sulfur on the disk at time of inspection.  Since no sulfur existed on the disk, UNC could not have been negligent for installing the disk back in the engine.

iix. To the extent any trace of sulfur existed, UNC acted reasonably by using the manufacturer's specifications, which permit the presence of sulfur on a disk within certain parameters.

ix. UNC followed the manufacturer's manual for the entire hot start inspection and process.

x. UNC followed industry practice and FAA requirements, neither of which involves telling a customer that a part at one time during the maintenance process had a red tag affixed, where a Material Review Board later decided the red tag was not warranted by the manufacturer's specifications.

xi. The "repairs" that Era references concern the "groove" in the disk, all of which the Court has ordered are excluded from evidence. (Docket 376 at p. 5). Thus, these repairs could not be a basis for allegations of negligence.

**10.    Issue 10:**        *Was the negligence of the UNC defendants a legal cause of the plaintiff's harm?*

a.  Plaintiff contends:

i. But for the UNC defendants' negligent conduct, the CT disk would have been replaced in 1998, the engines would not have stopped generating useful power, and the crash would not have occurred.

ii. But for the UNC defendants' negligent violations of Part 145 of the U.S. Federal Aviation Regulations, an unsafe and unairworthy CT disk would not have been installed in the engine in 1998, the engines would not have stopped generating useful power, and the crash would not have occurred.

iii. But for the UNC defendants' negligent failure to follow their own procedures and aviation industry standards and customs, the CT disk would have been replaced in 1998, the engines would not have stopped generating useful power, and the crash would not have occurred.

iv. But for the UNC defendants' negligent conduct, false information regarding the CT disk would not have been provided to Era, the CT disk would have been replaced in 1998, the engines would not have stopped generating useful power, and the crash would not have occurred.

v. But for the UNC defendants' negligent conduct, accurate information regarding the CT disk would have been provided to Era, the CT disk would have been replaced in 1998, the engines would not have stopped generating useful power, and the crash would not have occurred.

vi. It is more likely true than not true that:

- The defendants' negligent conduct was so important in bringing about the harm that a reasonable person would regard that negligent conduct as a cause and attach responsibility to that negligent conduct, and

- The harm would not have occurred but for the negligent conduct of the UNC defendants.

vii.  The negligent conduct of the UNC defendants was a substantial factor in bringing about the following harm suffered by plaintiff:

| | |
|---|---:|
| Loss of Helicopter | $2,100,000.00 |
| Non-reimbursed Expenses | $25,086.62 |
| Loss of Business Revenue | $814,972.37 |
| | |
| Total Compensatory Damages | $2,940,058.99 |

**b.  Defendants contend:**

i.  Replacement of the CT Disk was not required by the manufacturer's specifications.

ii.  Had the CT disk been replaced, the accident would have most likely occurred, possibly on a different date, because Era misused and abused the part and engine and caused a premature failure by operating outside the parameters set out in the helicopter manufacturer's manual.

iii.  The conduct of Era was an intervening and superceding cause of the CT disk failure.

iv.   Even if UNC did not detect traces of sulfur on the disk, it took all reasonable steps to check for sulfur. Any amount of sulfur that was present at time of the UNC inspection was so insignificant as not to constitute the cause of disk failure.  The disk instead failed by Era's misuse and abuse of the engine and helicopter.

v.   Defendants further contend that of the $2,100,000 in damages for loss of the helicopter, Era Aviation, Inc. already received $2,047,480 from its insurer, USAU, which then pursued, settled and dismissed with prejudice its own subrogation claim for that amount.  This means the most that Era Aviation was entitled to claim in this action for the loss of the helicopter was $52,520.00, which in turn was the only claim that Era Aviation, Inc. had a right to assign to Era Helicopters, LLC, if such an assignment occurred before Era Aviation abandoned all its claims in bankruptcy.   Defendants also contend that Alaska law precludes plaintiff from recovering both loss of use damages and prejudgment interest, and that if loss of use damages are recovered, such damages are limited to the period of time reasonably necessary to obtain a replacement helicopter or the date Era Aviation received the insurance payments from USAU whichever occurred first.

11.   **Issue 11:**      *Plaintiff*:  *Did the conduct of the Dallas Airmotive and/or UNC defendants demonstrate actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice such as acts done with bad motive or with reckless indifference to the interests of others?*

*Defendants*:  *Did the conduct of the Dallas Airmotive and/or UNC defendants demonstrate actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice such as acts done with bad motive or with reckless indifference to the interests of Era Aviation, Inc.?*

a.   Plaintiff contends:

i.   The UNC defendants knew that:

- Era was relying on the UNC defendants to do their job correctly, and in accordance with industry standards and Federal Aviation Regulations, and

- The quality of the work performed by the UNC defendants could not be reasonably inspected by Era, and

- Era was completely dependent on the UNC defendants to do their job correctly, and in accordance with industry standards and Federal Aviation Regulations.

ii.   The UNC defendants also knew that:

- The CT Disk was a "critical rotating component" part of the engine, the failure of which would likely cause a catastrophic engine failure and substantial damage, and

- The CT disk had been involved in an overtemp event, and

- The CT disk was damaged.

iii.   Despite this knowledge, the UNC defendants knowingly installed an unsafe and unairworthy CT disk in the engine in violation of Parts 43 and 145 of the U.S. Federal Aviation Regulations.

iv.   The UNC defendants knew that the CT disk they installed in Era's engine was dangerous, unsafe, and unairworthy, because:

- At least five of the UNC defendants' own employees separately determined that the CT disk could not be safely reinstalled in the engine, and

- The UNC facility in Millville, New Jersey, refused to attempt any repairs on the damaged CT disk, and

- The CT disk had been "red-tagged" as useless scrap.

v.    The UNC defendants deliberately attempted to hide and cover-up their dangerously reckless conduct by:

- Falsely certifying in the engine's log books that the CT disk was safe and airworthy, and the engine repairs had been performed in accordance with the engine manufacturer's requirements, and

- Failing to disclose to Era the fact that at least five of the UNC defendants' own employees separately determined that the CT disk could not be safely reinstalled in the engine, and

- Failing to disclose to Era the fact that the UNC facility in Millville, New Jersey, refused to attempt any repairs on the damaged CT disk, and

- Failing to disclose to Era the fact that the CT disk had been "red-tagged" as useless scrap.

vi.  Based on the foregoing, the conduct of the UNC defendants demonstrated reckless indifference to Era's property and to the lives of Era's helicopter pilots

b.  Defendants contend:

i.  UNC, if it was indeed negligent in any manner with respect to its maintenance work, never took any action that it knew would cause a part failure and never acted in a manner sufficiently outrageous to constitute such actual malice or reckless indifference.

ii.  UNC convened a Material Review Board to require engineers to inspect the CT disk before it was installed.

iii.  No UNC personnel (or anyone else) ever detected sulfur on the CT disk.

iv.  UNC personnel found that the disk conformed to manufacturer's specifications.

v.  All documents and information regarding the "grooving" were excluded from evidence by the Court.  (Docket 376 at p. 5).

vi.  No UNC personnel believed that the possible presence of trace amounts of carbon could cause a disk failure, nor did such carbon actually cause a failure here.

vii.  No logbook entry was required for the removed red tag.

iix.  UNC personnel knew that Era would pay for a new disk if one had been required by the manufacturer's specifications and therefore had no reason to conceal any condition of the disk that did not meet manufacturer's specifications.

ix.  Plaintiff and UNC have both agreed that UNC was not motivated by financial gain and that therefore the statutory cap on punitive damages is three times the amount of compensatory damages, if any, pursuant to AS 09.17.020(f).

**12.  Issue 12:**        *Was the pilot negligent?*

a.  Defendants contend:

i.  The pilot repeatedly flew the helicopter outside parameters set out by the manufacturer.

ii.  The pilot misstated his own body weight when calculating permissible payload on each flight, including the accident flight.

iii.  The pilot failed to use an available Bambi Bucket that was the correct size for the job at hand.

iv.  The pilot obtained water from the dip pond using maneuvers that placed unnecessary stress on engine parts, including the CT disk.

v.  The pilot did not learn how to properly complete the U.S. Government-required weight form for his missions.

vi.  The pilot erred in calculating permissible payload under U.S. Government requirements for flights, including the flight that destroyed the helicopter.

vii. The pilot cinched the Bambi Bucket in a manner not allowed by the manufacturer when used with this helicopter.

iix. The pilot deactivated the automatic fuel systems so he could manually inject more fuel into the engine when using the helicopter outside the manufacturer's permissible specifications in the manual.

ix.  The pilot did not check the helicopter manual to determine maximum weight at the altitude and temperature of the day.

x.   The pilot did not learn the Era procedures for how to react when an engine loss occurs.

xi.  The pilot did not follow the Era manual when an emergency occurred.

xii. The pilot did not jettison the bucket and associated hardware and/or lines when the engine failed.

xiiv. The pilot disengaged warnings in the helicopter for engine failures and other operating failures.

xiv. The pilot did not follow the manual of Era and/or the manufacturer to auto rotate to safe landing.

xv.   The pilot did not use the kick pedal to jettison the bucket, if he could not reach or use the collective jettison control.

xvi.  The pilot ignored advice by U.S. Government personnel who supervised him when they told him that he must use the proper size bucket for the mission at hand.

xvii. The pilot did not pay due care to his surroundings and the trees on the landscape in the area.

xiix. The pilot did not consider that failing to jettison the bucket could result in the bucket or lines catching on a ground obstacle such as a tree, thereby causing the helicopter to crash.

b.   <u>Plaintiff contends:</u>

i.    The defendants' contentions are based solely on evidence which *does not exist*; evidence which has already been deemed *inadmissible* by the court; evidence which is *inadmissible by law*; and/or opinions which are *not* included in the defendants' court-approved written direct examinations of defendants' expert witnesses.

ii.   The pilot was *not* negligent.

iii.  The pilot was properly trained, qualified, and certificated to fly this helicopter on this mission.

iv.   The sequential loss of power from *both* engines was an unforeseeable event, and something which a reasonable pilot would not expect to occur.

- 47 -

v.   The helicopter altitude and operating environment (terrain, speed, etc.) was reasonable and appropriate for this mission.

vi.   The helicopter's altitude and operating environment (terrain, speed, etc.) reasonably prevented the pilot from safely landing the helicopter following the sequential loss of power from *both* engines.

vii.   The pilot did not have sufficient time to release the water bucket prior to impact.

iix.   The pilot did not repeatedly fly the helicopter with too much weight.

- The water bucket was the size and model recommended by the bucket manufacturer for this particular helicopter.

- The water bucket was "cinched" to restrict the quantity of water that could be carried in the bucket.

- The pilot's reported body weight was consistent with the weight listed on the pilot's doctor-certified FAA medical certificate.

- The pilot's post-crash weight reported by the coroner is inaccurate and unreliable.

- The weight calculations performed by the defendants' experts and others that purport to show that the helicopter was flown with too much weight are based on inaccurate, incomplete and unreliable data.

ix. The pilot exercised the amount of care that a reasonably prudent person of reasonable and ordinary carefulness would use under similar circumstances.

**13.    Issue 13:**          *Was the pilot's negligence a legal cause of the plaintiff's harm?*

a.  Defendants contend:

i. But for the pilot's failure to use the proper size bucket for the mission at hand, the accident would not have occurred because the engine would not have failed from the Helicopter being operated outside the envelope.

ii. Operation of the Helicopter over permissible weight limitations, in conjunction with temperature and altitude, was the direct and proximate cause of the engine failure because the operation outside the envelope caused the disk to fail.

iii. The  pilot's disarming of warnings caused the accident by removing his ability to know of system failures and react accordingly to save the ship.

iv. The pilot's use of manual fuel control caused the accident by increasing engine temperatures above the levels permitted by the manufacturer and thereby causing parts to fail prematurely.

v. The pilot's failure to follow the ERA manual requirements was the legal cause of the accident because he would have safely landed had he followed the manual requirements to jettison the bucket.

- 49 -

vi.    The pilot's failure to appreciate the ground conditions and avoid the tree was the direct and proximate cause of the accident because the bucket and lines caught on the tree and drove the nose of the Helicopter into the ground, thereby destroying the Helicopter.

b.   Plaintiff contends:

i.    The defendants' contentions are based solely on evidence which *does not exist*; evidence which has already been deemed *inadmissible* by the court; evidence which is *inadmissible by law*; and/or opinions which are *not* included in the defendants' court-approved written direct examinations of defendants' expert witnesses.

ii.    The pilot did *not* cause:

•    The loss of power from *the* #1 (left hand) engine, or
•    The malfunction of the sprag clutch (right hand), or
•    The loss of power from *the* #2 (right hand) engine, or
•    The sequential loss of power from *both* engines.

iii.    Under the circumstances that existed at the time of the crash, the pilot could not have reasonably prevented or minimized substantial damage to the helicopter following the unexpected and unforeseeable sequential loss of power from *both* engines.

•    The helicopter would have been destroyed or substantially damaged even if the pilot had jettisoned the water bucket prior to impact.

• Once the helicopter lost useful power from both of its engines, the helicopter was a ballistic object, and the rate of descent would not have been slowed by jettisoning the water bucket.

• The absence of damage to the helicopter's floor pan proves that the helicopter did *not* impact the terrain in a nose first attitude.

iv. The defendants cannot substantiate their claim that this helicopter was negligently and repeatedly flown with too much weight on so many occasions that the CT disk was subjected to elevated operating temperatures of sufficient magnitude to cause unusual diametral growth in the disk.

• The engine manufacturer (defendant PWC) inspected, studied and tested the CT disk after the crash, and was *unable* to conclude that the disk failed as a result of being subjected to elevated operating temperatures.

v. The CT disk did *not* fracture as a result of the engine being exposed to elevated operating temperatures for prolonged periods of time.

vi. The defendants cannot quantify:

• The number of times that the helicopter was allegedly flown with too much weight, and

• How much growth in the diameter of the CT disk is necessary to cause the CT disk to fracture, and

Era Av 4EH/PO/WO Lg24175/20070323c

- The temperatures or loads the CT disk was exposed to during the alleged operation at elevated temperatures, and

- The duration of time the CT disk was exposed to operation at elevated temperatures.

vii. The defendants cannot prove:

- That the number of times this helicopter was allegedly flown with too much weight was sufficient to generate the amount of growth in the diameter of the CT disk that is necessary to cause the CT disk to fracture.

- That the elevated operating temperatures to which this CT disk was allegedly exposed were sufficient to generate the amount of growth in the diameter of the CT disk that is necessary to cause the CT disk to fracture.

- That the duration of time this CT disk was allegedly exposed to elevated operating temperatures was sufficient to generate the amount of growth in the diameter of the CT disk that is necessary to cause the CT disk to fracture.

iix. The CT disk was *not* exposed to elevated operating temperatures for prolonged periods of time.

- There was no change in the microstructure of the CT disk.

- There was no damage to other component parts in the #1 (left hand) and #2 (right hand) engines.

- This CT disk experienced significant diameteral growth (creep) (0.0014") during its first 648 cycles of use when the engine was *not* subjected to elevated operating temperatures.

- The same amount of total diametral growth (creep) that occurred in this CT disk (0.00871") could have occurred as a result of temperatures generated during "normal" engine operation.

14. **Issue 14:**    *Was ERA negligent?*

a. Defendants Contend:

i. ERA failed to use reasonable care in maintaining the Helicopter by installing the jettison switch in a position that the pilot could not access in a timely manner.

ii. ERA failed to use reasonable care for training of personnel, including pilot Shadrick.

iii. ERA failed to prepare a manual that provided reasonable instruction to pilots for engine failure and jettison procedures.

iv. ERA failed to use reasonable care in the supervision and control of its pilots, including Shadrick.

v. ERA failed to act in accordance with the procedures required by the US Government when its personnel operated the Helicopter over permissible weight.

    vi.  ERA failed to operate its equipment in accordance with the manufacturers' required parameters for operation of the Engine and Helicopter.

   vii.  ERA failed to use reasonable care in educating its pilots on the proper completion of US Government-required weight forms for the mission at hand.

  b.    <u>Plaintiff Contends:</u>

    i.  There is no evidence that Era Aviation, Inc. was negligent.

    ii.  The defendants' contentions are based solely on evidence which *does not exist*; evidence which has already been deemed *inadmissible* by the court; evidence which is *inadmissible by law*; and/or opinions which are *not* included in the defendants' court-approved written direct examinations of defendants' expert witnesses.

   iii.  The helicopter was always properly maintained, and the jettison switch was properly in a position that the pilot could access in a timely manner.

   iv.  Era Aviation, Inc. used reasonable care for training of personnel, including pilot Shadrick.

    v.  Era Aviation, Inc. prepared a manual that provided reasonable instruction to pilots for engine failure and jettison procedures.

   vi.  Era Aviation, Inc. used reasonable care in the supervision and control of its pilots, including Shadrick.

vii.  Era Aviation, Inc. acted in accordance with the procedures required by the US Government, whose personnel approved and authorized all flights of the helicopter relating to this particular mission.

iix.  Era Aviation, Inc. operated its equipment in accordance with the manufacturers' requirements.

ix.  Era Aviation, Inc. used reasonable care in educating its pilots on the proper completion of US Government-required weight forms for the mission at hand.

**15.    Issue 15:**        *Was Era Aviation's negligence a legal cause of the plaintiff's harm?*

a.   Defendants contend:

i.  ERA's negligent installation of the jettison switch was the direct cause of the property loss because the pilot's failure to jettison was the last act in time before the crash that could have avoided the property loss.

ii.  ERA's negligent training was the direct and proximate cause of the property loss because the pilot could have jettisoned the bucket and performed an autorotation had he been properly trained.  Further, had he been properly trained, the pilot would have known to use a smaller bucket that was available at the job site, which would have lessened the load and not led to disk failure.  Further, with proper training, the pilot would have known not to perform aerobatic maneuvers and other manipulations of the controls that led to excessive stresses on engine parts, including the CT disk, and that would have thereby avoided the disk failure.  Further, with proper training, the pilot would

have read and obeyed the manufacturer's flight envelope chart in the manual, which forbid operation of this helicopter at the weight it was carrying for the altitude and temperature of the day.

iii.   ERA's negligent creation of a pilot's manual was the direct and proximate cause of the loss. The pilot would have known to jettison the bucket had the manual been reasonably prepared. The pilot would have known to perform an autorotation upon the failure of both power sections. The pilot would have known to take these and other actions that would have avoided the crash and the property loss.

iv.   ERA's negligent failure to perform any reviews of its pilot and maintain a record of such reviews was the direct and proximate cause of this loss. Had ERA performed reviews at regular intervals, it could have corrected the dangerous practices of its pilots, learned about the deficiencies in the ERA manual, taught the proper completion of US Government weight forms, reminded pilots on proper use of the flight envelope charts in the manufacturer's manual and taken other similar actions that would have led to operations that did not place excessive loads and stresses on the CT disk and other parts, causing them to fail and that would have prepared the pilot for emergency procedures in the event of an engine failure.

b.   <u>Plaintiff contends</u>:

i.   The defendants' contentions are based solely on evidence which *does not exist*; evidence which has already been deemed *inadmissible* by the court; evidence which is *inadmissible by law*; and/or opinions which are *not* included in the defendants' court-approved written direct examinations of defendants' expert witnesses.

- 56 -

ii.   The helicopter would have sustained substantial damage or been destroyed even if the pilot had jettisoned the water bucket.

iii.  The use of this size water bucket did not cause the engines to fail, and did not cause the helicopter to crash.

iv.  The pilot could not have avoided the crash by performing an autorotation at this altitude and speed.

v.   Neither the helicopter nor its engines were ever misused or improperly maintained.

**16.    Issue 16:**        *Was any entity or person other than the defendants, Era Aviation, Inc. or the pilot negligent?*

a.   Defendants contend:

i.   The jury is entitled to consider the fault of nonparties in deciding whether to allocate fault to any party in the case.

ii.  To the extent that the US Government caused the damages alleged, no fault can be allocated to the defendants.

iii. The forms that the US Government created and required and the acts/omissions in its supervision of plaintiff were negligent.

b.    Plaintiff contends:

    i.    There is no evidence that any person or entity other than the defendants were negligent.

    ii.    The defendants' contentions are based solely on evidence which *does not exist*; evidence which has already been deemed *inadmissible* by the court; evidence which is *inadmissible by law*; and/or opinions which are *not* included in the defendants' court-approved written direct examinations of defendants' expert witnesses.

    iii.    The jury is not permitted to consider the fault of non parties because those non parties were identified as potentially responsible persons, the persons are not protected from a civil action under AS 09.10.055, and the parties had a sufficient opportunity to join those persons in the action but chose not to.  (AS 09.17.080(a)(2).)

**17.    Issue 17:**    *Was negligence of any persons or entity other than the defendants, Era Aviation, Inc., or the pilot a legal cause of the plaintiff's harm?*

a.    Defendants contend:

    i.    The US Government's negligence in the forms it created and required and in its supervision of plaintiff caused the accident and property loss.

b.    Plaintiff contends:

i.    There is no evidence that any person or entity other than the defendants were negligent.

ii.    The defendants' contentions are based solely on evidence which *does not exist*; evidence which has already been deemed *inadmissible* by the court; evidence which is *inadmissible by law*; and/or opinions which are *not* included in the defendants' court-approved written direct examinations of defendants' expert witnesses.

iii.    The jury is not permitted to consider the fault of non parties because those non parties were identified as potentially responsible persons, the persons are not protected from a civil action under AS 09.10.055, and the parties had a sufficient opportunity to join those persons in the action but chose not to.  (AS 09.17.080(a)(2).)

**18.    Issue 18:**    *Did Era Aviation take reasonable steps to avoid or mitigate its damages?*

a.   Defendants contend:

i.    ERA failed to locate an alternate helicopter by purchase or lease in a timely manner for its operations.  Locating a substitute helicopter more promptly would have lessened the damages for loss of use.

ii.    ERA failed to take all reasonable measures to subcontract its work so that it could continue operations without interruption.

    iii.   ERA failed to timely secure payment for the property loss so it could immediately purchase or lease another helicopter.

    iv.   ERA failed to reduce its overhead so that it would not incur costs that were not offset by revenues before the helicopter was replaced.

  b.  <u>Plaintiff contends:</u>

    i.   The defendants' contentions are based solely on evidence which *does not exist*; evidence which has already been deemed *inadmissible* by the court; evidence which is *inadmissible by law*; and/or opinions which are *not* included in the defendants' court-approved written direct examinations of defendants' expert witnesses.

    ii.   A replacement helicopter was located and obtained as quickly as possible.

    iii.   Era Aviation, Inc. was not reasonably required to, and could not have, subcontracted its work to others, and even if it had done so, the damages would not have been mitigated or lessened.

    iv.   Era Aviation, Inc. did timely secure payment for the property loss.

    v.   Era Aviation, Inc. was not reasonably required to, and could not have, reduced its overhead, and even if it had done so, the damages would not have been mitigated or lessened.

**B.     The Following Are The Issues Of Law To Be Tried And Determined:**

**1.     Plaintiff:**  Plaintiff contends the following issues of law must be tried and determined:

   a.   Will the jury be permitted to consider the fault of non parties even though those non parties were identified as potentially responsible persons, they are not protected from a civil action under AS 09.10.055, and the parties had a sufficient opportunity to join those non parties in the action but chose not to. (AS 09.17.080(a)(2).)

   b.   If the jury awards damages for the fair market value of the destroyed helicopter, are the defendants are entitled to a reduction in that award equal to the $2,047,480.00 that was paid to Era Aviation, Inc. by subrogated collateral sources (Era's own insurers)?

   c.   If the jury awards damages for the fair market value of the destroyed helicopter, are the defendants are entitled to a reduction in that award equal to the sums paid by noncollateral sources (the defendants and their own insurers) to settle the subrogation claims brought by Era's insurers?

   d.   Whether the assignment was sufficient to transfer to Era Helicopters, LLC the right to pursue the claims, remedies and damages described above?

**2.     Defendants:**  The defendants contend the following issues of law must be tried and determined:

a.  What claims, if any, were properly assigned to Era Helicopters, LLC before Era Aviation, Inc. abandoned all its claims in bankruptcy?  Defendants repeatedly demanded years ago, but were only provided three days ago, a purported assignment of claims from Era Aviation, Inc. to Era Helicopters, LLC. The purported assignment is inconsistent with the sworn testimony of an ERA Helicopters, LLC officer as to who became the assignee and as to the date of the assignment.  The purported assignment was not listed on the plaintiff's exhibit list and therefore cannot be considered at trial. Therefore defendants do not concede at this time that Era Helicopters, LLC owns the claims asserted here.  Further, with respect to the claim for destruction of the helicopter, Era Aviation, Inc. was paid $2,047,480 from its insurer, USAU, which then pursued, settled and dismissed with prejudice its own subrogation claim for that amount.  This means the most that Era Aviation, Inc. was entitled to claim for the destruction of the helicopter was the insurance deductible of $52,520.00, which in turn was the only claim that Era Aviation, Inc. had a right to assign to Era Helicopters, LLC, if such an assignment occurred.  <u>Ruggles v. Grow</u>, 984 P.2d 509 (Alaska 1999); <u>Thomann v. Fouse</u>, 93 P.3d 1048, 1051 n 10 (Alaska 2004);  <u>Brinkerhoff v. Swearingen Aviation Corp.</u>, 663  P.2d 937 (Alaska 1983).  Finally, defendants contend that any purported assignment of a punitive damages claim is void or unenforceable since such an assignment is against public policy against champerty and maintenance.

b.  If liability and damages are proven, is plaintiff entitled to prejudgment interest on amounts for which it did not receive payments from USAU, or is it entitled to recover damages for loss of use of the helicopter for the period of time reasonably necessary to obtain a replacement helicopter or from the date of loss to the date Era received payment from its insurance company whichever first occurred?  Plaintiff is not entitled to recover both prejudgment interest and loss of use damages:

- 62 -

> Such an award [prejudgment interest] is to compensate for the loss of the funds representing the value of the vessel. To grant such an award plus a separate one for damages attributable to loss of use of the vessel constitutes a double recovery. In order to make a wronged plaintiff whole, under certain circumstances, it may be more appropriate to award the actual, provable damages attributable to loss of use of property than to award interest from the date of loss. Both interest and an award of loss of use of property, however, are not permissible.

State v. Stanley, 506 P.2d 1284, 1295 (Alaska 1973), rehearing denied 509 P.2d 279. See also, Brinkerhoff v. Swearingen Aviation Corp., 663 P.2d 937 (Alaska 1983), where the Court repeated its observation that an overlapping of loss of use damages and prejudgment interest would constitute a double recovery.

c.  In the exercise of its gate-keeping function the Court must decide the threshold issue of whether plaintiff's claim for punitive damages should be given to the jury:

> Specifically, the plaintiff must prove by clear and convincing evidence that the defendant's conduct was outrageous, such as acts done with malice, bad motive, or reckless indifference to the interests of another. … "If the evidence does not give rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice, then the trial court need not submit the issue of punitive damages to the jury."

Lee Houston & Associates, Ltd. v. Racine, 806 P.2d 848, 856 (Alaska 1991). The trial court must make a threshold determination whether the conduct at issue "gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice." Mitchell v. Heinrichs, 27 P.3d 309, 312 (Alaska 2001) (citations and quotations omitted, emphasis added).

- 63 -

d.    Defendants incorporate herein by reference their pending Motion for Rulings of Law re Recoverable Damages filed at Docket 475.

e.    Defendants incorporate by reference all motions in limine filed to date and do not waive their right to seek review of the rulings issued to date as the trial progresses.

### IX.    General Questions for the Jury, Voir Dire Jury Questionnaire, Preliminary Jury Instructions, Jury Instructions, and Special Verdict Form

**A.    General Questions for the Jury.**

See *Appendix "A."*

**B.    Voir Dire Jury Questionnaire.**

See *Appendix "B."*

**C.    Preliminary Jury Instructions.**

See *Appendix "C."*

**D.    Jury Instructions.**

See *Appendix "D."*

**E.    Special Verdict Form.**

See *Appendix "E."*

Era Av 4EH/PO/WO Lg24175/20070323c

## X.    Exhibits

See *Appendix "F."*

## XI.    Witness Lists

See *Appendix "G."*

**All parties have identified witnesses whose excerpted deposition testimony will be read or (if videotaped) played for the jury.  The parties agree that before any such deposition testimony is read or played in the presence of the jury, the parties will meet and confer in an attempt to resolve all objections (if any) to the proposed deposition testimony.  In the event the parties are unable to resolve such objections, then any remaining objections will be resolved by the Court before any disputed deposition testimony is read or played for the jury.**

**The parties understand that the Court has put them on notice that they are responsible for ensuring that the witnesses they want to put on the stand to testify are subpoenaed to testify, regardless of whether the intended witness is listed as a witness for the plaintiff or the defendants.  Simply because a party lists a witness does not mean that the witness will be called.  Therefore, a party should not rely on the listing of a witness by the opposing party as an indication that the witness will be called.  To the extent possible, the parties shall stipulate to the witnesses that will be called to testify.**

Era Av 4EH/PO/WO Lg24175/20070323c

## XII.    Effect of this Order

**When finalized, this Proposed Pretrial Order shall supersede the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.**

Dated: _____        _____

                                                   Hon. James K. Singleton
                                                   U.S. District Judge

Era Av 4EH/PO/WO Lg24175/20070323c

Respectfully Submitted,

Dated:  March __23__, 2007       **LAW OFFICES OF JON A. KODANI**


s/  Jeffrey J. Williams

By:     Jon A. Kodani, Esq.
          Jeffrey J. Williams, Esq.

2200 Michigan Avenue
Santa Monica, CA  90404
Tel. (310) 453-6762
EMail *lojak@kodanilaw.com*

Attorneys for Plaintiff
Era Helicopters, LLC

Dated:  March __23__, 2007       **NIXON PEABODY, LLP**


s/  Raymond L. Mariani

By:     Raymond L. Mariani, Esq.

50 Jericho Quadrangle, Suite 300
Jericho, NY  11753-2728
Tel. (516) 832-7520
EMail *rmariani@nixonpeabody.com*

Attorneys for Defendants
Dallas Airmotive / UNC Airwork

- 67 -

Dated:  March  __23__, 2007          **GROH EGGERS, LLC**


s/  David A. Devine_____

By:     David A. Devine, Esq.

2600 Cordova Street, Suite 110
Anchorage, AK  99503
Tel. (907) 562-6474
EMail  *devined@groheggers.com*


Local Counsel for Defendants
Dallas Airmotive / UNC Airwork

Dated:  March  __23__, 2007          **BAKER BRATTAIN, LLC**


s/  William F. Brattain_____

By:     William F. Brattain, Esq.

N Street Plaza
821 N Street Suite 101
Anchorage, AK  99501
Tel.  (907) 277-3232
EMail  *brattain@bakerbrattain.com*


Attorneys for Defendant
Pratt & Whitney Canada

**APPENDIX "A"**
**General Questions for the Jury**

1.   Does anyone here know, or are any of you acquainted with, any of the parties in this case?

- Era Aviation, Inc.

- Era Helicopters, LLC

- Pratt & Whitney Canada, Inc.

- UNC Airwork Corporation

- Dallas Airmotive, Inc.

2.   Do you know any attorneys or employees from the law offices involved in this case?

- Jon A. Kodani

- Jeffrey J. Williams

- The Law Offices of Jon A. Kodani

- William F. Brattain

- Baker Brattain LLC

- Raymond L. Mariani

- Nixon Peabody LLP

- David A. Devine

- Groh Eggers LLC

3.   Do you know anyone else who is involved in or associated with this trial, such as Court personnel?

4.    Do you know any of the following people who may be called as witnesses in this case?

- Mr. Vernon Albert
- Mr. Cullen Baker
- Mr. Terry Bennett
- Mr. Thomas Berthe
- Mr. Brian Blixhavn
- Mr. Ian Cheyne
- Mr. Terry Cole
- Mr. Mike Cumnock
- Ms. Tealeye Cornejo
- Donald O. Cox, Ph.D., P.E.
- Mr. Frank "Bob" Culver
- Mr. Tony Davis
- Ms. Jutta Demers
- Mr. Scott Ellis
- Mr. Robert Galloway
- Ms. Anna Goss
- Mr. Les Hanberg
- Mr. Mark Jones

- Mr. Brett Juchster
- Mr. Gus Lapthorne
- Mr. Richard (Lash) Larew
- Dr. Charles Manning
- Mr. Cliff Mitchell
- Mr. Charles Morin
- Mr. George Neufeld
- Mr. Rick Oeder
- Kenneth Orloff, Ph.D.
- Mr. Ron Ortuso
- Mr. Steve Rauch
- Mr. David S. Rupert
- Lawrence A. (Larry) Scanlan, Ph.D.
- Mr. Mike Snellgrove
- Mr. Douglas R. Stimpson
- Mr. Weldon Walshe
- Mr. Thomas Young

5.    Do you have any personal knowledge of, or have you read or heard anything about the facts surrounding this case?

6.    Have you or a close relative or friend ever worked for any party?

7.    Is there any other reason that you would like to bring to the Court's attention why you question your ability to decide this case based solely on the evidence presented to you?

**APPENDIX "B"**
**Voir Dire Questionnaire**

When you are called upon, please stand with the microphone and give the following information to the attorneys, the parties, and the Court. The microphone is not connected to a loudspeaker, but it does record what you say, so it is necessary that you speak clearly and loudly into it. If in response to any of the questions you would prefer to answer in private, please so indicate and at a later time you will be asked to come forward and discuss your answer confidentially with the Court and counsel at the bench.

1. State your name, and spell your last name. Where were you born, and where were you raised?

2. What neighborhood do you live in? How long have you lived in Alaska?

3. What is your marital status? What is your spouse's name? Please give the number of children, their ages, and their occupations if they are adults.

4. What is the highest level of formal education that you've attained?

5. What is the name of your employer? Please give a brief work history, and if you are married, please give your spouse's occupation.

6. What are your hobbies, interests, and organizations, and any public expressions of your opinions? For example, do you have any bumper stickers, or any political activity that is public? Have you ever run for public office?

7. Are you a citizen of the United States?

8. Do you have any military service? Your rank at discharge?

9. Have you ever served on a jury? If so, (a) when was that? (b) Was it a civil or a criminal case? (c) Was it a grand jury or a trial jury? (d) Did the jury reach a verdict in that case?

10. Do you know any of the parties, a lawyer present in the courtroom, or any of the witnesses named by an attorney?

11. Do you have a special disability or a medical condition which would make it difficult for you to serve as a juror?

Era Av 4EH/PO/WO Lg24175/20070323c

12.    Is there any reason you are concerned about your ability to be fair to both sides in this case?

13.    Is there anything else that you feel that the lawyers, parties or the Court should know regarding your jury service?

14.    Have you or any members of your family ever worked in the aviation industry?

15.    Have you or any of your family members ever flown in a helicopter?  If so, describe your experience with helicopter  flights and the approximate dates involved.

16.    Have any friends or family members described to you their experiences with helicopter flights?  If so, what did they tell you about their experiences?

17.    Do you, any members of your family, or any close friend have any pilot licenses or aircraft ratings?  If so, describe the type of licenses and ratings and the approximate dates issued.

18.    Have you had any sort of pilot training?  If so, describe the training you received and the approximate dates of the training.

19.    Do you or any of your family members have any background or training as an airplane or helicopter mechanic?

20.    Do you, any members of your family, or any close friend have any aircraft maintenance or mechanic's licenses?  If so, describe the type of licenses and the approximate dates issued.

21.    Have you, any members of your family, or any close friend worked on a fire fighting crew or been involved in fighting a forest fire or brush fire?  If so, describe the fire fighting experience and the approximate dates involved.

22.    Have you or any of your friends or family been involved in a helicopter or airplane accident?  If so, describe what happened and approximately when it happened.

23.    What experiences, if any, have you or family members had with Era Aviation, Inc. or Era Helicopters, LLC?

24.    Have you or any member of your family ever had repairs to an aircraft done?

25.    Have you or any member of you family ever had repairs to an aircraft engine done?

26.    Is the Federal Aviation Administration presently or in the past employed you or any members of your family?  The NTSB?

27.  Are you or any member of your family employed by, or have in the past, been employed by the Federal government?

28.  Is your ability to impartially render a verdict in this case affected by the fact of the death of the pilot?

29.  Can you, in rendering a verdict in this case, be fair to a corporation that is based outside of Alaska?

30.  Do you favor the Plaintiff just because it initiated this action against the Defendants?

31.  Do you have any personal beliefs or convictions which might either encourage you to award or dissuade you from awarding damages that are designed to punish a defendant?

**Requested by Defendants / Plaintiff Objections (*Argumentative / Unrelated to Issues*)**

1.  Have you or any member of your family been involved in any kind of dispute over the performance of services or purchase of a product?  If so, please describe the circumstances and result of the dispute.

2.  Has anyone ever made a claim to you or a family member for property damage?  If so, who made the claim and what type of property was involved?  What happened to cause the property damage?

3.  Have you or any member of your family ever made a claim to anyone for property damage?  If so, who did you make a claim to and what type of property was involved?  What happened to cause the property damage?  Do you believe your claim was handled fairly?  Please describe what how your claim was handled.

4.  If the evidence supports it, would you be able to reach a conclusion that the deceased pilot was the cause of this accident?

5.  Are you able to reach a decision that the deceased pilot was the cause of this accident even though he is not a party to this case?

**APPENDIX "C"**
**Preliminary Jury Instructions**

<u>Ninth Circuit Model Civil Jury Instructions</u>

1.1     Duty of Jury

1.2     Claims and Defenses

1.3     What Is Evidence

1.4     What Is Not Evidence

1.5     Evidence For Limited Purpose

1.6     Direct and Circumstantial Evidence

1.7     Ruling on Objections

1.8     Credibility of Witnesses

1.9     Conduct of Jury

1.10    No Transcript Available to Jury

1.11    Taking Notes

1.12    Outline of Trial

1.13    Burden of Proof—Preponderance of the Evidence

1.14    Burden of Proof—Clear and Convincing Evidence

**APPENDIX "D"**
**Jury Instructions**


### Ninth Circuit Model Civil Jury Instructions

2.2      Bench Conferences and Recesses
2.4      Stipulations of Facts
2.6      Deposition as Substantive Evidence
3.1      Duties of Jury to Find Facts and Follow Law
3.2      What Is Evidence
3.3      What Is Not Evidence
3.5      Direct and Circumstantial Evidence
3.6      Credibility of Witnesses
3.7      Opinion Evidence
3.9      Charts and Summaries Not Received in Evidence
3.10    Charts and Summaries in Evidence
3.11    Two or More Parties - Different Legal Rights
4.1      Duty to Deliberate
4.2      Use of Notes
4.3      Communication With Court
4.4      Return of Verdict
4.5      Additional Instructions of Law
5.1      Burden of Proof—Preponderance of the Evidence
5.2      Burden of Proof—Clear and Convincing Evidence
6.2      Liability of Corporations
7.1      Damages - Proof
7.2      Measures of Types of Damages

### Alaska Civil Pattern Jury Instructions

1.08      Credibility of Expert Witnesses
2.14      Closing Instructions – Videotape Depositions
3.01      Negligence – Plaintiff Entitled to Recover
3.02A    Comparative Negligence
3.03A    Negligence Defined
3.04A    Violation of Statute – Negligence Per Se
3.04B    Violation of Statute - Evidence of Negligence
3.04C    Compliance with Statute
3.06      Legal Cause
3.09      Introduction to Special Verdict Form
7.01      Products Liability – Plaintiff's Claims
7.02      Liability for Defect in Product

| 7.03 | Defectiveness Defined |
| 7.06 | Strict Liability in Tort - Comparative Negligence |
| 7.07 | Strict Liability in Tort – Legal Cause |
| 20.14 | Conversion, Loss, or Destruction of Property |
| 20.16 | Loss of Use of Property |
| 20.17A | Fair Market Value Defined |
| 20.17B | Value of Loss of the Use of Property Defined |
| 20.17C | Fair Rental Value |
| 20.20A | Liability for Punitive Damages |
| 20.20B | Amount of Punitive Damage Award |

### *Requested by Plaintiff Only*

Proposed Special Instruction No. P-1 (atttached)
Proposed Special Instruction No. P-2 (atttached)
Proposed Special Instruction No. P-3 (atttached)

### *Requested by Defendants Only*

| 3.07 | Multiple Causes/Superseding Cause |
| 7.03a | Scientific Unknowability |
| 7.08 | Strict Liability in Tort - Multiple Causes |
| 7.08a | Strict Liability in Tort - Superseding Cause |
| 20.18A | Avoidable Consequences |
| 20.20C | Punitive Damages Special Verdict Form |
| | Proposed Special Instruction No. D-1 (atttached) |
| | Proposed Special Instruction No. D-2 (atttached) |
| | Proposed Special Instruction No. D-3 (atttached) |
| | Proposed Special Instruction No. D-4 (atttached) |
| | Proposed Special Instruction No. D-5 (atttached) |

Era Av 4EH/PO/WO Lg24175/20070323c

**Proposed Special Instruction No. P-1**
**Requested by Plaintiff Only**


The seller of a defective product is liable for any damages caused by that defective product, even though the seller has exercised all possible care in the preparation and sale of the product.


(REST. TORTS (Second) § 402A(2)(a); <u>Clary v. Fifth Ave. Chrysler Center, Inc.</u>, 454 P.2d 244, 248 (Alaska 1969))

**Proposed Special Instruction No. P-2**
**Requested by Plaintiff Only**


The seller of a defective product is liable for any damages caused by that defective product, even though the user or consumer of the defective product has not bought the product from or entered into a contractual relation with the seller.


(REST. TORTS (Second) § 402A(2)(b); <u>Clary v. Fifth Ave. Chrysler Center, Inc.</u>, 454 P.2d 244, 248 (Alaska 1969))

**Proposed Special Instruction No. P-3**
**Requested by Plaintiff**

***(Only If The Court Allows Defendants To Inform The***
***Jury That Era Aviation, Inc. Was Paid By Collateral Sources)***

The collateral source rule thus prohibits the reduction of a plaintiff's damages when he has received compensation from another source. It also has an evidentiary role, excluding evidence of other compensation on the theory that such evidence would affect the jury's judgment unfavorably to the plaintiff on the issues of liability and damages.

(Tolan v. ERA Helicopters, Inc., 699 P.2d 1265, 1267 (Alaska 1985); John's Heating Service v. Lamb, 46 P.3d 1024, 1043 (Alaska 2002))

**Proposed Special Instruction No. 1**
**Requested by Defendants Only**

ERA Helicopters, LLC has already received insurance payments for certain losses resulting from the damage to its helicopter.  Losses that were compensated by insurance are not  recoverable by ERA in this lawsuit.  Instead, ERA may only claim damages for a loss to the  extent that it was not compensated by insurance.  You may not award ERA anything for losses  to the extent that those losses have already been compensated by insurance.

Authorities for this instruction: *Ruggles v. Grow*, 984 P.2d 509 (Alaska 1999); *Thomann v. Fouse*, 93 P.3d 1048, 1051 n 10 (Alaska 2004);  *Brinkerhoff v. Swearingen Aviation Corp.*, 663  P.2d 937 (Alaska 1983).

**Proposed Special Instruction No. 2**
**Requested by Defendants Only**

The first item of claimed loss is damage to Era Aviation's helicopter, but only to the extent that loss was not covered by insurance.  If you find that defendants legally caused such a  loss, then the amount that will reasonably compensate plaintiff for this loss is the difference in  the fair market value of the helicopter immediately before and immediately after the accident,  minus the amount that Era Aviation has already received from insurance for the damage to the  helicopter.

I will now explain the term "fair market value."

Imagine that the owner of property puts it up for sale and is allowed a reasonable time  to sell it.  The fair market value is the amount a fully informed seller would receive from a  fully informed buyer in a normal, open market sale.  In arriving at this figure, you must assume  that the owner would be free to sell or not to sell and that the buyer would be free to buy or not  to buy.

Authority for this instruction:  Alaska Pattern Civil Jury Instruction 20.15 and 20.17A; *Ruggles  v. Grow*, 984 P.2d 509 (Alaska 1999); *Thomann v. Fouse*, 93 P.3d 1048, 1051 n 10 (Alaska  2004); *Brinkerhoff v. Swearingen Aviation Corp.*, 663 P.2d 937 (Alaska 1983).

**Proposed Special Instruction No. 3**
**Requested by Defendants Only**

The second item of claimed loss is the loss of use of the helicopter, but only to the extent the loss was not covered by insurance.  If you find that defendants legally caused such a  loss, then the plaintiff is entitled to be compensated for the fair value of the use of the helicopter during the period reasonably necessary to replace it.

The value of the use of the helicopter is to be measured by the earnings that were reasonably anticipated for the period of loss of use, but were lost because the helicopter was not available.  You must fix the net earnings after expenses.  You must then deduct any amount   the plaintiff has already received from insurance for the loss of use of the helicopter.

[Or an alternative second paragraph]:

The value of the use of the helicopter is to be measured by the cost of obtaining a substitute for the helicopter during the period of loss of use.  You must then deduct any amount  the plaintiff has already received from insurance for the loss of use of the helicopter or to  obtain a substitute for the helicopter during the period of loss of use.

Authority for this instruction:   Alaska Pattern Civil Jury Instruction 20.16 and 20.17B; *Ruggles  v. Grow*, 984 P.2d 509 (Alaska 1999); *Thomann v. Fouse*, 93 P.3d 1048, 1051 n 10 (Alaska  2004); *Brinkerhoff v. Swearingen Aviation Corp.*, 663 P.2d 937 (Alaska 1983).

**Proposed Special Instruction No. 4**
**Requested by Defendants Only**


As the plaintiff, Era Aviation bears the burden of proving the amount of its alleged damages with reasonable certainty.  A plaintiff is not required to show its damages with mathematical certainty, but you must have a reasonable basis for fixing damages in this case.  A  mere guess is not enough.  You are not permitted to award speculative damages, which means  compensation for loss which, although possible, is conjectural or not reasonably probable.


Authority for this instruction:  *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216,  225 (Alaska 1978); *Reeves v. Alyeska Pipeline Service Co.*, 926 P.2d 1130 (Alaska 1996).

- 83 -

**Proposed Special Instruction No. 5**
**Requested by Defendants Only**

The plaintiff claims that a product manufactured or sold by the defendants damaged the plaintiff.

A product is defective if:

(1)  The product differed from the manufacturer's intended result; or the product differed from other units of the same product line; or

(2)  The product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; or

(3)  If the use of the product in a manner that is reasonably foreseeable by the defendants involves a substantial danger that would not be readily recognized by the ordinary  consumer of the product and the manufacturer fails to give adequate warning of such danger;  or

(4)      (A) The plaintiff proves that the products design legally caused injury, and

(B)  The defendants failed to prove, in light of the relevant factors, that on balance, the benefits of the design outweigh the risk of danger inherent is such design.

In determining (B), you may consider, among other things:

(a)  The gravity of the danger posed by the challenged design;

(b) The likelihood that such danger would occur;

(c)  The adverse consequences to the product and to the consumer that would result from an alternative design;

(d) The mechanical feasibility of a safer alternative design; and

(e)  The financial cost of an improved design.

In considering the mechanical feasibility and financial cost of other designs, you may consider how other manufacturers manufacture similar products.

---

A defective condition in a product is a legal cause of harm if it is a substantial factor in  bringing about the harm.  A defective condition in a product is a substantial factor in bringing  about the harm if it is more likely true than not true that:

1.  the defective condition in the product was so important in bringing about the harm that a reasonable person would regard it as a cause and attach responsibility to it; and

2.  the harm would not have occurred but for the defective condition of the product.

Authority for this instruction: Alaska Pattern Civil Jury Instruction 7.03 (defect) and 7.07 (legal cause).

**Proposed Special Instruction No. 6**
**Requested by Defendants Only**


Defendant UNC/DAI requests that the following sentence be added to any instruction given to the jury regarding punitive damages:


"You may **not** award punitive damages to punish defendant UNC for harm to anyone other than the plaintiff in this case."


Authority for this addition: *Phillip Morris USA v. Williams*, 127 S.Ct. 1057, 1063 (2007).

**APPENDIX "E"**
**Special Verdict Form**

## A.      Plaintiff.

## PHASE I

We, the jury in the above entitled action, find the following Special Verdict on the questions submitted to us:

## Question No. 1:

Was the product(s) defective?

        Yes   _____          No   _____

If you answer "yes" to Question No. 1, then please answer Question No. 2.

However, if you answer "no" to Question No. 1, then please skip Question Nos. 2 and 3, and answer Question No. 4.

## Question No. 2:

Did the defects exist when the product(s) left the possession of the defendants?

        Yes   _____          No   _____

If you answer "yes" to Question No. 2, then please answer Question No. 3.

However, if you answer "no" to Question No. 2, then please skip Question No. 3, and answer Question No. 4.

**Question No. 3:**

Were the defects in the product(s) a legal cause of damage to the Helicopter?

Yes ＿＿＿＿＿＿＿＿    No ＿＿＿＿＿＿＿＿

Please answer Question No. 4.

**Question No. 4:**

Were the defendants negligent?

Yes ＿＿＿＿＿＿＿＿    No ＿＿＿＿＿＿＿＿

If you answer "yes" to Question No. 4, then please answer Question No. 5.

If you answer "no" to Question No. 4, but you answered "yes" to Question Nos. 1, 2 **and** 3, then please skip Question No. 5 and answer Question Nos. 6 and 7.

If you answer "no" to Question No. 4, and you also answered "no" to Question Nos. 1, 2 **or** 3, then do not answer any further questions.  Your foreperson should date and sign this verdict.

**Question No. 5:**

Was the negligent conduct of the defendants a legal cause of damage to the Helicopter?

Yes ＿＿＿＿＿＿＿＿    No ＿＿＿＿＿＿＿＿

Era Av 4EH/PO/WO Lg24175/20070323c

If you answer "yes" to Question No. 5, then please answer Question Nos. 6 and 7.

If you answer "no" to Question No. 5, but you answered "yes" to Question Nos. 1, 2 *and* 3, then please answer Question Nos. 6 and 7.

If you answer "no" to Question No. 5, and you also answered "no" to Question Nos. 1, 2 *or* 3, then do not answer any further questions.  Your foreperson should date and sign this verdict.

**Question No. 6:**

What do you find to be the total amount of damages suffered by plaintiff Era Helicopters, LLC?

$\$$_____

**Question No. 7:**

Assuming the combined fault of Era Aviation, Inc., the pilot, and all defendants to be 100%, what percentage of responsibility is attributable to:

| | |
|---|---|
| Era Aviation, Inc. and its pilot: | _____% |
| Defendant UNC / DAI: | _____% |
| Defendant Pratt & Whitney: | _____% |
| TOTAL: | 100 % |

Please answer Question No. 8.

**<u>Question No. 8:</u>**

Do you find by clear and convincing evidence that the defendants' conduct demonstrated reckless indifference to the interests of others, or was outrageous?

Yes  _____          No  _____

DATED: _____, 2007, at Anchorage, Alaska.

_____
Foreperson of the Jury

Era Av 4EH/PO/WO Lg24175/20070323c

## PHASE II

We, the jury in the above entitled action, find the following Special Verdict on the questions submitted to us:

### Question No. 1:

What amount of money will fairly accomplish the purposes of punishing the defendants and deterring the defendants and others from repeating similar acts?

$_____

DATED: _____, 2007, at Anchorage, Alaska.

_____
Foreperson of the Jury

Era Av 4EH/PO/WO Lg24175/20070323c

**B.    Verdict Form Proposed by Defendants UNC and DAI.**

SPECIAL VERDICT

We, the jury in the above-entitled case, find the following special verdict submitted

to us in the above-captioned case:

Claims Against UNC Defendants

(1)    Was the defendant UNC negligent?

Answer "yes" or "no"  Answer: _____

If you answered question 1 "no", do not answer question 2 and move directly to

question 3.  However, if you answered "yes" to question 1, then continue.

(2)    Was the negligence of defendant UNC a legal cause of injury to the plaintiff?

Answer "yes" or "no"  Answer: _____

(3)    Was a product sold by the defendant UNC defective?[1]

Answer "yes" or "no."  Answer: _____

If you answered question 3 "no", do not answer questions 4 and 5 and instead

proceed directly to question 6.  However, if you answered "yes" to question 3, then

continue.

---

[1]    DAI specifically reserves its right to later amend this proposed Special Verdict, as it believes that Plaintiff will not be able to prove at trial that a product liability action lies against DAI.  All references in this Special Verdict form to plaintiff=s product liability cause of action are subject to this caveat.

(4)    Was the product defective when it left the possession of defendant UNC?

Answer "yes" or "no."  Answer: _____


If you answered question 4 "no", do not answer question 5 and instead proceed

directly to question 6.  However, if you answered "yes" to question 4, then continue.


(5)    Was a defect in the product a legal cause of harm to the plaintiff?

Answer "yes" or "no."  Answer: _____


(6)    Do not answer this question unless you answered "yes" to both questions 1

and 2 or unless you answered "yes" to questions 3, 4 and 5.  Has the plaintiff proven by

clear and convincing evidence that defendant UNC acted with actual malice or engaged in

conduct sufficiently outrageous to be deemed equivalent to actual malice such as acts done

with bad motive or with reckless indifference to the interests of Era Aviation, Inc and that

therefore punitive damages should be awarded to the plaintiff?


Answer "yes" or "no."  Answer: _____

Era Av 4EH/PO/WO Lg24175/20070323c

**Claims Against Defendant Pratt & Whitney**

(7)    Was the defendant Pratt & Whitney negligent?

Answer "yes" or "no."  Answer: _____

If you answered question 7 "no", do not answer question 8 and instead proceed directly to question 9.  However, if you answered "yes" to question 7, then continue.

(8)    Was the negligence of the defendant Pratt & Whitney a legal cause of injury to the plaintiff?

Answer "yes" or "no."  Answer: _____

(9)    Was a product made or sold by the defendant Pratt & Whitney defective?

Answer "yes" or "no."  Answer: _____

If you answered question 9 "no", do not answer questions 10 and 11 and instead proceed directly to question 12.  However, if you answered "yes" to question 9, then continue.

(10)    Was the product defective when it left the possession of defendant Pratt & Whitney?

Answer "yes" or "no."  Answer: _____

If you answered question 10 "no", do not answer question 11 and instead proceed directly to question 12.  However, if you answered "yes" to question 10, then continue.

(11)    Was a defect in the product a legal cause of harm to the plaintiff?

Answer "yes" or "no."  Answer: _____

Era Av 4EH/PO/WO Lg24175/20070323c

**Damages**

(12)  What are the damages, if any, sustained by the plaintiff as a legal result of the accident?  Do not include any amounts for which plaintiff has already received insurance.

| | |
|---|---|
| Damage to the helicopter3 | $_____ |
| Loss of use of the helicopter | $_____ |

If you have awarded the plaintiff any sum of money in answer to question 12, then continue.


(13)  Was Era Aviation, Inc. or its employee pilot negligent?

Answer "yes" or "no."  Answer: _____

If you answered question 13 "no", do not answer question 14 and instead proceed directly to question 15.  However, if you answered "yes" to question 13, then continue.


(14)  Was the negligence of Era Aviation, Inc. or its employee pilot a legal cause of Era's injury?

Answer "yes" or "no."  Answer: _____

---

3       Defendants continue to object to plaintiff's effort to assert a claim for the value of the helicopter.  Following the loss of its helicopter, Era Aviation, Inc. was paid $2,047,480 from its insurer, USAU, who then pursued, settled and dismissed with prejudice its own subrogation claim for that amount.  This means the most that Era Aviation, Inc. was entitled to claim for the destruction of the helicopter was the insurance deductible of $52,520.00, which in turn was the only claim that Era Aviation, Inc. had a right to assign to Era Helicopters, LLC, if such an assignment occurred. Ruggles v. Grow, 984 P.2d 509 (Alaska 1999); Thomann v.  Fouse, 93 P.3d 1048, 1051 n 10 (Alaska 2004);  Brinkerhoff v. Swearingen Aviation Corp., 663  P.2d 937 (Alaska 1983).

(15)     Assuming the combined responsibility of Era Aviation, its employee pilot, and both defendants to be 100%, what percentage of responsibility is attributable to:

Era Aviation and its pilot:          _____ %

Defendant UNC / DAI:          _____ %

Defendant Pratt & Whitney:          _____ _ %

TOTAL:          100 %

DATED at Anchorage, Alaska this _____ day of _____, 2007.

_____
Foreperson of the Jury

Era Av 4EH/PO/WO Lg24175/20070323c

## **PHASE II**

We, the jury in the above entitled action, find the following Special Verdict on the questions submitted to us:

**Question No. 1:**

What amount of money awarded to plaintiff will fairly accomplish the purpose of punishing defendant UNC for harming Era Aviation, Inc.?

$\underline{\hspace{3cm}}$

DATED: $\underline{\hspace{4cm}}$, 2007, at Anchorage, Alaska.

$\underline{\hspace{6cm}}$
Foreperson of the Jury

### C.      Verdict Form Proposed by Defendant PWC

**Question No. 1:**

Was the CT Disk defective?

Yes _____                    No _____

**Question No. 2.**

Did the defect exist when the CT disk  left the possession of the defendant  PWC?

Yes _____                    No _____

**Question No. 3:**

Did Defendants Dallas Airmotive/UNC Airworks sell the CT disk to Era?

**Question No. 4:**

Did the defect exist when the CT disk  left the possession of the defendant Dallas Airmotive/UNC Airworks?

Yes _____                    No _____

**Question No. 4:**

Was the sprag clutch defective?

Yes _____                    No _____

**Question No. 5:**

Did the defect exist when the sprag clutch   left the possession of the defendant  PWC?

Yes _____          No _____

**Question No. 6:**

Were the defect(s)  in the CT disk a legal cause of Era's injury?

Yes _____          No _____

**Question No. 7:**

Were the defect(s)  in the sprag clutch a legal cause of Era's injury?

Yes _____          No _____

**Question No. 8:**

Was  the defendant PWC  negligent?

Yes _____          No _____

**Question No. 9:**

Were the defendant  Dallas Airmotive/UNC Airworks negligent?

Yes _____          No _____

**Question No. 10:**

Was Era Aviation, Inc. or its employee pilot negligent?

Yes   _____        No   _____

**Question No. 11:**

Was the negligence of Era Aviation, Inc. or its employee a legal cause of Era's injury?

Yes   _____        No   _____

**Question No. 12**

Was the negligent conduct of the defendant PWC a legal cause of Era's injury?

Yes   _____        No   _____

**Question No. 13:**

Was the negligent conduct of the defendant Dallas Airmotive/UNC Airworks  a legal cause of damage to the Helicopter?

Yes   _____        No   _____

**Question No. 14:**

What was the fair market value of the Helicopter before the crash?

$_____

**Question No. 15:**

What amount in dollars would fairly compensate the plaintiff for its reasonable loss of use of

the helicopter?

$_____

**Question No. 16:**

      Assuming the combined responsibility of Era Aviation, its employee pilot, and both

defendants to be 100%, what percentage of responsibility is attributable to:

|  |  |  |
|---|---|---|
| Era Aviation | _____ % |
| The Helicopter Pilot: | _____ % |
| Defendant UNC / DAI: | _____ % |
| Defendant Pratt & Whitney: | _____ _ % |
| TOTAL: | 100 % |

- 101 -

**Question No. 17:**

Has the plaintiff proven by clear and convincing evidence that defendant Dallas Airmotive/UNC Airworks acted with actual malice or engaged in conduct sufficiently outrageous to be deemed equivalent to actual malice such as acts done with bad motive or with reckless indifference to the interests of Era Aviation, Inc and that therefore punitive damages should be awarded to the plaintiff??

Yes  _____          No  _____

DATED: _____, 2007, at Anchorage, Alaska.

_____

Foreperson of the Jury

**APPENDIX "F"**
**Joint Exhibit List**

Defendants object to the inclusion of those exhibits on the annexed exhibit lists that were not listed in the Exhibit Lists that the parties were required to file with the Court, and did file with the Court, on 20 February 2007.   Specifically, defendants object to the inclusion of Exhibits 230 and 231-232 by plaintiff.

Exhibit 230 consists of a document that defendants requested repeatedly over the last 18 months form plaintiff and that plaintiff refused to provide, or even admitted existed. The exhibit concerns the threshold issue of whether the current plaintiff has standing to pursue any claims whatsoever related to the loss of the Helicopter.  The exhibit conflicts in multiple respects with the sworn testimony of an officer for plaintiff, testimony that plaintiff was ordered by the Court to submit on defendants' motion.

Exhibits 231-232 are documents that were long in the possession of plaintiff and should have been listed in the Exhibit List.

Plaintiff responds that the defendants' comments and objections are frivolous.

Exhibit P230 (the assignment) was not produced earlier because the defendants did not disclose their plan to dispute the validity of the assignment until the meeting of counsel on March 1, 2007.  The assignment (Exh. P230) and the declaration previously submitted by Ms. Anna Goss are consistent, and they both state that the claims have been assigned to the present plaintiff, Era Helicopters, LLC.

Exhibits P231-P232 were not identified on the plaintiff's previous exhibit list, because the UNC defendants did not disclose their intention to dispute the fact that they sold the subject CT disk until the meeting of counsel on March 1, 2007.

### A.     Plaintiff's Exhibit List

| ExhNo | Description | Status |
|-------|-------------|--------|
| P001 | CT Disk Ass'y, exemplar, stand mounted | ID |
| P002 | 1997 Repair Docs | ADM |
| P003A | Engine Log Book Records | ADM |
| P003B | Demers Report ME 11937FS (final) | ADM |
| P003C | Statement, HanbergL | ADM |
| P004A | UNC Work Instructions F09113 items 1-8 | ADM |
| P004B | Statement, HanbergL | ADM |
| P005A | UNC Disassembly Inspection Record | ADM |
| P005B | Drawing, HanbergL | ADM |
| P006A | UNC Rework Original | ADM |
| P006B | CT Disc, Diameter K measurements | ADM |
| P006C | Photo, N174EH w/ bucket | ADM |
| P007A | Coltec Industries Certificate of Conformance | ADM |
| P007B | Photo, N174EH w/ bucket | ADM |
| P008A | PWC Invoice | ADM |
| P008B | Photo, N174EH w/ bucket | ADM |
| P009A | PWC Service Bulletin 5406 | ID |
| P009B | Photo, N174EH w/ bucket | ID |
| P010A | UNC Overhaul Inspection Record (redacted) | ADM |
| P010B | Demers Report ME 11940FS (final) | ADM |
| P011 | UNC Inspection Parts Life Summary | ADM |
| P012A | UNC Overhaul Inspection Record | ADM |
| P012B | Berthe Factual Notes | ADM |
| P013 | UNC M.R.B. Approval Form | ADM |
| P014 | UNC Rejected Parts Inventory (redacted) | ADM |
| P015 | UNC Rework Original | ADM |
| P016 | UNC Process Instruction Record PI 002/384/1 | ADM |
| P017A | UNC-Millville Detail Inspection Record | ID |
| P017B | Berthe/Ortuso Report No. TL-1603 (redacted) | ID |
| P018A | UNC Rejected (Red) Tags | ADM |
| P018B | PWC Fig. 5, Gearbox Sub Ass'y | ADM |
| P019A | UNC Work Authorization/Estimate, w/ attachments | ADM |
| P019B | PWC Fig. 7, Gearbox Ass'y | ADM |
| P020 | PWC Invoice (2 pages) | ADM |
| P021 | UNC Stock Request | ID |
| P022 | UNC Repair/Ticket | ADM |

**A.    Plaintiff's Exhibit List** *(continued)*

| | | |
|---|---|---|
| **P023** | UNC Compressor Disc Assembly Record | **ADM** |
| **P024** | UNC engine Records | **ADM** |
| **P025** | PWC Critical and Rotating Components Manual | **ADM** |
| **P026** | Era P.O. G131444 | **ADM** |
| **P027** | PWC Invoice | **ADM** |
| **P028** | UNC Bench & Parts Issue Sheet (redacted) | **ADM** |
| **P029** | UNC P.O. MF-011399 | **ADM** |
| **P030** | UNC-Millville Receiving & Inspection Report | **ADM** |
| **P031** | Cost Estimate Approval | **ADM** |
| **P032** | UNC-Millville Job Record | **ADM** |
| **P033** | UNC Assembly Inspection Record (3 pages) | **ADM** |
| **P034** | UNC Job Record | **ADM** |
| **P035** | UNC Repair Ticket | **ADM** |
| **P036** | UNC Shipping Record | **ADM** |
| **P037** | UNC Invoice (2 pages) | **ADM** |
| **P038** | Era Engine Log Book Record | **ADM** |
| **P039** | Era Accounts Payable Batch Report | **ADM** |
| **P040** | Bell 412 Drawings (3) | **ADM** |
| **P041** | Bell 412 Drawings (3) | **ADM** |
| **P042** | Bell 412 Drawings (3) | **ADM** |
| **P043** | Photos, cockpit, exemplar | **ID** |
| **P044** | Photos, cockpit, exemplar | **ID** |
| **P045** | Photos, cockpit, exemplar | **ID** |
| **P046** | Photos | **ADM** |
| **P047** | Photos | **ADM** |
| **P048** | Photos | **ADM** |
| **P049** | Photos | **ADM** |
| **P050** | Photos | **ADM** |
| **P051** | Photos | **ADM** |
| **P052** | Photos | **ADM** |
| **P053** | Photos | **ADM** |
| **P054** | Photos | **ADM** |
| **P055** | Photos | **ADM** |
| **P056** | Photos | **ADM** |
| **P057** | Photos | **ADM** |
| **P058** | Photos | **ADM** |
| **P059** | Photos | **ADM** |
| **P060** | Photos | **ADM** |
| **P061** | Photos | **ADM** |
| **P062** | Photos | **ADM** |

**A.    Plaintiff's Exhibit List** *(continued)*

| | | |
|---|---|---|
| **P063** | Photos | **ADM** |
| **P064** | Photos | **ADM** |
| **P065** | PWC Photos (engine and disass'y) | **ADM** |
| **P066** | PWC Photos (engine and disass'y) | **ADM** |
| **P067** | PWC Photos (engine and disass'y) | **ADM** |
| **P068** | PWC Photos (engine and disass'y) | **ADM** |
| **P069** | PWC Photos (engine and disass'y) | **ADM** |
| **P070** | PWC Photos (engine and disass'y) | **ADM** |
| **P071** | PWC Photos (engine and disass'y) | **ADM** |
| **P072** | PWC Photos (engine and disass'y) | **ADM** |
| **P073** | PWC Photos (engine and disass'y) | **ADM** |
| **P074** | PWC Photos (engine and disass'y) | **ADM** |
| **P075** | PWC Photos (engine and disass'y) | **ADM** |
| **P076** | PWC Photos (engine and disass'y) | **ADM** |
| **P077** | PWC Photos (engine and disass'y) | **ADM** |
| **P078** | PWC Photos (engine and disass'y) | **ADM** |
| **P079** | CT Disk (l/h) and blades (including segments) (actual) | **ADM** |
| **P080** | Exemplar CT Disk Assembly | **ADM** |
| **P081** | #2 RH CT Disk, actual | **ADM** |
| **P082** | Bambi Bucket and control cables (actual) | **ADM** |
| **P083** | Exemplar Engine Housing | **ADM** |
| **P084** | PWC Release Note (Engine CP-PS 62224) | **ADM** |
| **P085A** | PWC Lab Report ME 9053CS | **ADM** |
| **P085B** | PWC Lab Report ME 10245CS | **ADM** |
| **P085C** | PWC Lab Report ME 10307FS | **ADM** |
| **P086** | Memo, UNC is recognized distributor for PWC | **ADM** |
| **P087** | Era P.O. G114283 | **ADM** |
| **P088** | UNC Cost Estimate Approval | **ADM** |
| **P089** | *intentionally blank* | – |
| **P090** | PWC Invoice P4803003 | **ADM** |
| **P091** | UNC Work Instructions F07705, items 15-21 | **ADM** |
| **P092** | UNC Log Book Sign-Off Record | **ADM** |
| **P093** | UNC Inspection & Modification Certificate | **ADM** |
| **P094** | UNC Engine Test Certificate | **ADM** |
| **P095** | UNC Inspection Parts Life Summary | **ADM** |
| **P096** | FAA Form 337 (2 pages) | **ADM** |
| **P097** | UNC Shipping Record 130064 (2 pages) | **ADM** |
| **P098** | UNC Invoice | **ADM** |
| **P099** | Era Accounts Payable Batch Report | **ADM** |

A.    **Plaintiff's Exhibit List** *(continued)*

| | | |
|---|---|---|
| **P100** | Era Check 213658 | **ADM** |
| **P101** | *intentionally blank* | – |
| **P102** | Shadrick USDA Helo Pilot Qualification Card | **ID** |
| **P103** | *intentionally blank* | – |
| **P104** | Shadrick FAA Certificate (front and back) | **ADM** |
| **P105** | Shadrick OAS Approval Record | **ADM** |
| **P106** | *intentionally blank* | – |
| **P107** | Shadrick Helo Pilot Qualifications and Approval Record | **ADM** |
| **P108** | Shadrick Certificate of Completion, Annual Recurrent Training | **ID** |
| **P109** | Corr, FAA Authorization as Check Pilot | **ID** |
| **P110** | Corr, ERA Request for Check Pilot Authorization | **ID** |
| **P111** | Corr, FAA Authorization as Check Pilot | **ID** |
| **P112** | Shadrick Certificate of Completion, BH412 Ground School | **ID** |
| **P113** | Shadrick Flight Safety Record of Training, BH412 | **ID** |
| **P114** | Shadrick FAR 135 Competency/Proficiency Record | **ID** |
| **P115** | Era Pilot Information Sheet | **ID** |
| **P116** | N174EH Weight Report (2 pages) | **ADM** |
| **P117** | N174EH Master Equipment List (6 pages) | **ADM** |
| **P118** | Bell 412 Flight Manual | **ADM** |
| **P119** | Bell 412 Flight Manual Supplement FMS-19.1 | **ADM** |
| **P120** | Bell 412 Flight Manual Supplement FMS-35.2 | **ADM** |
| **P121** | Bell 412 Flight Manual Supplement FMS-52.1 | **ADM** |
| **P122** | Bell 412 Checklists | **ADM** |
| **P123** | Helicopter Control Panel, drawing | **ID** |
| **P124** | N174EH Power Check Forms | **ADM** |
| **P125** | *intentionally blank* | – |
| **P126** | Pilot Duty and Flight Hours Log | **ADM** |
| **P127** | Helibase Flight Time Tracking Records | **ADM** |
| **P128** | Helibase Mission Request Logs | **ADM** |
| **P129** | Helibase Flight Following Logs | **ADM** |
| **P130** | Interagency Helicopter Passenger/Cargo Manifests | **ID** |
| **P131** | Helicopter Daily Use and Cost Summaries | **ADM** |
| **P132** | DOI Helicopter Load Calculation Book, Shadrick | **ADM** |
| **P133** | Load Calculations, N174EH | **ADM** |
| **P134** | Load Calculations, N174EH | **ADM** |
| **P135** | Load Calculation, N174EH (5,500 +30) | **ADM** |
| **P136** | Aircraft Contract Daily Diaries | **ADM** |
| **P137** | Aircraft Contract Daily Diaries | **ADM** |
| **P138** | Aircraft Contract Daily Diaries | **ADM** |

**A.      Plaintiff's Exhibit List** *(continued)*

| | | |
|---|---|---|
| **P139** | Aircraft Contract Daily Diaries | **ADM** |
| **P140** | Aircraft Contract Daily Diaries | **ADM** |
| **P141** | Aircraft Contract Daily Diaries | **ADM** |
| **P142** | Aircraft Contract Daily Diaries | **ADM** |
| **P143** | Aircraft Contract Daily Diaries | **ADM** |
| **P144** | Aircraft Contract Daily Diaries | **ADM** |
| **P145** | Aircraft Contract Daily Diaries | **ADM** |
| **P146** | Aircraft Contract Daily Diaries | **ADM** |
| **P147** | Aircraft Contract Daily Diaries | **ADM** |
| **P148** | Aircraft Contract Daily Diaries | **ADM** |
| **P149** | Aircraft Contract Daily Diaries | **ADM** |
| **P150** | Aircraft Contract Daily Diaries | **ADM** |
| **P151** | Aircraft Contract Daily Diaries | **ADM** |
| **P152** | Aircraft Contract Daily Diaries | **ADM** |
| **P153** | Aircraft Contract Daily Diaries | **ADM** |
| **P154** | USDA Forest Service Ops and Safety Procedures Guide | **ADM** |
| **P155** | Shadrick Pilot Certification (USFS) signed by Shadrick | **ADM** |
| **P156** | SAFECOM Aviation Safety Communique | **ADM** |
| **P157** | Bambi Bucket Manual | **ADM** |
| **P158** | ***intentionally blank*** | **–** |
| **P159** | PWC Overhaul Manual 3017043 | **ID** |
| **P160** | Drive Shaft (fractured) and components (actual) | **ADM** |
| **P161** | Larew exhibit, BlueBook | **ID** |
| **P162** | Larew exhibit, component time status | **ID** |
| **P163** | Larew exhibit, sales contract (AirLogistics) | **ID** |
| **P164** | Larew exhibit, sales contract (FAASA) | **ID** |
| **P165** | Larew exhibit, chart, fleet hours and revenue | **ID** |
| **P166** | Larew exhibit, shipping costs and employee expenses | **ID** |
| **P167** | Larew exhibit, summary of damages | **ID** |
| **P168** | Chart, Scanlan, Summary of facts and data | **ID** |
| **P169** | Chart, Scanlan, Flight path data | **ID** |
| **P170** | Chart, Scanlan, Terrain elevation | **ID** |
| **P171** | Chart, Scanlan, Analysis tasks | **ID** |
| **P172** | Chart, Scanlan, Height-velocity curve | **ID** |
| **P173** | Photos, Scanlan, Crash site | **ID** |
| **P174** | Chart, Scanlan, Chronology of events | **ID** |
| **P175** | Chart, Scanlan, Summary of conclusions | **ID** |
| **P176** | Rupert resume | **ID** |
| **P177** | Rupert, chart, assignments | **ID** |
| **P178** | Rupert, metallurgical mount (actual) | **ID** |

A.    **Plaintiff's Exhibit List** *(continued)*

| | | |
|---|---|---|
| **P179** | Rupert, SEM photos | **ID** |
| **P180** | Rupert, engine diagram line drawing | **ADM** |
| **P181** | Rupert, diagram, sprag clutch | **ADM** |
| **P182** | Rupert, diagram, engine cross-section | **ADM** |
| **P183** | Rupert, diagram, CGB cross-section | **ID** |
| **P184** | Rupert, chart, opinions re Ct disk | **ID** |
| **P185** | Rupert, photos of disk < Demers report | **ADM** |
| **P186** | Rupert, photos, hot corrosion damage | **ADM** |
| **P187** | Rupert, photos, hot corrosion damage | **ADM** |
| **P188** | Rupert, photos, hot corrosion damage | **ADM** |
| **P189** | Rupert, chart, maintenance history | **ID** |
| **P190** | Rupert, chart, opinions re drive shaft | **ID** |
| **P191** | Photos of disk, pitting | **ADM** |
| **P192** | Photos of disk, sulfur contamination | **ADM** |
| **P193** | Spectrograph analysis docs | **ID** |
| **P194** | CGB cross-section diagram | **ADM** |
| **P195** | Diagram, engine/component parts | **ADM** |
| **P196** | Diagram, engine/component parts | **ADM** |
| **P197** | Diagram, engine/component parts | **ADM** |
| **P198** | Diagram, engine/component parts | **ADM** |
| **P199** | Diagram, engine/component parts | **ADM** |
| **P200** | *intentionally blank* | – |
| **P201** | Diagram, engine/component parts | **ADM** |
| **P202** | Diagram, engine/component parts | **ADM** |
| **P203** | Diagram, engine/component parts | **ADM** |
| **P204** | Diagram, engine/component parts | **ADM** |
| **P205** | Diagram, engine/component parts | **ADM** |
| **P206** | Diagram, engine/component parts | **ADM** |
| **P207** | Diagram, engine/component parts | **ADM** |
| **P208** | Diagram, engine/component parts | **ADM** |
| **P209** | Diagram, engine/component parts | **ADM** |
| **P210** | Diagram, engine/component parts | **ADM** |
| **P211** | Chart, Stimpson, conclusions | **ID** |
| **P212** | Photo, fractured CT disk | **ID** |
| **P213** | FAR 14 CFR § 145.57 (1998) | **ID** |
| **P214** | CGB Log Book Records | **ADM** |
| **P215** | Sprag clutch, right | **ADM** |
| **P216** | PWC Training Manual, p. 4.5 | **ADM** |
| **P217** | Transcript, Deposition, Berthe, *excerpted* | – |
| **P218** | Transcript, Deposition, Demers *excerpted* | – |

**A.     Plaintiff's Exhibit List** *(continued)*

| | | |
|---|---|---|
| **P219** | Transcript, Deposition, Hanberg *excerpted* | – |
| **P220** | Transcript, Deposition, Neufeld *excerpted* | – |
| **P221** | Transcript, Deposition, Ortuso *excerpted* | – |
| **P222** | Transcript, Deposition, Walshe *excerpted* | – |
| **P223** | Transcript, Deposition, Manning, 040128 | – |
| **P224** | Transcript, Deposition, Manning, 050202 | – |
| **P225** | Transcript, Deposition, Morin | – |
| **P226** | Transcript, Deposition, Orloff | – |
| **P227** | Transcript, Deposition, Cheyne | – |
| **P228** | Transcript, Deposition, Albert | – |
| **P229** | Model, Bell 412 helicopter | **ADM** |
| **P230** | Master Bill of Sale (assignment) | **ID** |
| **P231** | Invoices and Payment Documents (1996) | **ID** |
| **P232** | Invoices and Payment Documents (1998) | **ID** |

Era Av 4EH/PO/WO Lg24175/20070323c

**B.      UNC Defendants' Exhibit List**

| Exhibit No. | Brief Description of Document | Discovery Doc. No. | Identified | Admitted | With-drawn |
|---|---|---|---|---|---|
| No. D-1. | LIST OF WORK ORDERS | DAI – 1 | | ADM | |
| No. D-2 (Now P-2 & 3A) | WORK ORDER F-07705 | DAI – 2-14 | | ADM | |
| No. D-3 | WORK ORDER F-09113 | DAI – 15-133, 136-185, 334-369 | | ADM | |
| No. D-4 | DAI MANUAL-MIAMI-RC3R810L | DAI – 186-285 + [NON BATES PAGES] | | ADM | |
| No. D-5 (now P-16) | DAI PROCESS INSTRUCTION PI 002/384/1 | DAI – 329-333 | | ADM (ONLY IF RED TAB ORDER DISTURBED) | |
| No. D-6 | PWC OVERHAUL MANUAL PAGES | | | ADM | |
| No. D-7 | INTENTIONALLY LEFT BLANK | | | | |
| ~~No. D-8~~ (Now P-9A) | EX. 9 TO WALSHE | PWC SB# 5048 | | ADM | |
| ~~No. D-9~~ (Now P-25) | EX. 6 TO WALSHE | PWC CRITICAL & ROTATING COMPONENTS BLEND SPEC | | ADM ~~(ONLY IF RED TABL ORDER DISTURBED~~ | |
| ~~No. D-10~~ (Now P-86) | PWC LETTER – 12/9/94 | TO WHOM IT MAY CONCERN LETTER RE DAI AS AMC | | ADM | |
| No. D-11 | PERSONNEL RECORDS | DAI PERSONNEL | | ADM | |

**B.      UNC Defendants' Exhibit List** *(continued)*

| No. D-12 | ERA MAINTENANCE RECORDS FOR N174EH | PWC 50-207 | | ADM | |
|---|---|---|---|---|---|
| No. D-13 (Now P-154) | USDA FOREST SERVICE OPERATIONS AND SAFETY GUIDE | PWC 208-220 | | ADM | |
| No. D-14 | INTENTIONALLY LEFT BLANK | | | | |
| No. D-15 | ERA N174EH – AIRCRAFT LOGS | ERA 2764-3423 PWC 253-305 | | ADM | |
| No. D-16 (Now P-126) | CREW DUTY – LOG | PWC 587 | | ADM | |
| No. D-17 | INTENTIONALLY LEFT BLANK | | | | |
| No. D-18 (Now P-136-153) | ERA CONTRACT DAILY DIARY | PWC 611-621, 626-634 | | ADM | |
| No. D-19 | ECTM PROGRAM DATA | | | ADM | |
| No. D-20 (Now P-17B) | PWC REPORT | | | ADM | |
| No. D-21 (Now P-3-B) | PWC METALLURGICAL LABORATORY REPORT | NO. 11937FS | | ADM | |
| No. D-22 | PT 6T – 3/3B DESCRIPTIVE NOTES | | | ADM | |
| No. D-23 | DRAWINGS – CT. DISK AND BLADES | PWC 1715-1722 | | ADM | |
| No. D-24 | CPW 203 – REVISION R WASPALOY | PWC 1782-86 | | ADM | |

**B.      UNC Defendants' Exhibit List** *(continued)*

| | | | | |
|---|---|---|---|---|
| No. D-25 | ERA EMAILS | ERA 88-91, 93, 111-114 | ID | |
| No. D-26 | USAU ACCIDENT SCENE REPORT | ERA 232-236 | ID | |
| No. D-27 | RELEASE | ERA 239 | ID | |
| No. D-28 (Now P-118-122) | BELL MANUAL | ERA 408-720 | | ADM |
| No. D-29 | CARGO/HOOK LOG | ERA 1281 | | ADM |
| No. D-30 | COMPONENT TIMES | ERA 1282 | | ADM |
| No. D-31 | INTENTIONALLY LEFT BLANK | | | |
| No. D-32 | SHADRICK MED. CERTIFICATES | ERA 1836-37 | | ADM |
| No. D-33 | ANNOTATED PT6T3B MANUAL | ERA 1884-2124 | | ADM |
| No. D-34 | ERA MANUAL | ERA 1365-1815 | | ADM |
| No. D-35 | ERA TRAINING MANUAL | ERA 2374-2596 | ID | |
| No. D-36 | NTSB REPORT | ERA 16681-16698 | ID | |
| No. D-36A | NTSB REPORT PHOTO | | ID | |
| No. D-37 | PHOTOS | ERA 4681-4687, 7147 | | ADM |
| No. D-38 | PHOTOS | ERA April 2003 (No Bates Numbers) | | ADM |
| No. D-39 | ERA MAINTENANCE MANUAL | | | ADM |

**B.      UNC Defendants' Exhibit List** *(continued)*

| | | | | | |
|---|---|---|---|---|---|
| No. 40 | MITCHELL EMAIL | ERA 12021-12024 | | ADM | |
| No. D-41 | FORM 337 (3/6/98) | ERA 16926-28 | | ADM | |
| No. D-42 | BUCKET INVENTORY | ERA 10504-10507 | ID | | |
| No. D-43 | FIRE DEPLOYMENT CHECKLIST | ERA 10500-10503 | | ADM | |
| No. D-44 | SLING LOADS MANUAL | ERA 7274-7350 | ID | | |
| No. D-45 | ERA OPERATIONS MANUAL | REV. 33 15-1-15-36 | | ADM | |
| No. D-46 | ERA EXTERNAL LOAD POWERPOINT | ERA 2-135 – 1-212 | ID | | |
| No. D-47 (Now P-157) | BAMBI MANUAL | ERA 2-61 | | ADM | |
| No. D-48 | ERA TRAINING SCHEDULE | ERA 2-1 – 2-56 | | ADM | |
| No. D-49 (Now P-3C) | HANDBERG STATEMENT | ERA 8614 | | ADM | |
| No. D-50 (Now P-4B) | HANDBERG STATEMENT | ERA 8615-16 | | ADM | |
| No. D-51 | EMAIL REGARDING ALTITUDE | (PWC 598) | ID | | |
| No. D-52 | EMAIL REGARDING TORQUE | (PWC 597) | ID | | |
| No. D-53 | AUTOPSY | | ID | | |
| No. D-54 | SIDLA REPORT | (PWC 403) | ID | | |
| No. D-55 | DOI – ACCIDENT REVIEW | | ID | | |
| No. D-56 | DOI AVIATION SAFETY REVIEW | | ID | | |
| No. D-57 | ERA PRESENTATIONS | ERA 4536-53 AND UNNUMBERED | ID | | |
| No. D-58 | FAA REPORT OF ACCIDENT | | ID | | |

**B.      UNC Defendants' Exhibit List** *(continued)*

| | | | | |
|---|---|---|---|---|
| No. D-59 | WRECKAGE DISTRIBUTION CHART | | ADM | |
| No. D-60 | COMPUTER MODEL OF BELL MODEL 412 HELICOPTER | KENNETH ORLOFF REPORT | ADM[4] | |
| No. D-61 | DIAGRAM OF FLIGHT PATH OF N174EH, SHOWING VANTAGE POINT OF EYEWITNESSES | ORLOFF REPORT | ADM | |
| No. D-62 | DIAGRAM OF RECONSTRUCTED VIEW OF N174EH FROM THE BUS | ORLOFF REPORT | ADM | |
| No. D-63 | DIAGRAM OF N174EH'S DESCENT AFTER THE POWER LOSS | ORLOFF REPORT | ADM | |
| No. D-64 | DIAGRAM OF MODEL 3542 BAMBI BUCKET | ORLOFF REPORT | ADM | |
| No. D-65 | DIAGRAM OF N174EH UPON ENTANGLEMENT OF BAMBI BUCKET IN THE TREE | ORLOFF REPORT | ADM | |
| No. D-66 | DIAGRAM OF N174EH NOSE-DOWN IMPACT | ORLOFF REPORT | ADM | |
| No. D-67 | PHOTOS OF BAMBI BUCKET CARGO HOOK | | ADM | |
| No. D-68 | PHOTOS OF ELECTRICAL RELEASE FOR N174EH CARGO HOOK | | ADM | |
| No. D-69 | ERA CONTRACT – PIERSON EXHIBIT | ERA 722-941 | ADM | |
| No. D-70 | FAA PHOTOS | | ADM | |
| No. D-71 | DR. MANNING PHOTOS (SEM AND WRECKAGE) | | ADM ( SEM, WRECKAGE PHOTOS MUST BE REVIEWED) | |

---

4      Plaintiff agrees to admission of Ex. D60-D68 so long as the exhibits are discussed in the direct testimony of Dr. Orloff.

**B.      UNC Defendants' Exhibit List** *(continued)*

| | | | | | |
|---|---|---|---|---|---|
| No. D-72 | DISK PHOTOS | | | ADM | |
| No. D-73 | INTENTIONALLY LEFT BLANK | | | | |
| No. D-74 (Now P-132-135) | HELICOPTER LOAD CALCULATIONS | | ID | | |
| No. D-75 | INTERAGENCY HELICOPTER OPERATIONS GUIDE | | ID | | |
| No. D-76 | SEI BUCKET DATA | | ID | | |
| No. D-77 | PWC REPORT TPC 3639 SERIAL NO. 6281 | | ID | | |
| No. D-78 | N 399 EH – REPORT | | ID | | |
| No. D-79 | MATERIAL ROUTING FORM | | ID | | |
| No. D-80 (Now P-229) | HELICOPTER SCALE MODEL | | | ADM | |
| No. D-81 (Now P-80) | EXEMPLAR CT DISK | | | ADM | |
| No. D-82 | EXEMPLAR CT BLADE | | | ADM [IF SAME PART NO.] | |
| No. D-83 | EXEMPLAR BAMBI BUCKET AND/OR CABLES | | | ADM [IF SAME PART NO.] | |
| No. D-84 | COCKPIT MOCK UP WITH EXEMPLAR FLIGHT CONTROLS | | ID | | |
| No. D-85 | PROOF OF PAYMENT TO ERA FOR HULL LOSS | | ID | | |

**B.     UNC Defendants' Exhibit List** *(continued)*

| | | | | |
|---|---|---|---|---|
| No. D-86 | MANNING –CHART HEADED RUPTURE STRENGTH (WASPALOY) | | | ADM[5] |
| No. D-87 | MANNING – GRAPH HEADED HISTOGRAM OF RADIAL GROWTH COMPRESSOR TURBINE DISK | | | ADM |
| No. D-88 | MANNING – HAND DRAWN DIAGRAM | | | ADM |
| No. D-89 | MANNING – DOCUMENT HEADED CT DISK MEASUREMENTS | | | ADM |
| No. D-90 (Now P-6B) | MANNING – DOCUMENT | BATES NUMBERED 1773 TO 1776 | | ADM |
| No. D-91 | INTENTIONALLY LEFT BLANK | | | |
| No. D-92 | MANNING –SERVICE INFORMATION LETTER FOR ALL PT6A ENGINES | | | ADM |
| No. D-93 | MANNING – SPECIFICATION CPW 203 | BATES NUMBERED BY PRATT 1782 TO 1897 | | ADM |
| No. D-94 | MANNING – PORTIONS OF PRATT & WHITNEY MAINTENANCE AND OVERHAUL MANUALS | | ID | |
| No. D-95 | MANNING – DOCUMENT HEADED THE AIRCRAFT GAS TURBINE ENGINES AND ITS OPERATIONS | | | ADM |

---

[5]     Plaintiff agrees to the admission of Ex. D86-D89 and D92-D95 so long as the exhibits are discussed in the direct testimony of Dr. Manning.

**B.      UNC Defendants' Exhibit List** *(continued)*

| | | | | |
|---|---|---|---|---|
| No. D-96 | TRANSCRIPT – DEPOSITION DESIGNATIONS - HERBERT[6] | | ID | |
| No. D-97 | TRANSCRIPT; DEPOSITION – COLE – DESIGNATIONS | | ID | |
| No. D-98 | TRANSCRIPT; DEPOSITION – LAPTHORNE – DESIGNATIONS | | ID | |
| No. D-99 | TRANSCRIPT ; DEPOSITION – ORDER – DESIGNATIONS | | ID | |
| No. D-100 | TRANSCRIPT; DEPOSITION – YOUNG – DESIGNATIONS | | ID | |
| No. D-101 | TRANSCRIPT; DEPOSITION – RAUCH – DESIGNATIONS | | ID | |
| No. D-102 | TRANSCRIPT; DEPOSITION – CORNEJO – DESIGNATIONS | | ID | |
| No. D-103 | TRANSCRIPT; DEPOSITION – BAKER – DESIGNATIONS | | ID | |
| No. D-104 | TRANSCRIPT – ENTIRETY FOR CROSS EXAMINATION/ IMPEACHMENT – STIMPSON | | ID | |
| No. D-105 | TRANSCRIPT – ENTIRETY FOR CROSS EXAMINATION/ IMPEACHMENT – COX | | ID | |

---

[6]      The entire deposition is designated except for the testimony that has strikeouts through the lines.

**B.** **UNC Defendants' Exhibit List** *(continued)*

| | | | | |
|---|---|---|---|---|
| No. D-106 | TRANSCRIPT ENTIRETY FOR CROSS-EXAMINATION/ IMPEACHMENT – LAREW | | ID | |
| No. D-107 | TRANSCRIPT – ENTIRETY FOR CROSS-EXAMINATION/ IMPEACHMENT – RUPERT | | ID | |
| No. D-108 | TRANSCRIPT – ENTIRETY FOR CROSS EXAMINATION/ IMPEACHMENT – SCANLAN | | ID | |
| No. D-109 | TRANSCRIPT – ENTIRETY IF COURT REVISES ORDERS REGARDING RED TAG – WASHINGTON | | ID | |
| No. D-110 | TRANSCRIPT – ENTIRETY IF COURT REVISES ORDERS REGARDING RED TAG – LIMA | | ID | |
| No. D-111 | TRANSCRIPT – CROSS DESIGNATIONS – WALSHE | | ID | |
| No. D-112 | TRANSCRIPT – CROSS DESIGNATIONS – HANBERG | | ID | |
| No. D-113 | TRANSCRIPT – CROSS DESIGNATIONS – BENNETT | | ID | |
| No. D-114 | DALLAS RESERVES THE RIGHT TO MAKE OFFERS OF PROOF AT TRIAL AS TO TESTIMONY IT WOULD HAVE OFFERED BY DEPOSITION HAD THE COURT NOT EXCLUDED CERTAIN AREAS OF TESTIMONY THROUGH ITS PRETRIAL RULINGS | | | |

C.      **Defendant PWC's Exhibit List**

| | | |
|---|---|---|
| **D200** | Crash site | **ADM** |
| **D201** | PWC Illustration Combining Gear Box | **ADM** |
| **D202** | PWC Illustration Internal Technical Configuration | **ADM** |
| **D203** | PWC Illustration Sprag Clutch Inside View | **ADM** |
| **D204** | Sprag Clutch – 37742-03A | **ADM** |
| **D205** | Sprag Clutch – 33742-10A | **ADM** |
| **D206** | Sprag Clutch – 37742-08A | **ADM** |
| **D207** | Sprag Clutch – 37742-12A | **ADM** |
| **D208** | Sprag Clutch – 37741-07A | **ADM** |
| **D209** | Sprag Clutch – 37741-16A | **ADM** |
| **D210** | Sprag Clutch - 37741-17A | **ADM** |
| **D211** | Intermediate Drive Shaft – 37741-31A | **ADM** |
| **D212** | Intermediate Drive Shaft – 37741-32A | **ADM** |
| **D213** | Intermediate Drive Shaft – 37741-33A | **ADM** |
| **D214** | Intermediate Drive Shaft – 37741-35A | **ADM** |
| **D215** | Intermediate Drive Shaft – 37741-19A | **ADM** |
| **D216** | Intermediate Drive Shaft – 37741-20A | **ADM** |
| **D217** | Outer Race of Clutch - 37742-13A | **ADM** |
| **D218** | Outer Race of Clutch  - 37742-32A | **ADM** |
| **D219** | Outer Race of Clutch - DSCO 3761 | **ADM** |
| **D220** | Outer Race of Clutch – 33742-26A | **ADM** |
| **D221** | Outer Race of Clutch – 33742-16A | **ADM** |
| **D222** | Outer Race of Clutch – 33743-34A | **ADM** |
| **D223** | Outer Race of Clutch – DSCO 3770 | **ADM** |
| **D224** | Shanks of the bolt - 37742-24A | **ADM** |
| **D225** | Retainer Plate holes - 37743-07A | **ADM** |
| **D226** | Retainer Plate holes - 37743-13A | **ADM** |
| **D227** | Wear and fretting between the shim plate - 37743-15A | **ADM** |
| **D228** | Chip Detector – 337742-34A | **ADM** |
| **D229** | Chip Detector – 37742-35A | **ADM** |
| **D230** | Chip Detector – 37741-23A | **ADM** |
| **D231** | Chip Detector – 33741-24A | **ADM** |
| **D232** | Chip Detector – 33741-27A | **ADM** |
| **D233** | Chip Detector – 33741-28A | **ADM** |
| **D234** | Clutch Gear – Cad Overlay.jpg | **ADM** |
| **D235** | TPC-3324 PWC Rocky Mountain Report | **ADM** |
| **D236** | TPC-3585: PWC Sri Lanka Report | **ADM** |
| **D237** | LP 38/97 PWC  TSB Canada Report | **ADM** |
| **D238** | ERA (M. Jones) Power Point (ERA 4550-4555) | **ID** |
| **D97** | *Transcript, T. Cole Deposition Designated* | **ID** |
| **D98** | *Transcript, G. Lapthorne* | **ID** |
| **D99** | *Transcript, R. Oeder Deposition Designated* | **ID** |

**C.     Defendant PWC's Exhibit List** *(continued)*

| | | |
|---|---|---|
| **D100** | *Transcript, R. Young Deposition Designated* | **ID** |
| **D101** | *Transcript, Rauch Deposition Designated* | **ID** |
| **D103** | *Transcript,  Baker Deposition Designated* | **ID** |
| **D102** | *Transcript, Cornejo Deposition Designated* | **ID** |
| **D250** | Transcript, Tony Davis, Designated | **ID** |
| **D251** | Transcript, Larew Deposition, Designated | **ID** |
| **D252** | Transcript,  T. Bennett (9.30.2003) Designated | **ID** |
| **D253** | Transcript,  T. Bennett I & II  (8.12-13.2004) Designated | **ID** |
| **D254** | Transcript,   ERA 30 B 6 (Terry Bennett) Designated | **ID** |
| **D255** | Transcript,   ERA 30 B 6 (Mark Jones) Designated | **ID** |
| **D256** | Transcript,   Cliff Mitchell (Designated | **ID** |
| **D260** | Transcript, Scott Ellis, Offer Of Proof, Issue Preservation | **ID** |
| **D261** | Transcript, B. Juechester, Offer Of Proof, Issue Preservation | **ID** |
| **D262** | NTSB  Blue Ribbon Report | **ID** |

Era Av 4EH/PO/WO Lg24175/20070323c

## APPENDIX "G"
### Joint Witness List

## A.     Plaintiff.

### 1.     Shall Be Called:

    a.     **Ms. Anna Goss**
         Fact witness (*assignment of claims to Era Helicopters, LLC*)
         CFO of Era Helicopters, LLC
         Houston, TX

    b.     **Mr. Les Hanberg**
         Subject to availability
         Otherwise by videotaped deposition
         Fact witness (*eyewitness*)
         Anchorage, AK

    c.     **Mr. Mark Jones**
         Fact witness (*maintenance and investigation*)
         Former V.P. Maintenance, Era Aviation, Inc.
         Current residence address unknown

    d.     **Mr. Gus Lapthorne**
         Fact witness (*helicopter operation and training*)
         Former Director of Operations, Era Aviation, Inc.
         Current residence address unknown

    e.     **Mr. Thomas Berthe**
         By videotaped deposition
         Fact and expert witness (*accident investigation*)
         Employee of defendant PWC
         Montreal, Quebec, Canada

    f.     **Ms. Jutta Demers**
         By videotaped deposition
         Fact and expert witness (*materials analysis*)
         Employee of defendant PWC
         Montreal, Quebec, Canada

Era Av 4EH/PO/WO Lg24175/20070323c

g.  **Mr. Weldon Walshe**
    By videotaped deposition
    Fact witness (*UNC 30(b)(6) designee*)
    Employee of defendant UNC Airwork
    Current residence address unknown

h.  **Donald O. Cox, Ph.D., P.E.**
    Expert witness (*metallurgy*)
    Los Angeles, California

i.  **Mr. David S. Rupert**
    Expert witness (*mechanical engineer*)
    Victoria, British Columbia, Canada

j.  **Lawrence A. (Larry) Scanlan, Ph.D.**
    Expert witness (*human factors*)
    Manhattan Beach, California

k.  **Mr. Douglas R. Stimpson**
    Expert witness (*piloting, maintenance, accident reconstruction*)
    Broomfield, Colorado

l.  **Mr. Richard (Lash) Larew**
    Expert witness (*damages*)
    Former employee of Era Aviation, Inc.
    Current residence address unknown

2.  <u>May Be Called:</u>

    a.  **Mr. Terry Bennett**
        Fact witness (*investigation*)
        Former Vice President, Era Aviation, Inc.
        V.P. Operations, Era Helicopters, LLC
        Anchorage, AK

    b.  **Mr. Frank "Bob" Culver**
        Fact witness (*helicopter operation and training*)
        Former Chief Pilot, Era Aviation, Inc.
        Gilber, Arizona

3.    Unlikely To Be Called:

    a.    **Mr. George Neufeld**
        By videotaped deposition
        Fact witness (*accident investigation*)
        Employee of defendant PWC
        Montreal, Quebec, Canada

    b.    **Mr. Ron Ortuso**
        By videotaped deposition
        Fact witness (*accident investigation*)
        Employee of defendant PWC
        Montreal, Quebec, Canada

    c.    **Mr. Brian Blixhavn**
        Fact witness (*CWN contract*)
        Former employee, Era Aviation, Inc.
        Current residence address unknown

    d.    **Mr. Tony Davis**
        By videotaped deposition
        Fact witness (*mission oversight*)
        USFS Helibase Manager
        Current residence address unknown

    e.    **Mr. Cliff Mitchell**
        Fact witness (*accident investigation*)
        Former employee, Era Aviation, Inc.
        Current residence address unknown

    f.    **Mr. Rick Oeder**
        Fact witness (*helicopter operation and training*)
        Former Director of Ops., Era Aviation, Inc. (Gulf Coast)
        Current residence address unknown

    g.    **Mr. Terry Cole**
        Fact witness (*helicopter operation and training*)
        Former Chief Pilot, Era Aviation, Inc.
        Current residence address unknown

**B.      Defendants UNC / DAI.**

1.      Shall Be Called:

a.      **Terry Bennett** - Era's Vice President of Safety.  Will testify to the investigation of the accident, his inspection of the accident site, the debris field, the recalculation of the weight and balance figures for the flight, and related topics.

b.      **Thomas Berthe** - PWC engineer/investigator, will discuss engine teardown, conclusions regarding failure mode, past experience with similar parts, components and other engine failures.

c.      **Ian Cheyne** - DAI V.P., Engineering.  Opinions regarding why the CT disk failed, how the ERA pilots abused the engine and caused parts to fail prematurely, background on DAI    generally.    Fact witness and expert witness.

d.      **Terry Cole** - ERA chief pilot.  ERA training program, operations manual for 412 and fire suppress operations, oversight of pilot Shadrick, prior accidents.

e.      **Tony Davis** - Department of Interior Manager for Fire Suppression Operations.   Procedures at accident site, contract with ERA, repeated demands on ERA to provide a smaller water bucket, prior ERA accident.

f.      **Jutta Demers** - PWC metallurgist.  Opinions regarding failure mode of engine components.

g.      **Robert Galloway** - OAS Aviation Safety Manager.  Will testify about  (1) OAS's statutory mandate to investigate accidents; (2) the OAS's investigation of the Cold Springs Accident; (3) Galloway's personal investigation of the accident site, including his eyewitness interviews.

h.      **Les Hamberg** - Pilot at accident site.   Observations of accident helicopter on accident flight.

i.      **Weldon Walshe** – DAI Manager.  Will testify regarding maintenance of subject engine.

j.      **Mark Jones** - Era Vice President of Maintenance.   Will testify regarding the work done by UNC Airwork for Era, the maintenance and repair of the accident helicopter, the DOI contract with Era, Era's investigation of the accident, the employment of the Waldron labs, the preparation of internal power point presentations regarding the accident, and related topics.

k.      **Gus Lapthorne** - Era Director of Operations.  Will testify regarding the training of Era pilots for regular operations and fire-fighting operations, Mr. Shadrick's responsibilities for documenting information during fire-fighting operations, load calculations, operations at the accident site, requirements pursuant to the DOI contract, and related topics.

l.      **Mike Cumnock** – DAI V.P. Customer Relations   Testimony regarding DAI procedures, Miami facility personnel, training, work performed by DAI on subject engine OEM requirements.

m.      **Dr. Charles Manning** - Expert metallurgist and engineer.   Will address cause of failure of CT         disk, engine abuse, hot start, sulfidation, overtorquing.

n.      **Clifford Mitchell** - ERA accident investigator.  Will provide details of accident site and investigation.

o.      **Rick Oeder** - Director of Operations for Era, Gulf Coast division. Will testify regarding Era's training procedures and history of prior accidents, the DOI power point presentation, and related topics.

p.      **Kenneth Orloff** - Expert accident reconstruction, helicopter pilot. Will describe flight path, accident sequence, failure mode of bucket hardware/cargo hook.

q.      **Ronald Ortuso** - Pratt & Whitney's Manager of Service Investigation Department.  Will testify regarding Pratt's investigation of the accident, the cause of the accident, and related topics.

r.      **Steven Rauch** - Department of Interior accident investigator.

s.      **Thomas Young** - Director of Maintenance for Era, Gulf Coast division.  Testified regarding the chain of custody for the helicopter records, the use of the accident helicopter out of the Gulf Coast division, the condition of the helicopter before the accident, and condition of the bucket jettison switch.

- 126 -

t.    **Tealeye Cornejo** – NTSB Investigator who will testify to her factual reports.

u.    **Cullen Baker** – ERA mechanic.  Will testify to his background, skills, education, ordering of equipment, pilot's use of buckets.

v.    **Mike Snellgrove** – DAI program manager.  Will testify to procedures, training, manuals, work performed.


2.    <u>May Be Called:</u>  None.


3.    <u>Unlikely To Be Called:</u>  None.

## C.     Defendant PWC.

### 1.     Shall Be Called:

a.     **Thomas Berthe** (Deposition)
By videotaped deposition
Fact and expert witness (*accident investigation*)
Employee of defendant PWC
Montreal, Quebec, Canada

b.     **Jutta Demers** (Deposition)
By videotaped deposition
Fact and expert witness (*accident investigation*)
Employee of defendant PWC
Montreal, Quebec, Canada

c.     **Tony Davis** (Deposition)
By videotaped deposition
Fact witness (*mission oversight*)
USFS Helibase Manager
Current residence address unknown

d.     **Robert Galloway** (Deposition)
By videotaped deposition
Fact and expert witness (*accident investigation*)
Employee of DOI

e.     **Steve Rauch**   (Deposition)
By videotaped deposition
Fact and expert witness (*accident investigation*)
Employee of DOI

f.     **Charles Morin**, Expert (Live Per Approved Script)

g.     **Vernon Albert** Expert (Live Per Approved Script)

h.     **Terry Bennett** (Deposition)

i.     **Cliff Mitchell** (Deposition)
Fact witness (*maintenance and investigation*)
Former Director of Safety , Era Aviation, Inc.
Current residence address unknown

- 128 -

j.      **ERA 30 B6** (Bennett and Jones) (Depositions)

Mark Jones
Fact witness (*maintenance and investigation*)
Former V.P. Maintenance, Era Aviation, Inc.
Current residence address unknown

Terry Bennett
Fact witness (*investigation*)
Former Vice President, Era Aviation, Inc.
Current residence address unknown

k.      **R.Larew** (Deposition)
Expert witness (*damages*)
Former employee of Era Aviation, Inc.
Current residence address unknown

l.      **C. Baker** (Deposition)
Fact witness (*liability*)
Former employee of Era Aviation, Inc.
Current residence address unknown

m.      **Les Hanberg**
By videotaped deposition
Fact witness (*eyewitness*)
Camrose, Alberta, Canada


2.      <u>May Be Called:</u>


a.   **Brett Juchester** (Deposition)

Fact Witness

b.   **Tealeye Conejo**  (Deposition)

NTSB Investigator

c.   **Scott Ellis**   (Deposition)

Fact Witness


3.      <u>Unlikely To Be Called:</u>  None.

Era Av 4EH/PO/WO Lg24175/20070323c

## CERTIFICATE OF SERVICE

*Era Helicopters, LLC v. UNC Airwork Corp. et al.*
D.Alaska Case No. A02-0131 CV (JKS)

[XXXX]    I hereby certify that on     **March  23 , 2007**    ,
I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

| For Defendants UNC Airwork Corp. and Dallas Airmotive, Inc. | For Defendant Pratt & Whitney Canada Corp. |
| --- | --- |
| David A. Devine, Esq. | William F. Brattain II |
| Ken Eggers, Esq. | BAKER BRATTAIN, L.L.C. |
| GROH EGGERS, LLC | N Street Plaza |
| 3201 C Street, Suite 400 | 821 N Street Suite 101 |
| Anchorage, AK  99503 | Anchorage, AK  99501 |
| Tel. (907) 562-6474 | Tel. (907) 277-3232 |
| Fax (907) 562-6044 | Fax (907) 272-4850 |
| EMail *devined@groheggers.com* | EMail *brattain@bakerbrattain.com* |
| *wardm@groheggers.com* | *williamfbrattain@hotmail.com* |

s/ Jeffrey J. Williams

Jeffrey J. Williams, Esq.
LAW OFFICES OF JON A. KODANI

**Attorneys for Plaintiff**
**Era Aviation, Inc.**

2200 Michigan Avenue
Santa Monica, CA 90404-3906
Tel: (310) 453-6762
Fax: (310) 829-3340
**Email: *lojak@kodanilaw.com***

Era Av 4EH/PO/WO Lg24175/20070323c